## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Emily Evans and Melanie Welch,

      Plaintiffs,

vs.                                     Civil Action No.:      -440
                                         Hon.

The City of Ann Arbor, James Worthington, in his
official and individual capacities, Craig Strong,
in his official and individual capacities, Meadowlark
Builders LLC, Douglas Selby, Kirk Brandon, Dave
Anderson, Harry Ramsden, Tina Roperti, Michigan Quality
Electric, Derek Tuck, David Giles, Rob McCrum, Arbor
Insulation, Meadowlark Energy, Robert Patterson,
Matthew Krichbaum, in his official and individual capacities,
Property Management Specialists, Inc., Howard and Howard
Attorneys, PLLC, Brandon J. Wilson, Esq., Judge Timothy Connors,
in his official capacity only, and the Hon. Carol Kuhnke,
Chief Judge of the Washtenaw County Circuit Court,
in her official capacity only,

      Defendants, Jointly and Severally.

_____/

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
Attorney for Plaintiffs

_____/

## **COMPLAINT AND JURY DEMAND**

    **NOW COME** Emily Evans and Melanie Welch, by and through their attorney Marc M.

Susselman, pursuant to the First, Fifth and Fourteenth Amendments of the United States

Constitution, 28 U.S.C. §2201, and 42 U.S.C. §§ 1983 and 1988, seeking declaratory and

injunctive relief, and compensatory, exemplary and punitive damages against certain of the

named Defendants, jointly and severally, and in support of the Complaint state:

## PRELIMINARY STATEMENT

This lawsuit involves allegations of fraud upon the court and subornation of perjury and is brought pursuant to Fed. R. Civ. P. 60(b)(3) and (6), and MCR 2.612(C)(3). Plaintiff, Emily Evans, alleges that a judgment was entered against her in the Washtenaw County Circuit Court by Judge Timothy Connors, granting Defendant Meadowlark Builders, LLC, a construction lien on Plaintiff's property based on a void contract which the Michigan Department Of Licensing And Regulatory Affairs had determined violated the Michigan Occupational Code and with respect to which Meadowlark had signed a Consent Order stipulating that the contract violated Michigan law, and based on sworn statements filed with the Court by Meadowlark that asserted that Meadowlark and its subcontractors had performed work on Evans' property which had not been performed and/or had been done improperly, a judgment which was therefore obtained by a fraud upon the court, aided and abetted by Meadowlark's attorney and inspectors employed by the City of Ann Arbor who filed documents with the City stating that work had been done which they had not inspected and/or stating that work had been done which they had inspected but had determined had not been done, and that by virtue of these actions the City committed a taking of Evans' property without just compensation, in violation of the Fifth Amendment of the United States Constitution, and Evans was deprived of her property without due process of law and in violation of her procedural and substantive due process rights under the Fourteenth Amendment, and thereby in violation of 42 U.S.C. §1983. Plaintiff Welch is Evans' mother and has prudential standing to be a plaintiff in this lawsuit. A non-party may bring a claim of fraud on the court. *See Southland v. Irons,* 628 F.2d 978 (6th Cir. 1980); *Root Ref. Co. v. Universal Oil Products Co.,* 169 F.2d 514 (3d Cir. 1948), *cert denied,* 335 U.S. 912 (1949).

Plaintiffs further allege that the Washtenaw County Circuit Court, Judge Connors presiding, violated Evans' First Amendment right to petition the government for a redress of grievances and of access to the courts, as well as her procedural due process rights under the Fourteenth Amendment, by failing to allow Evans a reasonable amount of time to retain a new attorney when her then attorney failed to appear for trial, and Judge Connors proceeded to conduct a jury trial without Evans being represented by an attorney, at the conclusion of which Judge Connors entered a default judgment against Evans and ruled that the lien which Meadowlark had imposed on Evans' home was a valid construction lien and authorized foreclosure on Evans' home, when, as a matter of fact and law, the construction lien violated the Michigan Construction Lien Act, MCL 570.1101, *et seq.,* because it exceeded the balance due under the contract; because the lien included the cost for work which Meadowlark had not performed; because the Michigan Department of Licensing and Regulatory Affairs had ruled that the contract violated the Michigan Occupational Code, which Meadowlark admitted by agreeing to a Consent Order to that effect, and which therefore by operation of law was void and unenforceable; and because it was obtained by fraud.  *See* MCL 570.1107(1); *Jaenicke v. Davidson,* 290 Mich. 298 (Mich. 1939); *Mahoney v. Lincoln Brick Co.,* 304 Mich. 694 (Mich. 1943); *Vugterveen Systems v. Olde Millpond,* 454 Mich. 119 (Mich. 1997); *Ronnisch Constr. Grp., Inc. v. Lofts on the Nine, LLC,* 499 Mich. 544 (Mich. 2016); *Erb Lumber, Inc. v. Gidley,* 234 Mich. App. 387 (Mich. Ct. App. 1999).

Judge Connors thereafter appointed a receiver, Defendant Krichbaum, to oversee Evans' property and recover funds in order to pay the judgment.  In the process of the receivership, Krichbaum contracted with a property management company to lease another home owned by Evans to tenants, who damaged the property.  Despite requests that Krichbaum and/or the

property management company account for any rental receipts obtained from the tenants, Krichbaum has failed and refused to do so, in violation of MCL §554.1022(3)(a) and/or (b), and MCR 2.622(D)(4) and (6).

Plaintiffs accordingly request that the judgment which was obtained by a fraud upon the Washtenaw County Circuit Court be vacated *ab initio* and that, after a jury trial, judgment be entered in favor of Evans and that she be awarded compensatory, exemplary and punitive damages, as well as reasonable attorney fees, against the Defendants, and that a declaratory judgment be entered declaring that Judge Connors violated Evans' constitutional rights and an injunction be entered requiring that the Chief Judge of the Washtenaw Circuit Court take steps to insure that such conduct not be repeated against any future litigants. Such declaratory and injunctive relief is not barred by the 11th Amendment, since no monetary damages are sought against Judge Connors or the Hon. Carol Kuhnke, who are immune from suit for monetary damages, but who are subject to declaratory and future injunctive relief as persons under 42 U.S.C. §1983. *Ex parte Young,* 209 U.S. 123 (1908).

This lawsuit is not precluded by the *Rooker-Feldman* doctrine because it is based on injuries inflicted on Evans separate and apart from the judgment itself. *See Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280 (2005); *Hazel-Atlas Co. v. Hartford Co.,* 322 U.S. 238 (1944); *Simon v. Southern Railway,* 236 U.S. 115 (1915); *McCormick v. Braverman,* 451 F.3d 382 (6th Cir. 2006); *Coles v. Granville,* 448 F.3d 853 (6th Cir. 2006). In addition, although Evans, proceeding *pro se,* appealed the judgment to the Michigan Court of Appeals, which affirmed the judgment, and the Michigan Supreme Court denied leave to appeal, the central issue of this lawsuit, whether the Defendants committed fraud, has never been adjudicated, because Judge Connors denied Evans' motion to amend her Counter-Complaint to include counts

alleging fraud.   Consequently, neither the doctrine of *res judicata,* nor collateral estoppel, precludes this lawsuit.  *See McCormick, supra; Adair v. State;* 470 Mich. 105 (Mich. 2004); *Richards v. Tibaldi,* 272 Mich. App. 522 (Mich. Ct. App. 2006); *Monat v. State Farm Ins. Co.,* 469 Mich. 679 (Mich. 2004).

Since the lawsuit is still pending (*see* Register of Actions, attached hereto as Exhibit 1), there has been no final judgment (*see Grievance Admin. v. Fieger,* 476 Mich. 231, 250, note 14), and the one-year limitation contained in Rule 60(b) therefore does not apply to allegations of fraud on the court, or for "any other reason justifying relief from the operation of the judgment" under Rule 60(b)(6), for which there is no statute of limitations.  *See Fuller v. Quire,* 916 F.2d 358 (6th Cir. 1990).  In addition, no statute of limitations applies to preclude "**a court** to entertain **an independent action** … to set aside a judgment for fraud on the court."  MCR 2.162(C)(3) (emphasis added).  *See Allen v. Allen,* 341 Mich. 543 (Mich. 1954); *Kiefer v. Kiefer,* 212 Mich. App. 176 (Mich. Ct. App. 1995).

## JURISDICTION AND VENUE

1.     This action arises under the First and Fourteenth Amendments of the United States Constitution and is brought pursuant to 28 U.S.C. §2201,  and 42 U.S.C. §§ 1983 and 1988.

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1343, and supplemental jurisdiction over the Michigan state law claims under 28 U.S.C. §1367(a).

3.     Venue is proper in the Eastern District of Michigan under 28 U.S.C. §1391 because the events giving rise to the claims detailed herein occurred in the Eastern District of Michigan.

## **PARTIES**

4.      Emily Evans is a resident of Ann Arbor, Michigan and owns property in Ann
Arbor.

5.      Melanie Welch is the mother of Emily Evans and has assisted Evans in managing
her affairs because Evans suffers from a medical condition.  Welch thereby has prudential
standing to participate as a Plaintiff in this lawsuit.  In addition, since Evans has standing, all
other Plaintiffs have standing.  *See Bowsher v. Synar,* 478 U.S. 714 (1986); *Rumsfeld v. Forum
for Academic and Institutional Rights,* 547 U.S. 47 (2006).

6.      The City of Ann Arbor (hereinafter "City") is a governmental municipality
located in Washtenaw County, Michigan.

7.      During all times relevant to this lawsuit, James Worthington was employed by the
City as an inspector of homes under construction or remodeling whose job it was to determine
that the construction/remodeling work done on a home located in the City had been completed
satisfactorily in order to satisfy the City's housing code and in accordance with the permit which
had been issued to the contractor or subcontractor.

8.      During all times relevant to this lawsuit, Craig Strong was employed by the City
as the chief inspector of homes under construction or remodeling whose job it was to determine
that the construction/remodeling work done on a home located in the City had been completed
satisfactorily in order to satisfy the City's housing code and in accordance with the permit which
had been issued to the contractor or subcontractor.

9.      Meadowlark Builders LLC ("Meadowlark") is a home construction and
remodeling business whose principal office is located in Ann Arbor, Michigan, at 3250 W.

6

Liberty Rd.

10.    Douglas Selby is the Co-Founder and Sustainability Director of Meadowlark.

11.    Kirk Brandon is the Co-Founder of Meadowlark.

12.    During all times relevant to this lawsuit, Dave Anderson was employed as a client account manager for Meadowlark.

13.    During all times relevant to this lawsuit, Harry Ramsden was the project manager for the remodeling project which is the subject of this lawsuit.

14.    Tina Roperti is the Administrative & HR Director at Meadowlark.

15.    Meadowlark Energy, LLC, is an electrical contractor and subsidiary of Meadowlark Builders, with its principal office located at 3250 W. Liberty Rd., Ann Arbor, Michigan.

16.    Michigan Quality Electric ("MQE") is a electrical contractor with its principal office located in Commerce, Michigan.

17.    Derek Tuck is the owner of MQE.

18.    During all times relevant to this lawsuit, David Giles was an electrician employed by MQE.

19.    During all times relevant to this lawsuit, Rob McCrum was represented by MQE to be a licensed electrician employed by MQE.  However, during the course of the prior lawsuit, Plaintiffs learned that McCrum was not licensed.

20.    Arbor Insulation ("AI") is an insulation contractor located in Ann Arbor and is a subsidiary of Meadowlark.

21.    During all times relevant to this lawsuit, Robert Patterson was a general manager employed by AI.

22.     Matthew Krichbaum is a licensed attorney with his office located in Ann Arbor. During all times relevant to this lawsuit, Krichbaum was the court appointed receiver over Evans' property.

23.     Property Management Specialists, Inc., ("PMSI"), is a property management company located in Ann Arbor, Michigan, with which Krichbaum contracted to lease property owned by Evans, and which therefore was an agent of Krichbaum in his capacity as receiver.

24.     Howard and Howard Lawyers, PLC, ("H & H") is a law firm located in Royal Oak, Michigan, which represented Meadowlark and Selby in the prior lawsuit which resulted in the judgment against Evans.

25.     During all times relevant to this lawsuit, Brandon J. Wilson was employed by H & H as the attorney representing Meadowlark and Selby.

26.     Judge Timothy Connors is a sitting judge on the Washtenaw County Circuit Court and was the presiding judge in the case of Meadowlark Builders, LLC, v. Emily Evans and Emily Evans v. Arbor Insulation, LLC, and Quality Electric Services, LLC, Case No. 16-355-CK.

27.     The Hon. Carol Kuhnke is the Chief Judge of the Washtenaw County Circuit Court.

**STATEMENT OF FACTS AND PROCEEDINGS**

28.     Evans purchased the house (hereinafter "Home") located at 1513 Brooklyn Ave., Ann Arbor, Michigan, on August 6, 2015.

29.     Evans contacted Amica Mutual Insurance Company ("Amica") in order to purchase homeowner's insurance on the Home.

30.     Amica informed Evans that in order to obtain a homeowner's insurance policy she

8

would need to show written proof that all active knob and tube wiring had been removed from the Home, since such wiring in older homes was considered a fire hazard.

31.     Evans contacted Meadowlark and was directed to speak with Anderson. Evans informed Anderson of Amica's requirement and Anderson recommended that Evans contact MQE.

32.     Evans contacted MQE and spoke to Giles.  Giles inspected the Home and advised Evans that knob and tube wiring was present throughout the entire Home.  Giles provided Evans with an Electrical Proposal on August 25, 2015, which called for a variety of electrical work and upgrading at the Home.

33.     Because Evans was in poor health and recovering from a traumatic head injury, her mother, Melanie Welch, assumed the responsibility of identifying contractors and overseeing their work.

34.     Welch indicated to Giles that she thought his estimate was high.  Giles advised Welch that he expected the project would cost less because the kitchen and bathrooms had been remodeled after the Home was built and therefore probably had new wiring which would satisfy Amica.

35.     After receiving the electrical proposal from Giles, Welch contacted Anderson regarding repairing the walls once the electrical work at the Home had been completed.  They agreed that Meadowlark would repair the walls once the electrical work was completed.

36.     Anderson advised Welch that it would be a good idea to install insulation in the walls and attic at the time the walls were being repaired, and Welch agreed.

37.     In September, 2015, Amica approved conditional homeowner's insurance of the Home.  The condition which Evans was required to satisfy was to demonstrate that all live knob

and tube wiring had been removed from the Home.

38.    On November 23, 2015, Anderson sent an email to Evans and Welch with a proposal for the renovations they had discussed.  At the end of the email, Anderson stated:  "Let me know if you have any questions.  We need 50% deposit to get the work scheduled, **and the rest after completion when you are satisfied.**"  (Emphasis added.)  (Copy attached as Exhibit 2)

39.    On November 25, 2015, Evans signed a one-page contract with Meadowlark for all the electrical and insulation work to be done for a fixed price contract sum of $50,893.  The one-page contract Evans signed did not include any limitations on the scope of the electrical work which would be completed.  The contract required that Evans pay an up-front deposit of $25,446.00, before any of the work had started.  (*See* Affidavit of Evans and Contract attached as Exhibit 3; pp. 49-61 of Evans' deposition dated Feb. 6, 2017, attached in its entirety as Exhibit 4.)  Evans gave Meadowlark a check in the amount of $25,446.00.

40.    On December 10, 2015, Evans and Welch walked through the Home with Anderson and met Defendant Ramsden, the project manager, and Greg Brown, Ramsden's supervisor.  During this walk through, Brown indicated that they would not be doing any work regarding the wiring in the kitchen and bathrooms because they were updated.  Welch immediately took Anderson and Ramsden aside and stated that this would be a problem, since the purpose of the remodeling project was to provide proof to Amica that the knob and tube wiring had been removed from the entire Home.  Anderson and Ramsden indicated that Brown was mistaken and that the City's electric code required assuring that all the wiring was up to code and that the wiring would be checked to make sure that this had been done.

41.    Meadowlark, MQE and AI began work on the project following issuance by the

City of the necessary permits.  The costs of the permits were paid from the deposit that Evans paid to Meadowlark.  The electric permit cost $225 (Exhibit 5); the insulation permit cost $350 (Exhibit 6).

42.    On January 5, 2016, the Home passed a rough electric inspection conducted by the City inspector.

43.    On January 6, 2016, AI began installation of the insulation.  The two men employed by AI indicated to Welch that this was their first job for AI.  Upon information and belief, AI is a subsidiary of Meadowlark, since the license for AI is in the name of "Meadowlark Energy,"  has the same address as Meadowlark and the license holder for Meadowlark Energy is Selby, co-owner of Meadowlark.

44.    Immediately after work commenced at the Home, there were serious issues.  On January 7, 2016, Welch emailed Ramsden asking why the baseboard had not been removed in the upstairs closet with a ten-foot exterior wall, as the baseboards in all of the other walls where insulation was installed had been removed.  Her concern was that this wall had not been insulated and since this was an exterior wall, it would cause energy loss at a rapid rate.  Ramsden and Patterson assured Welch that the wall had been filled with insulation from the walls of the two bedrooms on either side of it.

45.    On January 11, 2016, Worthington, an inspector employed by the City, purportedly inspected the Home to confirm that the insulation had been properly installed and issued a pass indicating that it had.  (*See* inspection report attached as Exhibit 7.)

46.    This proved to be false.  On June 17, 2016, Defendant Strong, chief inspector for the City, came to the Home to conduct a thorough inspection.  After putting a hole in the wall in question, Strong discovered that it was hollow and that no insulation had been injected into the

11

space behind the wall. He also revealed that a wall in the rear addition to the Home had fiberglass insulation that was old and would have been installed in 1956 when the addition was built. (*See* Affidavit of Melanie Welch, attached as Exhibit 8; email of Strong's successor, Glen Dempsey, attached as Exhibit 9, confirming that he had spoken to Strong and Strong indicated that he had poked a hole in a closet wall and determined that the space had no cellulose insulation; he did the same for another wall and determined that only original fiberglass batt insulation was behind that wall.) At no time did Strong revoke the pass inspection report which had been filed by Worthington.

47. On January 15, 2016, McCrum provided Evans with a report which included the original scope of work expected to remove knob and tube wiring within the Home and other necessary upgrades per City code. Also listed were additional areas of the Home where knob and tube wiring was found along with "unexpected" repairs. At all times during the project, Meadowlark and MQE presented and held McCrum out to be the supervisor of all electrical work at the Home and was referred to by Ramsden as "the electrician." McCrum testified at his deposition, however, that he was not a licensed electrician. (*See* McCrum's deposition, attached as Exhibit 10, pp. 9-10.)

48. On January 15, 2016, AI inadvertently sent Welch an invoice for the insulation installation totaling $4,493.00. (*See* invoice attached as Exhibit 11.) The invoice contained a vague description of the work performed, without specifying what rooms had been insulated. The invoice was actually intended for Meadowlark, which was charging Evans $7,820.00 for the same work. (*See* Sworn Statement attached as Exhibit 12, filed with Meadowlark's Claim of Lien.)

49. On January 22, 2016, Welch walked through the property with McCrum. They

went through each room, including the kitchen and bathrooms.  Welch pointed to each outlet and fixture, and McCrum verified that each outlet and fixture no longer had knob and tube wiring.  Welch later learned from a different contractor that there was no way that the fixture had been checked for knob and tube wiring because some were still sealed with old paint.

50.     Prior to beginning work on the project, Anderson had advised Evans and Welch that the baseboards throughout the Home would be carefully removed and replaced once all electrical work had been performed and the insulation installed.  Early on during the project Welch noted that the baseboards were not being removed carefully.  Plaster above the baseboards and door frames had been damaged and many of the baseboards had also been damaged.  Some of the baseboards were broken and could not be replaced, so new wood was attached to replace the broken baseboards, and was intermingled with the old baseboards that were chipped and cracked.  When Ramsden refused to replace the baseboards, Welch complained to Brandon, who ordered Ramsden to replace all of the baseboards.

51.     After the baseboards were replaced, a carpenter working for Meadowlark attached doorstop strips not typically used as shoe molding to the baseboards instead of the ¾ inch quarter round that should have been used.  When Welch advised Ramsden that the installation was wrong because it did not cover the floor edges as the original ¾ inch quarter round had done, he agreed to replace it.  However, the carpenter simply added smaller quarter round onto the door strips, leaving two layers attached to the baseboards.  Ramsden advised Welch that this was not authorized and promised to remove it and install the ¾ inch quarter round.  This was never done.

52.     On February 5, 2016, Welch received a letter from Tuck, owner of MQE, via email, in response to her request for certification that all live knob and tube wiring had been completely removed from the Home, as required by Amica.  The letter only certified that knob

and tube wiring had been removed from "open areas." Evans and Welch were concerned, since Amica had required certification that the knob and tube wiring had been removed from the entire Home.

53.     From February 6, 2016, through February 8, 2016, Welch emailed many of the parties who worked on the project regarding the fact that Evans needed certification that knob and tube wiring had been removed throughout the Home and not just in open areas in order to keep the homeowner's insurance coverage.  In addition, she was concerned that the rewiring needed to be completed and that the shoe molding had not been replaced as promised.

54.     On February 10, 2016, Evans, Welch and Brandon, who had taken over supervision of the project from Ramsden, conducted a walk-through of the Home.  Evans pointed out that the doorstop strips attached to the baseboards throughout the Home did not cover the floor like the quarter round that had been removed when the baseboards had been removed and were damaged in the process.  Brandon indicated that the doorstop strips and the wrong size quarter round that had been attached to it would be replaced, since that combination had not been authorized for installation.  He agreed to replace it with the correct size quarter round which had been the original pattern, as seen in the closets, and which the Meadowlark carpenters should have used in the first place.

55.     On February 18, 2016, Meadowlark and its sub-contractors walked off the job, as confirmed by Selby when he testified at the jury trial which was conducted on October 2, 2016. (*See* transcript of jury trial, attached in its entirety as Exhibit 13, pp. 73-74.)  Meadowlark left the Home with the electrical work incomplete, leaving wires exposed throughout the Home.  (*See* copies of photos attached as Exhibit 14.)

56.     Meadowlark informed Evans and Welch that it would not return to the Home to

complete the work it had contracted to do until Evans paid it what Meadowlark claimed was the balance due under the contract, in the amount of $27,918.00.  This amount exceeded the contract price which Meadowlark had indicted was the total price for the work it was contracting to perform ($50,893.00), minus the $25,446.00 Evans had paid as a deposit on November 25, 2015. This was contrary to Anderson's assertion in his November 23, 2015, letter (exhibit 2) that the balance of the contract would not be due until "completion when you are satisfied."

57.     On February 25, 2016, Welch met with Selby, Brandon and Anderson in an attempt to reach an agreement regarding completing the work on the Home.  Selby insisted that Evans pay what he claimed was the balance due before they would return to work.  He also demanded that Evans and Welch sign a confidentiality agreement as a pre-condition to finishing the work.  Plaintiffs refused.

58.     Selby was refusing to close the electric permit on the Home, which prevented Evans from hiring a new company to complete the electrical work.  Selby was telling the City that he could not close the permit because he had a contract with Evans, and he would not close the permit unless and until Evans had paid what he claimed she still owed on the contract.

59.     When none of the Meadowlark employees or sub-contractors had returned to the Home for over two weeks to complete the work Meadowlark had contracted to do, Evans sent Meadowlark a letter on or about March 7, 2017, in which she listed all of the deficiencies in Meadowlark's work and indicated that she was terminating the contract.  (*See* letter attached as Exhibit 15.)  Thereafter, Evans changed the code on her house lock to prevent Meadowlark and its contractors from entering the Home.  (*See* Evans' deposition, Exhibit 4, p. 198.)  This allowed the City to close the permit to allow Evans to hire a different electrical contractor to obtain a new permit to complete the electrical work on the Home.

60.     At this point, Evans and Welch learned that McCrum was not a licensed electrician. On March 15, 2016, Evans filed a complaint against Tuck and MQE with the Michigan Department of Licensing and Regulatory Affairs ("MDLARA") regarding various issues, including walking off the project and closing the electrical permit without a final inspection; employing unlicensed electricians; and making false statement regarding work on the Home.

61.     On April 1, 2016, the MDLARA sent a letter to Tuck indicating that a complaint had been filed against him.  (*See* copy of letter attached as Exhibit 16.)  The letter stated, in relevant part:  "Review of Bureau of Construction Codes, Electrical Division licensing records has found that Robert McCrum IS NOT licensed to perform electrical installation in the State of Michigan.  Allowing an unlicensed person to perform electrical installations is a violation of the Electrical Administrative Act, 1956 PA 217.  Further, obtaining a permit for an unlicensed person is a violation of the Stille-DeRossett-Hale Single State Construction Code Act, 1972 PA 230, and as such is subject to civil fines."  (Capitalization in the original.)

62.     Evans thereafter engaged the services of A2 Electric, PLLC ("A2"), owned by Nate Richardson, to complete the electrical work which Meadowlark had failed to finish.  A2 charged Evans $7,984.00 for the work, which included $700.00 to check to make sure that all knob and tube wiring had been removed from the Home; $1,200.00 to rewire the kitchen and bathrooms; and $4,800.00 to connect wires, install boxes and electrical devices; hang light fixtures and other miscellaneous electrical work.  (*See* Affidavit Of Nathan Richardson, attached hereto as Exhibit 17.)  The Exhibit was identified by Mr. Richardson at the trial and offered into evidence by Meadowlark's attorney, Brandon Wilson.  (*See* trial transcript, Exhibit 13, p. 55.) After A2 completed the electrical work, it submitted an invoice to Evans, attached to which was

a description of the scope of work it had completed.  (*See* Exhibit 18, attached.)  The scope of work indicates on p. 2 that in the Second Floor Hallway, A2 "Repaired incorrect wiring."  On pp. 4-5, in the Basement, items 3-6, A2 "Removed unprotected 3-wires and rerouted them.  Changed single gang junction box to 2-gang box because it had too many wires for single gang (per electrical inspector).  Rerouted and sleeved wires under joist due to code violations.  Supplied and installed ne 100-Amp., 30-circuit electric panel t replace 20-circuit panel because house has 27 circuits.  Existing 20-circuit panel not rated for tandem breakers."  This was all work which Meadowlark and MQE under the terms of the contract and which Meadowlark was demanding that Evans pay in advance before it would complete the work required under the contract, and which Anderson had indicated would not have to be paid for until the job was completed and Evans was satisfied with the work.

63.     On April 4, 2016, Wilson, on his then firm's letterhead, sent Evans a letter charging Evans with breaching the contact and demanding that she pay Meadowlark what he claimed was the outstanding balance under the contract in the amount of $27,918.00.  (*See* letter attached hereto as Exhibit 19.)  Attached to the letter was a Sworn Statement, sworn and attested to by Selby, which purported to list and itemize the work which Meadowlark claimed it had completed on the Home, and the price being charged for each item of work.  The Sworn Statement listed Insulation, in the amount of $7,820.00, of which it claimed $3,910.00 was still owed.  It also listed Electrical, in the amount of $31,550.00, of which it claimed $15,888.00 was still owed.

64.     Also attached to the letter was a Claim of Lien, signed by Selby, which Meadowlark had filed with the Washtenaw County Register of Deeds, claiming a lien on the Home in the amount of $27,918.00.  The Claim Of Lien stated that Meadowlark had last worked

on the property on February 25, 2016, when in fact its employees and contactors had walked off the job on February 18, 2016.  Following the Claim of Lien was a First Amended Claim of Lien, also filed with the Washtenaw County Register of Deeds, signed by Selby and claiming that the construction lien amount was $25,447.00, rather than $27,918.00.

65.     The First Amended Claim of Lien, like the original Claim of Lien, was filed in violation of the Michigan Construction Lien Act, MCL 570.1101, *et seq.,* for two reasons: (1) The construction lien was based on the Sworn Statement, which claimed that all of the electrical work had been completed, when, as Mr. Richardson's affidavit, invoice with the attached scope of work, and trial testimony (Exhibit 13, p. 53) indicated, this claim was false, because the work had not been completed.  Under MCL 570.1107(1), a contractor may not assert a lien for work or material it has not "provided."  *See Ronnisch Constr. Grp., Inc. v. Lofts on the Nine, LLC.,* 499 Mich. 544, 552 (Mich. 2016) ("The fundamental purpose of the CLA with respect to contractors, workers and suppliers is to provide a method to secure payment for their labor and materials."), citing *Smalley v. Gearing,* 121 Mich. 190, 198 (1899) ("[S]tating that the Mechanics' Lien Act 'provide[d] a method for securing payment to those whose **labor or material goes into the building** … '"  (Emphasis added.) (2) The amended construction lien violated the last sentence of MCL 570.1107(1), "A construction lien acquired pursuant to this act shall not exceed the amount of the lien claimant's contract less payment made on the contract."  *See Erb Lumber, Inc. v. Gidley,* 234 Mich. App. 387, 396 ("The proper amount of a lien is the lien claimant's price less payments made on that contract to the lien claimant."). *Kincaid Henry Bldg. Grp., Inc. v. Heart of Howell, LLC,* No. 346034 (Dec. 3, 2020) (unpublished) (copy attached as Exhibit 20) ("The plain language of these statutory provisions provides that the amount of a lien claimant's construction lien must be calculated by determining the total value of the claimant's contract, the

18

amount of work performed by the claimant under the contract, i.e., the proportion or percentage completed, and the amount paid by the owner in relation to the work performed. **The value of the total contract multiplied by the proportion of the contract completed, minus the amount paid by the owner, equals the amount owed by the owner, equals the value of the lien**." *Id.* at \*5; emphasis added.)  The price specified in the contract was $50,893.00, of which Evans had paid $25,446.00, leaving a balance due of $25,447.00.  Had Meadowlark correctly completed all the work required under the contract, it would have been entitled to payment of $25,447.00.  But A2's invoice, and Mr. Richardson's affidavit and testimony, demonstrated that Meadowlark had not completed all of the work it had contracted to do, thereby reducing the amount owed under the contract, and in turn reducing the balance due under the contract.  Yet in the Amended Claim of Lien, Meadowlark claimed a lien in the full amount due of $25,447.00 as if it had completed the contract.  In so doing, Meadowlark violated the Construction Lien Act.

66.     On April 20, 2016, Meadowlark filed a Complaint in the Washtenaw County Circuit Court against Evans alleging breach of contract and foreclosure of a construction lien. The lawsuit was assigned to Judge Timothy Connors.  Meadowlark attached three exhibits to the Complaint.  (*See* Complaint, attached as Exhibit 21.)  The first exhibit was a document Meadowlark claimed was the contract between it and Evans.  The purported contract consisted of the one-page contract which Evans had signed on November 25, 2015 (*see* Exhibit 3), plus four additional pages which were not attached to the contract which Evans had signed on November 25, 2015.  The other three exhibits were the First Amended Claim of Lien; Proof of Service of Claim of Lien; and a Lis Pendens which had been filed on April 20, 2016.

67.     On August 8, 2016, Evans' then attorney, Joshua Castmore, filed an Answer to the Complaint, with a jury demand, as well as a Counter-Complaint And Third Party Complaint.

The Counter-Complaint contained five counts:  Count I: Unjust Enrichment; Count II: Breach Of Implied Covenant Of Good Faith And Fair Dealing; Count III: Civil Conspiracy; Count IV: Negligence,  (*See* Counter-Complaint (minus exhibits), attached hereto as Exhibit 22.)

68.     On August 26, 2016, Meadowlark filed a motion for summary disposition to dismiss Evans' Counter-Complaint.  The Court held a hearing on October 13, 2016, and granted the motion to dismiss with the exception of the claim of unjust enrichment.

69.     Evans filed a complaint regarding Meadowlark with the MDLARA.  On December 27, 2016, the MDLRA issued a Formal Complaint against Meadowlark and Selby. (Copy attached as Exhibit 23.)  The Complaint contained four counts.  The First Count asserted that Meadowlark had violated the Michigan Administrative Code. R. 338.1533(1), by failing to put all agreements between it and Evans in writing and have all agreements signed by both parties.  The Second Count asserted that the contract had been procured by a salesperson who was not licensed as a builder or contractor, in violation of Michigan Administrative Code R. 338.1536.  The Third Count asserted that Meadowlark had violated the Code by aiding and abetting a person in the unlicensed practice of an occupation.  The Fourth Count asserted that Meadowlark's conduct had evidenced a willful departure from, and disregard of, plans or specifications in a material respect, violating Code §2411(d).  Attached to the Complaint as Exhibit A was the one-page contract which Evans had signed, plus four "Scope of Work" pages which had not been provided to Evans, and which were not part of the contract.  Attached to the Complaint as Exhibit B were three change orders which MDLARA asserted Meadowlark had "failed to provide copies of the change orders to Homeowner that were signed by both parties."

70.     On January 19, 2017, Meadowlark filed an *ex parte* emergency motion to compel Evans' deposition.  A hearing was scheduled for January 26, at 9:00 A.M., but the hearing was

canceled.  Because Evans was advised that the hearing had been canceled, she remained at home and was lying on a couch in her living room when several police officers came into her back yard and began banging on her windows, asking her why she was hiding.  They stated that they had been sent to her home by Judge Connors to bring her to court.  Evans responded that she had been told that the hearing had been canceled.  She overheard the officers stating that it appeared that she was healthy and could walk, despite her medical condition.  The officers then left.

71.    On March 17, 2017, the MDLRA sent an email to Selby acknowledging receipt of Selby's response to the Formal Complaint.  (Copy attached as Exhibit 24.)  Regarding Count IV, which alleged that the work which Meadowlark had done materially departed from what the contract indicated would be done, Lorne Carignan stated:

> This is a question of fact with no clear resolution.  I have an assertion from Ms. Welch that Craig Strong of the Ann Arbor building department punched a hole in the wall of the closet and verified there was no cellulose insulation in that wall. As weak as that evidence is, it's more than anything I have from Meadowlark proving that particular wall was insulated.  (I don't understand the mention of an eyebrow dormer or how that affects the injection of cellulose insulation in a closet wall from a hole behind the baseboard.  Perhaps you can clarify that further.) **There also appears to be an assertion that cellulose was blown into this closet wall cavity from the rooms on either side, which seems unlikely if not impossible because the wall studs would prevent that.**  If I call Craig Strong to testify at a hearing and he says he found no cellulose insulation in that closet wall, what's Meadowlark's rebuttal?  (Emphasis added.)

72.    On June 8. 2017, Meadowlark filed a motion for leave to file a First Amended Complaint to add a claim for unjust enrichment.

73.    On June 13, 2017, a Consent Order was entered with respect to the Formal Complaint which had been issued by the MDLRA.  (Copy of Consent Order is attached as Exhibit 25.)  The Consent Order stated, in relevant part:

> Respondents [Meadowlark and Selby] admit the allegations in the Complaint, with the exception of Counts III and IV, which Respondents deny and shall be dismissed.  The Michigan Board of Residential Builders and Maintenance

21

and Alteration Contractors has reviewed this Consent Order and Stipulation and agrees that the public interest is best served by resolution of the outstanding Complaint.

Therefore, IT IS FOUND that the facts alleged in the Complaint constitute violation(s) of MCL 338.604(h) and MCL 339.604(l).

IT IS ORDERED that Counts III and IV of the Complaint are DISMISSED.

The Stipulation attached to the Consent Order was executed by Meadowlark and Selby on April 21, 2017.  The Stipulation stated, in relevant part:

1.      Respondent and the Department agree that Counts III and IV of the Complaint shall be dismissed by the Board.

2.      **The facts alleged in the Complaint constitute violation(s) of MCL 339.604(h) and MCL 339.604(l).**

3.      Respondents understand and intend that by signing this Stipulation Respondents are waiving the right, pursuant to the Occupational Code, the rules promulgated thereunder, and the Administrative Procedures Act, MCL 24.201 *et seq.,* to require the Department to prove the charges set forth in the Complaint by presentation of evidence and legal authority, and Respondents are waiving the right to appear with an attorney and such witnesses as Respondents may desire to present a defense to the charges.

….

6.      This Order is approved **as to form and substance by Respondents** and the Department and may be entered as the final order of the Board in this matter.  (Emphasis added.)

74.     Upon information and belief, Meadowlark's and Selby's attorney, Brandon Wilson, was aware that his clients had signed the Stipulation and was aware of the existence of the Consent Order.

75.     Meadowlark and Selby stipulated that the contract which they maintained applied to Evans violated two sections of the Michigan Occupational Code.  As such, the contract, including the change orders which they claimed were part of the contract, violated public policy,

22

by virtue of which under Michigan law they were void and unenforceable.  *See Mahoney v. Lincoln Brick Co.,* 304 Mich. 694 (Mich. 1943); *Federoff v. Ewing,* 386 Mich. 474 (Mich. 1971); *Peeples v. Detroit,* 99 Mich. App. 285 (Mich. Ct. App. 1980).  In addition, since Meadowlark elected to sue for breach of a written contract, given that the contract violated Michigan law and was therefore void, it was not entitled to recover either on an implied contract or *quantum meruit* theory.  *See Morris Pumps v. Centerline Piping,* 273 Mich. App. 187 (Mich. Ct. App. 2006); *Belle Isle Grill Corp. v. City of Detroit,* 256 Mich. App. 463 (Mich. Ct. App. 2003); *Mead v. Rehm,* 256 Mich. 488 (Mich. 1932); *Cardillo v. Canusa Extrusion,* 145 Mich. App. 361 (Mich. Ct. App. 1985).

76.     On June 30, 2017, Evans filed a motion for leave to file a First Amended Counter-Complaint which proposed to add claims of (1) fraudulent misrepresentation; (2) silent fraud; (3) violation of MCL 125.1447; and (4) negligent misrepresentation as an alternative claim.  (*See* Defendant/Counter-Plaintiff/Third-Party Plaintiff's Cross-Motion For Leave To File First Amended Complaint attached as Exhibit 26.)

77.     On July 13, 2017, the court held a hearing on Meadowlark's motion for leave to file a First Amended Complaint to add a claim for unjust enrichment.  At the same hearing, the court heard Evans' motion for leave to file a First Amended Counter-Complaint to add claims of fraud.  The court granted Meadowlark's motion to amend, but denied Evans' motion to amend. With regard to Evans' motion to amend, the court stated (copy of hearing transcript attached as Exhibit 27, pp. 9-10):

> THE COURT:  There's a big difference between lack of performance and fraud.  Fraud is sort of the allegation du jour of everybody running around and doing it, and it sort of heightens the atmosphere.
>
> I'm sorry, I just don't think this contract remodeling job is quite the societal necessary import of all of this stuff –

MR. CASTMORE:     Well, we have –

THE COURT: -- so the answer is no.

The court entered an Order granting Meadowlark the right to amend, and denying Evans the right to amend, on July 14, 2017.  (Copy attached as Exhibit 28.)  The court's ruling in this regard was clearly erroneous.  This was not a hearing on a motion for summary disposition.  The court pre-judged whether the facts would support a claim of fraud, and denied the motion on the basis that it felt that fraud claims were becoming "the allegation du jour."  Evans had the right to allege, and seek to prove, that Meadowlark had committed fraud, but Judge Connors summarily shut the door on her.  It was clearly a valid and viable claim, because on June 17, 2016, before Meadowlark had filed the lawsuit, Strong had determined in Welch's presence that there was no insulation behind one of the walls, and old fiberglass insulation was still behind another wall.  Meadowlark continued to assure Evans that the Home had been properly insulated.  At this point Meadowlark and its subsidiary, Arbor Insulation, knew that these assertions about a past event were false, thereby committing fraud.  *Titan Ins. Co. v. Hyten,* 491 Mich. 547, 556 (Mich. 2012).  Therefore, there was no valid argument that the amendment was futile, and certainly no valid argument of undue delay, since the court at the same time granted Meadowlark the right to amend to add a new claim of unjust enrichment by Evans.

78.     Meadowlark, under Wilson's signature, then filed Plaintiff's First Amended Complaint ("FAC"), which continued to plead breach of contract, and contained the additional unjust enrichment count.  (Copy of First Amended Complaint attached hereto as Exhibit 29.)  In ¶8 of the FAC, Meadowlark alleged that Evans had agreed to pay it $50,893.  In ¶9, Meadowlark alleged, "Defendant subsequently agreed to pay Plaintiff to perform additional work on the Project in the amount of $2,471 (the "Extras Contract").  The Original Contract and the Extras

Contract are referred to together as the "Contract."

In making this allegation, Meadowlark and Wilson were committing a fraud on the court, because it was precisely the additional amount for additional work which the MDLARA had charged Meadowlark and Selby with violating Michigan law in Count I of the Formal Complaint, and had attached the change orders charging those additional amounts to the Formal Compliant which Evans had not seen and had not agreed in writing to pay for, **and as to which Selby had signed a Stipulation acknowledging that the allegations in Count I of the Formal Complaint were true which stated that those charges, and the purported contract encompassing them, were unlawful.** Meadowlark again committed fraud on the court by attaching to the FAC as Exhibit A the one-page contract which Evans had signed, plus the four additional pages itemizing the exclusions to the scope of work, pages which were not presented to Evans when she signed the one-page contract, **and which the MDLARA had included in its Count I as violating Michigan law, and which again Selby had agreed violated Michigan law when he signed the Stipulation**. Attached to the FAC as Exhibit B was the First Amended Claim of Lien, which was for less money than the original Claim of Lien, since it deducted the amount of $2,471.00 which had been included in the original Claim of Lien for work which Meadowlark claimed Evans had agreed to orally. The balance due under the First Amended Claim of Lien was $25,447.00.

79.    On August 3, 2017, Evans filed a Motion For Reconsideration And Motion To Amend Witness List. (Copy attached as Exhibit 30.) The motion for reconsideration and brief in support noted that Judge Connors had failed to specify his reasoning for denying the motion; that delay in and of itself was not sufficient to deny a motion to amend; that Meadowlark would not be prejudiced by the proposed amendment; and that justice would be served by allowing the

amendment.  With regard to the motion to amend the witness list, Evans wanted to add Joe O'Neal, an expert in the area of construction who held bachelor's and master's degrees in civil engineering from the University of Michigan.  The motion attached Mr. O'Neal's affidavit as Exhibit B, in which Mr. O'Neal attested, among other things, that the amounts which Meadowlark indicated it was charging Evans in its Sworn Statement did not accurately reflect the amounts that Meadowlark's subcontractors were charging Meadowlark; that it was unethical "for both a general contractor and subcontractor to bill their profit twice when they are essentially the same company"; that "it is a material misrepresentation to attempt to pass off the work of an unlicensed apprentice as the work of a licensed journeyman electrician as has been alleged in this case by Defendant Quality Electric Service, LLC"; and that it was "highly unusual and unethical for a contractor to bill for services, in whole or in part, prior to beginning work on a project, which happened in this case."

80.     The hearing on Evans' motion to amend the witness list to add a single expert in the construction industry was held on August 32, 2017.  (*See* hearing transcript attached as Exhibit 31.)  Judge Connors denied the motion, stating, *id.* at pp. 8-10:

> THE COURT: Well, but I'm going to give you a cautionary instruction here, a cautionary note.  And whether I'm right or not, I understand, but as I told you, I think you sort of did the shotgun, spaghetti-on-the-wall approach to this, and we've pared it down.  This is a breach of contract claim, and you have to keep it at that.
>
> And what I'm concerned is the same concern why we amended the court rules on experts in this state, because it was perceived that experts were being used to circumvent – I have a named expert.  I've filled the expert's – like a donkey, I've filled their basket with all kinds of treatises and things which aren't otherwise can be introduced, and I just have them carry it in.
>
> So the first question is:  **Is this – an expert is supposed to be someone who assists the trier of fact in understanding the evidence, because it requires – it's beyond the ken of the average layperson.**

26

Tell me why we even need an expert at all, and then, if so, what, in terms of the claim that's before you and not trying to back-door in your negligence and fraud claims, et cetera?

MR. CASTMORE: Sure. And keep in mind, when we filed the affidavit, it was in our motion to amend our complaint, to add the fraud-related claim. So anything that Mr. O'Neil [sic] testified to in an affidavit regarding that was in support of our motion.

So, in response, I mean, ultimately, what he's going to testify to is whether or not Meadowlark was unjustly enriched by accepting Ms. Evans' funds and then, ultimately, not performing any of the work that it was supposed to, not having a licensed contractor. And he can explain the significance of that to the jury and why that is – **why that is unjust enrichment and that's not common in the construction industry**. And I think that that's important and for the jury to understand.

THE COURT: All right. I think that the motion is not timely. I'm not granting the opening this up. This is something that could have been identified a long time ago. And every time I try to pare this case down to what I think is legally at issue, it keeps trying to expand back out. Motion is denied. (Emphasis added.)

The court's ruling was clearly erroneous. Regarding whether Mr. O'Neal would have served the function of an expert in providing information that would have been beyond the ken of the average citizen, his testimony was that Meadowlark's methods and procedures were inconsistent with the standards in the construction industry, information that most lay people would not be aware of. Regarding the concern that Evans was attempting to reintroduce a claim of fraud, Mr. O'Neal's testimony supported the claim of unjust enrichment by Meadowlark, by overcharging for work. The fact that this testimony would also have supported a claim of fraud did not mean that it did not support the single claim of unjust enrichment, the only claim which Judge Connors would allow Evans to proceed to trial with, and was particularly unjust given that he had allowed Meadowlark to amend its complaint to add a new charge of unjust enrichment by Evans. Finally, regarding the assertion that the motion to add an expert witness was untimely, there had been no trial adjournments up to this point in the proceedings. It would not have been

unusual to adjourn the trial in order to accommodate the rights of a litigant and make sure that she obtained a fair trial. *Compare Dorman v. Township of Clinton,* 269 Mich. App. 638 (Mich. Ct. App. 2006)  (Court did not abuse its discretion in denying plaintiff's request to add an expert to his witness list, where plaintiff had been previously late in answering discovery requests and the motion to add the expert came two months before trial, which had already been adjourned twice.)

81.    On September 28, 2017, Castmore filed an Emergency Motion To Withdraw As Counsel.  (Copy of motion attached as Exhibit 32.)  Attached to the motion was an email from Evans terminating Castmore.  Castmore requested that the court grant his motion to withdraw and afford "Evans a reasonable amount of time to either retain new counsel or to prepare to represent herself *in Pro Per.*"  On that same date, Evans filed an Emergency Motion To Update Court Records As Of This Date to Show that Emily Evans Is Representing Herself.  (Copy of motion attached as Exhibit 33.)  In point of fact, Castmore had told Evans that he wanted to withdraw from representing her because he did not have sufficient time to prepare for the trial. He told Evans that the only way Judge Connors would allow him to withdraw was if Evans sent him an email terminating him.  (*See* email from Castmore explaining that Evans has to fire him in order for Judge Connors to allow him to withdraw, attached as Exhibit 34.)  Evans accordingly sent Castmore an email terminating him, as he had requested.

82.    Judge Connors did not rule on either motion.  On the date of trial, October 2, 2017, neither Castmore nor Evans appeared.  Welch was in the courthouse and went to the office of Chief Judge Swartz.  She indicated that Castmore informed her daughter that he was not going to appear for the trial, and that she was not going to appear because Judge Connors had not granted her motion to represent herself.  Welch was told by court staff in Chief Judge Swartz's

office that they expected Judge Connors to adjourn the trial in order to give Evans time to find a new attorney.

83.     When Judge Connors took the bench, he remarked that this was the date and time set for the jury trial and that the only people present were the Plaintiff, Plaintiff's attorney, and court staff.  (Trial Transcript, Exhibit 13, p. 4.)  (Plaintiffs have a video of the trial should the Court wish to see it.)   He then made a remark about a relative of the Defendant making communications in the building "in forms of emails and personal appearance, who is not the attorney of record and is not the plaintiff but is a relative of the plaintiff [*sic*]," referring to Welch, who at this point was in the courtroom and was observing the proceeding.  He proceeded to note that he had not discharged the Defendant's attorney, who was not present, nor was the Defendant.  He then stated, Exhibit 13, p 5:

> My suggestion, counsel, is, given the rather unusual and unorthodox communications that have been taking place, most recently, but, frankly, throughout this trial and throughout these proceedings, is that we pick a jury, that you present your proofs.  I do not know if the lawyer will show up.  If they do, they'll have their right to cross-examine any witnesses that you bring.
>
> When you rest your case, I'll see if there's any defendant here to put something forward.   If not, of course, I would suspect you'd move for a directed verdict.
>
> I say this because I don't think that this is over, okay.
>
> So are we ready to proceed with the jury?

This obviously took Wilson by surprise, because he was under the impression that the trial was going to be adjourned and he responded, *id.*:

> MR. WILSON:      Yes, Your Honor.   I do need to contact two witnesses –
>
> THE COURT: Okay.
>
> MR. WILSON: -- who I indicated should not appear, **based upon what I**

**was told before you took the benc**h.

THE COURT: Okay.

MR. WILSON:        So I need to contact them and, obviously, see if they can come back.  (Emphasis added.)

84.    The trial resumed and a jury was selected.  Wilson called Anderson as his first witness and had Anderson identify what he claimed was the proposed contract between Meadowlark and Evans marked as Exhibit 3.  (Exhibit 13, pp. 41-43)  Exhibit 3 was admitted. (Plaintiffs have been informed by the Washtenaw Circuit Court that the exhibits were returned to Wilson after the trial.)  Wilson then asked Anderson regarding  Exhibit 3:  "Are there rooms excluded in your proposed contract that is Exhibit 3?"  Anderson responded in the affirmative.

Wilson then had Anderson identify proposed Exhibit 4, and asked Anderson if that was the contract which Evans had signed.  (Exhibit 13, pp. 44-45)  Anderson responded in the affirmative.   He also asked Anderson if he had signed it, and Anderson answered in the affirmative.  Wilson then asked Anderson regarding Exhibit 4:

Q        Dave,  is Exhibit 4, the signed contract –

A        Yes.

Q        **-- is that, but for the signatures and the handwriting, is that the same document that you attached to your email which we marked as Exhibit 3?**

A        **Yes, it is.**  (Emphasis added.)

Exhibit 4 was then admitted as the contract which Evans had purportedly signed.  But this was false, and Wilson knew it, because Exhibit 4 was the same document which had been attached to the Formal Complaint filed by the MDLARA against Selby as Exhibit A and which included the additional four pages describing the scope of the work, which excluded certain rooms from the work which Meadowlark was agreeing to do, and which were not attached to the

one-page contract which Evans signed on November 25, 2016.  The MDLARA had ruled that the document which Selby claimed was the contract, with the additional pages, had not been signed by Evans, and therefore violated Michigan law, and was accordingly void and unenforceable. Selby had in fact signed a Stipulation acknowledging that the purported contract violated Michigan law, which Wilson knew he had signed.  The MDLARA also ruled regarding Count II that the contract was unlawful because Anderson was unlicensed and therefore was not authorized under Michigan law to execute contracts to do remodeling work on homes.  Selby had stipulated to this as well.  By offering that document as the contract which Evans signed, Wilson committed a fraud on the court, and he also suborned perjury by Anderson.

85.     Wilson next called Selby as a witness, but interrupted his examination of Selby in order to call Mr. Richardson as a witness.  (Exhibit 13, pp. 49-55)  Wilson tried to lead Richardson to agree that Evans had terminated the prior electrical contractor, but Richardson balked, indicating he did not know.  (*Id.*, p. 50)  Richardson testified that he did not find any old knob or tube wiring left in the Home.  (p. 51)  He then testified that when the inspectors had inspected the Home, "It wasn't a complete rough, I don't think."  (p. 52)  Wilson then asked Richardson to identity his affidavit and go through  its contents to identify what electrical work he did for Evans and how much he charged.  (Exhibit 17)  He testified that he charged $700 to confirm that all the knob and tube wiring had been removed.  Then he testified, regarding the kitchen, that it was "opened up … the wires were all open. … We had to finish it,  correct, yes," for which he charged $1200.  He then testified that he charged $900 to install a new electrical panel because, "The panel that was there, if you – somewhere in here says – I believe it was a twenty-something circuit.  You're not allowed tandem breakers on that panel.  When we got there, there was extra wires that had to be hooked into it, and there was no room for it, so we had

to upgrade it."  Wilson then moved to admit Richardson's affidavit and it was admitted and concluded his examination of Richardson.

Since Evans was not represented by an attorney at the trial, there was no one to point out to  the jury that Mr. Richardson's affidavit indicated there was an additional $4,800 which he charged Evans for the work which Meadowlark had not completed before it walked off the job, and for which Meadowlark was now seeking to recover from Evans by charging her the balance of the contract in the amount of $25,447.00 for work which it had not done and which was over a 500% mark-up over what Richardson charged her for work he actually did.

86.    Wilson then recalled Selby to testify.  He asked Selby if there were exclusions in "your contract, Exhibit 4?"  Selby testified that the contract excluded electrical work on the kitchens and bathrooms, "because they were previously remodeled." (Exhibit 13, pp. 60-61)  He asked Selby about work on the lower bathroom and garage, all of which Selby testified were excluded based on exclusions contained in Exhibit 4.  But Exhibit 4 was not the contract that Evans had signed, which Selby had acknowledged by signing the Stipulation as part of the settlement with the MDLARA, all of which Wilson knew, thereby suborning perjury by Selby.

Wilson proceeded to ask Selby to identify various change orders for work that he claimed was not included in the original contract and which he claimed Evans was refusing to pay for, and which was the reason he ordered the Meadowlark crew to walk off the job. (Exhibit 13, pp. 67-74).  But all of the change orders which Selby accused Evans of not paying for were included in Exhibit B of the MDLARA Formal Complaint, which the MDLARA charged in Count I of the Complaint also violated Michigan law because Evans had not signed them.  Selby conceded this point by signing the Stipulation.  Yet Wilson, knowing this, offered the change orders as evidence of work which was part of the contract and which Evans was refusing to pay for, again

32

committing fraud on the court and suborning perjury by Selby.

Selby then testified that, after ordering his crew to stop working, leaving a large part of the electrical work undone, which Richardson then had to finish and charge Evans, that Evans improperly locked them out, for which she was liable for paying the balance of the contract for work it did not complete because he ordered the Meadowlark employees to stop working.  But Evans testified at her deposition that Meadowlark demanded that she pay them the entire balance of the contract before they would return to complete the work.  (Exhibit 4, p. 198)  This was confirmed by an email which Selby sent to Evans on March 10, 2016, which Wilson asked Selby to identify at trial.  (Exhibit 35; (Exhibit 13, p. 77)  The email demanded that Evans pay the balance of the contract in full before Meadowlark would return to finish the electrical work it had left unfinished.  Selby stated:  "We are legally entitled to payment  for the work we have performed, and we are requesting payment in full within five (5) days, no later than Friday the 18th.  Should the payment not arrive in that time, we will refer this matter to our attorney, who will file a lien on the home and begin foreclosure proceedings.  We have no other recourse to receive payment for the work you authorized us to perform."   These representations were contrary to the Stipulation which Selby had signed in order to settle the Formal Complaint filed against him by the MDLARA, a Stipulation that admitted the document it claimed was the contract that Evans had signed violated Michigan law, and was therefore null and void and unenforceable.

Wilson then asked Selby to identify the inspection pass for the electrical work, which was approved after Richardson had finished the electrical work, completing the work which Meadowlark had left unfinished.  (Exhibit 36, marked as Exhibit 18 at the trial.)  Selby testified that the electrical inspection pass indicated "we passed the electrical rough inspection on January

5, 2016." But a rough electrical pass does not indicate that the electrical work has been completed. In fact, the invoice attached to Richardson's affidavit indicated that he completed the work which Meadowlark had left unfinished on April 25-26, 2016. (Exhibit 18) Wilson then had Selby identify the insulation pass as proof that Meadowlark had completed the insulation work correctly. (Exhibit 7, marked as Exhibit 19 at the trial.) Wilson used both inspection passes to convince the court and jury that Meadowlark had performed both the electrical and insulation work correctly.

Wilson proceeded to have Selby identify the claim of lien which Selby had filed with the Washtenaw County Register of Deeds. (Exhibit 13, p. 83) But this was the claim of lien which included charges for the additional change orders which the MDLARA had charged violated the law, and which Selby had stipulated violated the law. Moreover, the claim of lien had been replaced by the First Amended Claim of Lien, which was the only lien which Wilson had attached to the FAC, which had deleted those charges, and which was at this stage in the litigation the only lien which Meadowlark would have had a basis to collect on. By offering into evidence the Original Lien, rather than the corrected First Amended Lien, Wilson committed another fraud on the court.

87.     At the close of Plaintiff's proofs, Welch interrupted the trial and asked to testify. (Exhibit 13, pp. 87-88) Judge Connors refused to allow her to testify, indicating that she was not a party to the lawsuit and not an attorney. Judge Connors requested that she be removed from the court.

88.     Wilson then rested and Judge Connors indicated that neither the Defendant nor her attorney had appeared. (Exhibit 13, pp. 89-90) He asked Wilson if he wished to move for a default, at which point Wilson stated:

MR. WILSON:      I do, Your Honor.  There being no opposition to the claims, there are two counts in the complaint that I'd ask for relief on.  **The first is for breach of contract.  Our request of damages are in the amount of $27,918.**

And I would also ask for relief and default judgment as to Count 2, for enforcement of Meadowlark's construction lien, pursuant to the Michigan Construction Lien Act.

THE COURT: The default is granted.  The amount of damages under the two counts that went to trial is granted.  This matter was set as a jury trial at defendant's request.  I proceeded in this matter in case they did appear and wished to cross-examine or offer evidence.  They have not.  Therefore, your motion on the default is granted for the amounts that you've received.

I also wanted to make sure that the exhibits were in of record so that, if anyone sought to review what was the basis for your claim, we now have the record.

I believe there's  also a counter-claim?

MR. WILSON:      There is, Your Honor, and I would move for directed verdict.  There being no proofs put on, I'd ask that that claim – I believe it's the only claim left – for unjust enrichment as – or against Meadowlark, Arbor, and Quality Electric Service, I'd ask that that judgment of no cause be entered on that claim.

THE COURT: Judgment for directed verdict, no cause for action, there being no proofs proffered at the time and date set for jury trial, as requested by the defendant.

With that, can you give me a proposed judgment within thirty days?

MR. WILSON:      Absolutely. ….

At the time of the trial, Meadowlark had three counts pending against Evans under the FAC: first, a breach of contract claim; second, a claim for foreclosure of construction lien; and third, a claim for unjust enrichment.  While it is permissible to plead in the alternative claims for both breach of contract and unjust enrichment, a litigant may not simultaneously recover for both.  *See State v. Blackwell,* 299 Mich. App. 727, 734 (Mich. Ct. App. 2013); *Liggett Restaurant Group, Inc. v. City of Pontiac,* 260 Mich. App. 127, 137 (Mich. Ct. App. 2004); *Ford*

*Motor Co., v. Kahne,* 379 F. Supp.2d 857, 876 (E.D. Mich. 2005). If the purported contract is a written contract, a litigant may not simultaneously prevail on a claim of unjust enrichment with respect to the same property against the same party. The litigant must make an election, and at the end of the trial, Wilson did so, electing to assert the breach of contract claim. But his client had already signed a Stipulation admitting that the written contract he claimed applied violated Michigan law, and therefore under Michigan law was void and unenforceable. Under those circumstances, Meadowlark could have argued that it was entitled to relief under an unjust enrichment theory. But Wilson, by electing to proceed under the breach of contract claim, waived the unjust enrichment claim, relying instead on a contract which his own client – with Wilson's knowledge – had stipulated violated Michigan law, and was therefore void and unenforceable. Therefore, by asking the court to award his client $27,918.00 as damages for breach of contract – a contract which, by his client's own admission, violated Michigan law, and was therefore void and unenforceable – Wilson and Selby committed another fraud on the court.

Regarding Count II, the count requesting foreclosure of a construction lien in the amount of the damages, Wilson and Selby committed another fraud on the court, because the only lien which was attached to the FAC was the First Amended Claim of Lien, which did not include the amounts purportedly due for the work related to the change orders – change orders which the MDLARA had found violated Michigan law, and which Selby had conceded were unlawful, and therefore void as well, by signing the Stipulation. The First Amended Claim of Lien attached to the FAC was in the amount of $25,447.00. Since the construction lien was based on the only valid claim of lien, which was the First Amended Claim of Lien, Wilson and Selby, by requesting foreclosure of a construction lien in the amount of $27,918.00, violated the Construction Lien Act and committed another fraud on the court.

89.     The court entered the Judgment on October 30, 2017, which Wilson had drafted and submitted.  (A copy of the Judgment is attached as Exhibit 37.)  The Judgment states that the Plaintiff, Meadowlark, had placed proofs on the record in support of its claims for breach of contract and foreclosure of its Claim of Lien pursuant to the Michigan Construction Lien Act. This assertion is false, and constituted another fraud on the court, since the contract which Wilson and Selby had identified and entered in the record as the contract which Evans had signed was not the contract she signed and had been determined by the MDLARA to violate Michigan law, a determination which Selby had stipulated was true and accurate, and which therefore rendered the contract void and unenforceable under Michigan law, and accordingly could not be breached.  Likewise, the Claim of Lien pursuant to which the court granted a construction lien was not the lien upon which Meadowlark had sought relief, because it was not attached to the FAC and had been replaced by the First Amended Claim of Lien, and therefore the construction lien was not granted pursuant to the Michigan Construction Lien Act, which it violated.

The Judgment proceeded to award Meadowlark damages for breach of contract in the amount of $27,918.00, which constituted another fraud on the court, since that amount was the amount specified as being due in the original Claim of Lien, which included charges for the change work orders, which the MDLARA had determined also violated Michigan law and which Selby also stipulated violated Michigan law, and were therefore void and unenforceable under Michigan law.  Those charges had in fact been omitted from the First Amended Claim of Lien because, as stated in the First Amended Claim of Lien, "The original claim of lien is amended as follows:  The lien claimant's contract amount, including extras, is $53,364.00.  $2,471.00 in extras **were contracted for orally and therefore are not included in this construction lien**."

(Emphasis added.)  Because they were contracted for orally, they violated the Statute of Frauds.

The Judgment assessed another $26,758.,00 in attorney fees, and $420.27 in costs, assessments which also constituted a fraud on the court, because they were expended on actions to obtain the Judgment, which was itself a fraud on the court. The total money judgment assessed against Evans was in the amount of $55,096.27, a Judgment which is, and was, void and unenforceable because it was obtained by committing multiple frauds on the court, and by Wilson suborning perjury by Anderson and Selby.

90.     On December 14, 2017, Evans, acting *pro se,* filed a Claim of Appeal with the Michigan Court of Appeals.  On February 5, 2019, the Court of Appeals issued an unpublished decision denying the appeal.   (Copy of decision attached as Exhibit 38.)  The Court denied the appeal in large part because Evans, not being an attorney, failed to cite any case authority in support of her arguments.  Evans then retained an attorney (not the undersigned) to file an application for leave to appeal with the Michigan Supreme Court.  The Michigan Supreme Court denied the application on November 26, 2019.   The same attorney is currently representing Evans in a legal malpractice lawsuit against Castmore.

91.     Because the heating bills in the Home continued to be very high, Welch arranged to have a thermographic analysis to be conducted of the Home's walls.  The thermographic analysis was conducted on February 5, 2018, by Robert Riley, a certified thermographer.  (*See* Affidavit of Melanie Welch, Exhibit 8, ¶s 14-16, and thermographic report attached to the affidavit as Exhibit A.)  The report indicated that many areas of the Home's walls either had no insulation whatsoever, or that where insulation was present, it had not been properly injected, leaving gaps, or that the old fiberglass insulation which was supposed to have been removed and replaced with cellulose insulation had not been done.   This indicated that the insulation

inspection which Worthington claimed he had conducted was not done properly, and that the pass he had given for the insulation was erroneous.   In addition, it demonstrated that Meadowlark was not entitled to be paid for the insulation work which it claimed had been done, that the part of Judgment which was attributable to the claim that Evans had failed to pay for the work was fraudulent, and that Meadowlark's construction lien for Evans allegedly having failed to pay for work which Meadowlark claimed it had done violated the Michigan Construction Lien Act.

92.   On May 1, 2018, Meadowlark filed a Notice of Judgment Lien.   Evans was receiving disability payments from her employer, the University of Michigan.   Meadowlark proceeded to garnish Evans' disability payments, in violation of law, since the disability payments were exempt from garnishment under MCL §600.6023(1)(f).   Although Evans filed objections to the garnishment, Meadowlark succeeded in garnishing three months of Evans' disability payments, totaling $682.32, before the court entered an Order on July 18, 2018, requiring that the garnishment cease.   (Copy of Order attached as Exhibit 39.)   Evans was represented by Legal Services of South Central Michigan in the proceedings to stop the garnishment of her disability payments.   Although Meadowlark reimbursed the $682.32 to Evans, it did not compensate her for the interest she lost on the monies it had unlawfully garnished and which therefore constituted conversion under MCL §600.2919a.

93.   On April 17, 2019, Judge Connors entered an Amended Judgment on Meadowlark's motion to add attorney fees as mediation sanctions, and other attorney fees under he Michigan Construction Line Act.   While the court granted the mediation sanctions, it denied the construction lien attorney fees, which Meadowlark appealed.   The Michigan Court of Appeals reversed Judge Connors regarding his ruling on construction lien attorney fees, and on

remand Judge Connors granted the construction lien attorney fees, in the amount of $77,930,.00,

bringing the total judgment to $105,848.00.  (*See* Amended Judgment, attached as Exhibit 40.)

94.    Welch had filed a police report with the Ann Arbor Police Department alleging

that Meadowlark and Selby had committed fraud with regard to their transactions with Evans.

The complaint was assigned to Detective David Monroe for investigation.  (A copy of Detective

Monroe's Investigation Report is attached as Exhibit 41.)  Det. Monroe indicates in his Report

that he spoke to Mr. Richardson by telephone on May 8, 2019.  According to the Report,

Richardson told Det. Monroe the following (Exhibit 40, pp. 11-13, in relevant part):

> Richardson stated he had come into the residence to finish the job.  He stated
> someone gave her, referring to Melanie Welch, his number.   Richardson stated
> when he got there, he could see everything.  He stated it seemed like they were
> charging her a lot, and he gave her a price to finish the job.  He stated he thought
> the job was about $6,000 for his completion of the work, but he could not recall
> specifically.
>
> He stated that because someone else had already started the job, he told her that
> she would have to get an inspection first, and then he could come in.  He stated
> she had a problem with the first company because of having an unlicensed
> electrician on site, and then she believed they ended up having to do things not
> originally believed to have been needed.
>
> I asked Richardson about the price that he would have charged to do the complete
> job.  He stated he probably would not have done the job.  He stated it's "a pain in
> the butt," but believes it would have been about $15,000.
>
> Richardson then gave an example where they took off baseboard in the residence.
> He stated it's a 100-year-old house, they used a crowbar in taking off baseboard,
> broke it up, and piled it up outside.  **He stated they were trying to fix it in using
> smaller baseboard that was not for a house of that age, and then trying to
> bump it up to make it over.**
>
> He stated he did not understand why a builder was involved.  He stated there are
> just two aspects, the electrical work, and the insulation.  He stated each could
> have been hired independently.
>
> . . .
>
> **Richardson stated that when he got there the job was not even 50% done.**  He

stated that because he could see a lot of the stuff still exposed, he was comfortable in taking over the work.

**Referring back to the baseboard, he stated it looked like a kid had put it. He stated Welch was complaining to the company, so they did not come back.**

I asked about the specific work he had to complete concerning the electrical. He stated he never had a problem with it, stating that he is detail oriented. He stated that if someone complains, you just have to deal with it. He stated the work was just taking off the baseboard, doing the electrical work, and doing the insulation. I asked if there was anything he saw about the job, regarding the electrical work, where it looked like mistakes were being made.

**He stated it just looked bad because the electrical wires were sticking out everywhere. He stated they never got to the point of putting everything together, so he cannot say whether the job would have been done correctly.** He gave another example where there would be too many wires going to a panel, so the panel was not going to [be] large enough for all of the wires.

I mentioned that the price for baseboards was listed in Meadowlarks paperwork at $6,000. I asked if significant baseboard had been removed. **He stated baseboard had been removed all throughout the house. He stated the correct way of doing would be to number it, and then put it back in its original place. He stated you could not just take off all the baseboard and expect to reuse it after putting it in a big pile.**

I asked Richardson about ever having testified in the civil case. He stated he did. He stated he went to a civil case [hearing], stating there was only one attorney there. He stated the attorney represented the builder, the questions were one-sided, he was asked questions, and then he left. **He stated the attorney had the ability to ask questions that would make the one side look good, without any questions to counter his responses.**

. . .

Richardson stated he went to another residence shortly after working at the Welch property. **He stated he had gone to change a panel and stated the person for whom he went to work had also terminated Meadowlark. He stated they were charging three times the price he would charge to change an electrical panel. He stated he believes Meadowlark got hired to do work in a kitchen, the customer now needed a panel, and Meadowlark was going to charge an additional $3500. Richardson stated he charged $1500.** …
(Emphasis added.)

Detective Monroe transmitted his Investigation Report to the Office of the Washtenaw

County Prosecutor, but Steven Hiller, the Chief Assistant Prosecutor, declined to prosecute.

95.     Wilson arranged for a sheriff's sale of the Home to take place on July 11, 2019, to pay off the construction lien in the amount of $27,918.00.  Meadowlark had placed a bid to purchase the house for the amount of the construction lien.  On July 10, 2019, Evans was able to borrow enough money to pay off the construction lien and stop the sheriff's sale, using two cashiers checks.  One of the checks, in the amount of $25,447.00, was money Evans borrowed from Welch.  The other check in the amount of $2,471.00 was drawn on Welch's account.

Wilson and Evans' then attorney arranged that Evans was to deliver the payment to Meadowlark at Meadowlark's office.  However, when Evans and Welch went to the building where Meadowlark's office is located in order to deliver the two cashiers checks, Meadowlark's staff would not allow them into the office.  Tina Roperti, Meadowlark's Administrative & HR Director, left the office by a rear door and got into her car to leave.  Welch approached the car to hand Roperti the two checks to pay off the construction lien, but Roperti would not accept the checks and tossed them out her car window, and then began to close her car window on Welch's hand.  The car window scraped Welch's hand as she tried to remove it from the moving window.

Roperti then called 911 and asked police to come to the Meadowlark office.  Evans called the Washtenaw County Sheriff's Office and asked that a deputy sheriff be dispatched to Meadowlark's office.  Two deputy sheriffs arrived and Evans and Welch explained the situation to them, indicating that they were trying to deliver two checks to pay off the construction lien to avoid the foreclosure sale of the Home the next day.  One of the deputies took the checks and said he would deliver them to Meadowlark.  He was allowed to enter the office and delivered the checks, as a group of Meadowlark's employees were standing in a group laughing.  The office manager accepted the checks, but stated that their attorney, Wilson, had instructed them not to

give Evans a receipt.  The office manager asked the deputy to issue a trespass notice to Evans and Welch, ordering them not to come back unto Meadowlark's property for a year.  The deputy exited the office, prepared the Trespass Notice and handed it to Welch.  (Plaintiffs have a copy of the deputy's body cam recording of these events.)

96.    On July 30, 2019, Meadowlark moved to have a receiver appointed over Evans' property in order to generate monies to pay off the balance of the Judgment, which, since the construction lien had been paid, consisted solely of Wilson's attorney fees and costs.  On August 8, 2019, Judge Connors entered an Order appointing Krichbaum as receiver.  (Order attached as Exhibit 42.)  Krichbaum moved to allow him to contract with PMSI to lease another property which Evans owned, located at 1701 Hatcher Crescent, Ann Arbor Michigan, in order to generate income to pay off the balance of the Judgment.  On October 10, 2019, Judge Connors entered an Order allowing Krichbaum to contract with PMSI to lease Evans' house located at 1701 Hatcher Crescent.  PMSI thereafter rented the house to two different tenants.  Despite several requests by Evans to account to her for the income received from the rentals, PMSI has refused to provide her with this information.  PMSI has submitted bills to Krichbaum to be compensated for its work as the property manager, which Krichbaum has in turn included in invoices which he has submitted to Evans to pay for, but Krichbaum has also failed and refused to account to Evans for the amount of monies received through renting her house.  In so doing, Krichbaum has violated MCL §554.1022(3)(b) and MCR 2.622(D)(6).  In addition, the tenants damaged the house and PMSI has failed and refused to repair the damage which the tenants it approved to lease the house caused.

97.    Welch has filed complaints with the Ann Arbor City Council, criticizing the methods the City's building inspectors use to conduct inspections and grant passes.  She has

publicly criticized Meadowlark and Selby and accused them of engaging in fraud and shoddy workmanship and has demonstrated at houses which Meadowlark has remodeled and is showing to prospective customers.  On Saturday, September 21, 2019, Welch was in front of  a house which Meadowlark had remodeled and which was open for potential customers to visit.  Welch greeted a woman who was entering the house and asked her for her name and email address so that she could send her information about Meadowlark.  The woman wrote her name and email address on the notepad.

The next day, Welch was at a different house and two women and a child exited the house.  Welch did not recognize one of the women as being the same woman whom she had accosted the previous day, and approached her to ask for her name and email address.  The woman grabbed the notepad and pen out of Welch's hand and began crossing out the names on the notepad, and threatened to tear the notepad up.  Welch tried to retrieve the notepad, at which point Selby came running out of the house towards Welch and collided into Welch, whose arm was raised up in self-defense.  Selby filed a complaint with the Ann Arbor police accusing Welch of assault and battery by striking him with her arm.  The Washtenaw County Prosecutor's office charged Welch with a misdemeanor, which is currently pending in the 15th Judicial District Court.  Welch has pled not guilty.

98.    On December 19, 2019, Mr. O'Neal signed an updated affidavit based on the new information Welch had obtained since he had signed the original affidavit which had been attached to Castmore's motion to amend the witness list.  (*See* copy of Affidavit attached as Exhibit 43.)  Mr. O'Neal, who owns his own construction company, O'Neal Construction, Inc., located in Ann Arbor, and possesses bachelor's and master's degrees in civil engineering, attests in his affidavit, in relevant part:

16.     The major thing Meadowlark did that is deceptive and unethical is use an insulation subcontractor that is wholly owned by Meadowlark, enter into an agreement with that wholly-owned subcontractor for $25,000.00 (the amount shown in Permit Application when in fact the cost was $4,93.00), and then fail to reveal either the conflict, or the numbers to Ms. Evans.  Even if the contract was a lump sum contract, Ms. Evans had a right to know what was being charged, and by whom, and for what.  Furthermore, she had a right to know if Meadowlark was essentially double-dipping on profit by subcontracting work to itself and charging profit or overhead at both the general contactor and subcontractor level.  (See attached Exhibit B).

17.     I do not believe it is ethical for a contractor to hire a subcontractor it owns, as Meadowlark did, without disclosing that fact to the client.  Furthermore, it is, at a minimum, outside of the industry norm, if not unethical, to bill for profit twice for what is essentially, the same company.

18.     Ms. Evans provided me a copy of a thermal imaging inspection and report performed by DTE regarding heat loss in her home.  This inspection and report included infrared imaging and indicated that certain parts of the house that were supposed to be insulated by Meadowlark's wholly-owned subcontractor were either improperly insulated or not insulated at all, despite Meadowlark's representation otherwise.

19.     The inspection report from DTE, if accurate, is damning from the standpoint of whether Meadowlark actually did the work they were contracted to do.  If the DTE report is accurate, clearly Meadowlark did not do work they billed Ms. Evans for.  If Meadowlark billed for work they did not perform, claiming they actually did the work, they violated the Construction Lien Act, and possibly committed fraud against Ms. Evans.

99.     On July 30, 2020, Krichbaum filed a motion with the court to allow him to list the property located at 1701 Hatcher for sale in order to pay off the balance of the Judgment.  By this time, the outstanding Judgment had increased to $85,593.57, all of which represented attorney fees, interest and costs which Wilson claimed he was owed as part of the original Judgment, plus additional attorney's fees and costs he was claiming he was owed for legal work after the original Judgment was entered, including attorney fees for the unlawful garnishing of Evans' disability payments and defending against a motion to stop the unlawful garnishment.

100.    On August 21, 2020, Judge Connors entered an Order allowing Krichbaum to list

Evans' house located at 1701 Hatcher Crescent for sale.  On December 17, 2020, Krichbaum

filed a motion seeking leave to sell the house located at 1701 Hatcher Crescent.  Judge Connors

entered an Order on December 22, 2020, granting Krichbaum permission to sell the house

located at 1701 Hatcher Crescent.  Krichbaum did this at the same time that he knew that Evans

was seeking to obtain a loan in order to pay off the judgment lien and avoid the sale of her

Hatcher Crescent house.

      101.    On October 9, 2020, Howard & Howard sent Mr. O'Neal a letter threatening to

sue him for defamation for the opinions he had expressed in the affidavit he had executed on

December 12, 2019.  (Copy of letter attached as Exhibit 44.)  The threat was impotent, because

such a lawsuit would have been frivolous, since expert witnesses enjoy absolute immunity.  *See*

*MacGregor v. Rutberg,* 478 F.2d 790 (7th Cir. 2007).  The letter was another example of H & H's

bullying tactics and constituted witness tampering, a felony.  *See* MCL §750.122(3); *People v.*

*Green,* 255 Mich. App. 426 (Mich. Ct. App. 2003); *Cummings v. Wayne Co.,* 210 Mich. App.

249 (Mich. Ct. App. 1995).

      102.    Krichbaum proposed to sell the house to a friend of Selby's for $100,000 less than

the house was worth, so that he could pay off the Judgment lien and pay his receivership fees.  In

the mean time, Evans applied for a loan with the University of Michigan Credit Union to pay off

the Judgment lien.  The Credit Union agreed to lend Evans the money for the exact amount of

the lien, but for three months Evans tried to find out from Krichbaum and Meadowlark the

precise amount of the Judgment lien, which consisted of Wilson's attorney fees plus interest.

Krichbaum and Meadowlark would not tell Evans or her then attorney what the exact amount

was and kept delaying as the interest on the Judgment lien kept increasing.  On December 17,

2020, Evans finally closed a loan with the University of Michigan Credit Union for the exact

amount of the outstanding Judgment lien, in the amount of $85,593.57.   The Credit Union sent a check in that amount to Meadowlark on December 22, 2020.  A Satisfaction of Judgment was recorded on February 1, 2021.

So, for a home improvement which was supposed to have cost $50,893.00, Evans wound up paying $25,446.00 as a deposit; plus a construction lien in the amount of $27,918.00; plus costs, attorney fees and interest in the amount of $85,593.57; plus the $7,600.00 she had to pay Richardson to complete and correct the electrical work; plus $800.00 to correct the door stop molding which Meadowlark had damaged, for a total of $147,357.37.   Plus Krichbaum is claiming she owes him another $21,657.66.  The Home is still not properly insulated, and the house at Hatcher Crescent was severely damaged.  And still, Evans has not been told how much income rental was received.

103.    Krichbaum has continued to bill Evans for compensation he claims he is due for his services as the receiver.  He claims that he is owed $21,657.66 and has threatened to sell the property located at 1701 Hatcher Crescent to pay his fees.  (*See* invoice dated December 31, 2020, attached as Exhibit 45.)  He still has not accounted for any income which was received from PMSI's rental of the house.  Evans, through her attorney, has repeatedly asked Krichbaum how much rental income was received on the Hatcher Crescent property so that she can report it on her income tax, but both Krichbaum and PMSI have refuse to provide this information, in violation of Krichbaum's obligations under MCL §554.1022(3)(a) and/or (b) and MCR 2.622(D)(4) and (6).

104.    On February 24, 2021, in response to a request from PMSI to provide Evans' attorney who is representing her in her legal malpractice lawsuit against Castmore, PMSI indicated that it had destroyed its file relating to its management of the property located at

Hatcher Crescent, including its records regarding its receipt of rental income.

105.    On March 4, 2021, Howard & Howard sent a letter to Evans and Welch accusing them of making false and defamatory statements regarding Meadowlark, its owners and employees, demanding that they issue a retraction of the statements and that they cease and desist from continuing to make such statements.  The letter states that if a resolution of the matter is not achieved within two weeks, Howard & Howard will file a lawsuit against them, a draft of which is attached to the letter.   The draft lawsuit charges Evans and Welch with counts of Defamation; Civil Conspiracy; and Tortious Interference With Business Relationships.  (*See* letter and draft complaint attached as Exhibit 46.)  Notably, the draft of the complaint indicates it is to be filed in the Washtenaw County Circuit Court and is prefaced with the assertion that a prior civil action between these or other parties arising out of the same transaction or occurrence alleged in the complaint was previously filed in the same court and was assigned to Judge Timothy Connors, with the expectation that the new lawsuit would be assigned to Judge Connors as well.  This is just one more example of H & H seeking to have its way by using threatening tactics and intimidation.  The attorney who wrote the threatening letter appears to have forgotten, moreover, that truth is an absolute defense to a claim of defamation.

106.    The conduct of the Defendants has caused Evans enormous and extreme emotional distress, mental anguish and anxiety, to the point that she is under the care of a psychological social worker whom she sees three times a week.  She has suffered significant economic and financial injury and has had to go deeply into debt in order to avoid losing both of her houses.  And she owes the University of Michigan Credit Union $85,675.65.  The monthly payment on that loan is $642.57, which she has to pay out of her monthly disability benefit payment.  If she pays off the minimum due every month for 60 years, she will have paid

$51,902.43 in interest, which alone exceeds the amount she had agreed to pay for the home improvement work to begin with.

## PRELIMINARY CONCLUSIONS OF FACT AND LAW

107. Meadowlark was the first to breach the contract. Neither the one-page contract which Evans signed, nor the five-page document which Meadowlark claimed was the contract, contained an Integration Clause. Since the contract – whichever version applies – did not contain an Integration Clause, under Michigan law parol evidence is admissible to clarify its terms. *See UAW-GM Human Resource Center v. KSL Recreation Group v. KSL Recreation Group,* 228 Mich. App. 486 (Mich. Ct. App. 1998); *Hamade v. Sunoco, Inc.,* 271 Mich. App. 145 (Mich. Ct. App. 2006); *Chesterfield Exchange, LLC v. Sportsman's Warehouse, Inc.,* 572 F. Supp.2d 856 (E.D. Mich. 2008); *Comenos v. Viacom Intern., Inc.,* 857 F. Supp. 1160 (E.D. Mich. 1994). In his email to Evans and Welch dated November 23, 2015, Anderson stated that the balance on the contract after Evans paid the 50% deposit would be due "after completion when you are satisfied." (Exhibit 2) When Selby ordered the crew to walk off the job because Evans would not pay the entire balance of the contract because Meadowlark had not completed the work to her satisfaction, Selby breached the contract.

108. After discovering that Meadowlark had failed to inject any insulation behind one of the walls, and that fiberglass insulation had not been removed from behind another wall and replaced with cellulose insulation, Strong, the chief inspector for the City of Ann Arbor, indicated to Welch that Ann Arbor should not be issuing permits to conduct insulation work, since it was not possible to see inside walls. (Welch Affidavit, Exhibit 8, ¶13) By requiring that residents having insulation work done on their homes purchase a permit in the amount of $350, and then approving such work without using the available technology to confirm that the work

was done properly, the City is taking their money without providing the service such a permit

entails, and then allowing contractors to use the City's approval of the work as evidence in

litigation that the insulation work was in fact done, and done properly.  The City is thereby

committing a taking in violation of the 5th Amendment, and violating the 14th Amendment,

which prohibits government from depriving citizens of their property without due process.

109.    In *Hazel-Atlas Co. v. Hartford Co.,* 322 U.S. 238 (1944), in which the Supreme

Court reversed a 1932 judgment 12 years after it had been issued, based on fraud on the court,

Justice Black, writing for the majority, stated, *id.* at 244-46:

> Out of deference to the deep-rooted policy in favor of the repose of judgments
> entered during past terms, courts of equity have been cautious in exercising their
> power over such judgments.  …  But where the occasion has demanded, where
> enforcement of the judgment is "manifestly unconscionable," … they have
> wielded the power without hesitation.  Litigants who have sought to invoke this
> equity power customarily have done so by bills of review or bills in the nature of
> bills of review, or by original proceedings to enjoin enforcement of a judgment.
> … But whatever form the relief has taken in particular cases, the net result in
> every case has been the same:  where the situation has required, the court has, in
> some manner, devitalized the judgment even though the term at which it was
> entered had long since passed away.
>                                    * * *
> Furthermore, tampering with the administration of justice in the manner
> indisputably shown here involves far more than an injury to a single litigant.  It is
> a wrong against the institutions set up to protect and safeguard the public,
> institutions in which fraud cannot be tolerated complacently with the
> good order of society.  Surely it cannot be that preservation of the integrity of the
> judicial process must always wait upon the diligence of litigants.  **The public
> welfare demands that the agencies of pubic justice be not so impotent that
> they must always be mute and helpless victims of deception and fraud.**
> (Emphasis added; citations and footnotes omitted.)

The Sixth Circuit Court of Appeals likewise underscored the harm which a litigant's

commission of a fraud on the court does to the administrations of justice, stating in *Demjanjuk v.*

*Petrovsky,* 10 F.3d 338 (6th Cir. 1993), *id.* at 351-52:

> Fraud on the court is a somewhat nebulous concept usually discussed in civil
> cases.  No court system can function without safeguards against actions that

interfere with its administration of justice.  This concern must be balanced against the necessity for finality of court judgments, thus, only actions that actually subvert the judicial process can be the basis for upsetting otherwise settled decrees.

Professor Moore's definition is frequently cited:

> Fraud upon the court should … embrace that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct.

7 *Moore's Federal Practice and Procedure* 60.33.  Cases dealing with fraud on the court often turn on whether the improper actions are those of parties alone, or if the attorneys in the case are involved.  As an officer of the court, every attorney has a duty to be completely honest in conducting litigation.  Professor Moore emphasizes this element of fraud in his treatise:

> [W]hile an attorney should represent his client with singular loyalty, **that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court.  And when he departs from that standard in the conduct of a case he perpetrates fraud upon a court.**
> (Emphasis added.)

Under Michigan law, "A fraud is perpetrated on the court when some material fact is concealed from that court or when some material misrepresentation is made to that court." *MacArthur v. Miltich,* 110 Mich. App. 389, 391 (Mich. Ct. App. 1981).

Wilson and Selby committed fraud on the trial court in numerous instances:

a.    By attaching a five-page document to the original Complaint as the contract which Evans executed, when the only document she signed was the first page of the five-page document.  The additional four pages were included to convey to the court that Evans had agreed to the exclusions contained in the four additional pages.

b.    By alleging in the First Amended Complaint that Evans had agreed to pay for the

work done pursuant to the change orders, when the MDLARA had ruled that the change orders violated Michigan law and Selby had signed a Stipulation acknowledging this. "But once stipulations have been received and approved they are sacrosanct. Neither a hearing officer nor a judge may thereafter alter them. … Any deviation therefrom results in a denial of due process for the obvious reason that both parties by accepting the stipulation have been foreclosed from making any testimonial or other evidentiary record." *Dana Corp. v. Emp. Security Comm.,* 371 Mich. 107, 110 (Mich. 1963).

c.      By attaching to the FAC the same five-page document as the contract which Evans signed, even after the MDLARA had ruled that the five-page document violated Michigan law, and after Selby had signed a Stipulation acknowledging that claiming the five-page document was the contract violated Michigan law.

d.      By having Anderson at trial identify the five-page document as the contract which Evans had signed, contrary to the MDLARA Consent Order and Selby's Stipulation.

e.      By having Selby at trial identify the several change orders as work which Evans had agreed to having done, and for which she owed Meadowlark money, when the MDLAR had ruled that the change orders violated Michigan law and Selby had signed a Stipulation acknowledging this.

f.      By having Selby at trial identify the original Claim of Lien, which included as part of the balance due the charges for the change orders which the MDLARA had ruled violated Michigan law and which Selby acknowledged by signing the Stipulation.

g.      By requesting damages at the conclusion of the trial for breach of contract in the amount of $27,918.00, since that amount included the charges for the change orders, which the MDLARC ruled violated Michigan law and which Selby had acknowledged by signing the

Stipulation.

h.      By requesting foreclosure on a construction lien in the amount of $27,918.00 when that amount exceeded the amount stated as owed in the Amended Claim of Lien, which was the only lien before the court, since it had replaced the original Claim of Lien and was the only lien attached to the FAC.

i.      By presenting a Judgment to the court which listed Meadowlark's damages for breach of contract as $27,918.00 and which granted foreclosure on a construction lien in the same amount.

110.    By proceeding with the trial without allowing Evans additional time to obtain a new attorney, Judge Connors violated Evans' 1st Amendment right of access to the courts, which is subsumed under the right to petition the government for redress of grievances.   He also violated her 14th Amendment right to procedural due process.   This is compounded by the fact that it appears he had indicated he was going to adjourn the trial in order to enable Evans to find another attorney, but then he changed his mind because he was irritated by her mother's conduct and acted vindictively by retaliating against Evans.  *See Wasman v. United States,* 468 U.S. 559 (1984) (A judge violates due process when his decision is motivated out of vindictiveness.)  In so doing, Judge Connors violated Canons 1 and 2 of the Michigan Code Of Judicial Conduct. Canon 1 states:

**A Judge Should Uphold the Integrity and Independence of the Judiciary**

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.  A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary.  The provisions of this code should be construed and applied to further those objectives.

Canon 2 states, in relevant part:

**A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities**

A.   Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges.   A judge must avoid all impropriety and appearance of impropriety.   A judge must expect to be the subject of constant public scrutiny.   A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

B.   A judge should respect and observe the law.   At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary.   Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

*See State Bar v. Del Rio,* 407 Mich. 336 (Mich. 1979); *Judicial Disc. Proceeding Against Breitenbach,* 167 Wis. 2d 102 (Wis. 1992); 482 N.W.2d 52.

111.    In awarding Meadowlark the balance which Meadowlark claimed it was owed on the contract, it is curious that Judge Connors did not seem to notice that the only work which was left to be done after Selby ordered the crew to stop working was finishing the electrical work, for which Selby was charging Evans $25,447.00.   Yet Richardson's Affidavit, which was offered as evidence by Wilson, indicated that he had completed all of this electrical work for $4,800.00, approximately 1/5th of what Meadowlark was charging.   This huge mark-up apparently did not concern Judge Connors.

112.    The *Rooker-Feldman* doctrine does not preclude the filing of this lawsuit.   In *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280 (2005), the Supreme Court held that the lower courts were improperly applying the *Rooker-Feldman* doctrine to dismiss cases on the purported basis of lack of jurisdiction, when they in fact had jurisdiction.   The Court stated, *id.* at 284, 293:

The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind

from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

* * *

Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law. The Full Faith and Credit Act, 28 U.S.C §1738 … requires the federal court to "give the same preclusive effect to a state-court judgment as another court of that State would give." … Preclusion, of course, is not a jurisdictional matter. See Fed. Rule Civ. Proc. 8© (listing res judicata as an affirmative defense). In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in state court.

Nor does §1257 stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party … then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." …(Citations omitted.)

Applying the clarification in *Exxon-Mobil,* the Sixth Circuit Court of Appeals has held that the *Rooker-Feldman* doctrine does not bar an independent cause of action which does not challenge the state court judgment, but claims injury by virtue of how the state court judgment was obtained. Thus, in *McCormick v. Braverman,* 451 F.3d 382 (6th Cir. 2006), the Court rejected an argument that the trial court did not have jurisdiction under *Rooker-Feldman,* stating, *id.* at 392:

None of [Plaintiff's] claims assert an injury caused by the state court judgments; Plaintiff does not claim that the state court judgments themselves are unconstitutional or in violation of federal law. Instead, Plaintiff asserts *independent claims* **that those state court judgments were procured by certain Defendants through fraud, misrepresentation or other improper means, and that a state statute is vague and overbroad**. Certainly, these independent claims may deny a legal conclusion of the state court, *i.e.*, the Henry Ruff

> Property is the sole property of Edward's estate; however, this fact does not lead to a divestment of subject matter jurisdiction in the federal courts. Instead, the Supreme Court has instructed that preclusion law is the appropriate solution for these independent claims. (Italics in the original; emphasis added.)

*See also Simon v. Southern Railway,* 236 U.S. 115 (1915) (Federal court has equity jurisdiction to overturn judgment obtained in state court via fraud.); *Todd v. Weltman, Weinberg Reis Co., L.P.A.,* 434 F.3d 432, 437 (6th Cir. 2006) ("Defendant in the instant case claims this Court lacks subject matter jurisdiction because Plaintiff's federal claim is inextricably intertwined with the Ohio state court decision that Defendant's affidavit was valid. This argument ignores the fact that Plaintiff here does not complain of injuries caused by this state court judgment, as the plaintiffs did in *Rooker* and *Feldman.* Instead, after the state court judgment, Plaintiff filed an independent federal claim that Plaintiff was injured by Defendant when he filed a false affidavit.")

In the instant case, Evans is claiming that she has been injured by the fact that Meadowlark obtained its judgment against her due to the multiple frauds on the Washtenaw County Circuit Court which were perpetrated by Selby and Wilson at the trial. Accordingly, the lawsuit is not barred by the *Ricker-Feldman* doctrine.

113. The lawsuit is not barred by *res judicata* or collateral estoppel. The elements of *res judicata* were explained in *Adair v. State,* 470 Mich. 105 (Mich. 2004), as follows, *id. 121:*

> The doctrine of res judicata is employed to prevent multiple suits litigating the same cause of action. The doctrine bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first. … This Court has taken a broad approach to the doctrine of res judicata, holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence could have raised but did not. … (Citations omitted.)

*See also Richards v. Tibaldi,* 272 Mich. App. 522 (Mich. Ct. App. 2006).

*Res judicata* does not bar this lawsuit because Judge Connors denied Evans' motion to amend her Counter-Complaint to add fraud claims against Meadowlark. That became the law of the case. Consequently, had Evans even been represented by counsel at the trial, the law of the case would have precluded Evans from raising a claim that Meadowlark, Selby or Wilson was committing a fraud on the court. Thus, the question whether Meadowlark committed fraud of any kind has never been adjudicated by any state court, nor could it have been, given Judge Connors' ruling barring all fraud claims. The fact that *res judicata* does not bar claims of fraud on the court is demonstrated by the fact that the Michigan Court Rules allow such claims to be raised up to a year after a judgment has been entered. MCR 2.612(C)(1)(c) and (C)(2).

Collateral estoppel likewise does not bar this lawsuit. The Michigan Supreme Court explained the doctrine of collateral estoppel in *Monat v. State Farm Ins. Co.,* 469 Mich. 679 (Mich. 2004), as follows, *id.* at 683:

> Generally, for collateral estoppel to apply three elements must be satisfied: (1) "a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment"; (2) "the same parties must have had a full [and fair] opportunity to litigate the issue"; and (3) "there must be mutuality of estoppel." … "[M]utuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action. In other words, '[t]he estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him." (Citations omitted.)

In *Monat,* the Court held that mutuality of estoppel was no longer required if the claim of estoppel was being asserted defensively. Here, neither of the remaining factors is satisfied. The principal factual issue raised in this lawsuit is whether Meadowlark benefited from a fraud on the court committed by Sibley and/or Wilson. This factual issue was never litigated, because Judge Connors precluded it by denying Evans the right to amend her Counter-Complaint. Even if it had been raised, however, Evans did not have a full and fair opportunity to litigate the issue, she

was not represented by counsel at the trial.  Consequently, collateral estoppel does not bar this lawsuit.

114.    The lawsuit is not barred by the statute of limitations, since the state lawsuit is still pending (*see* Register of Actions, Exhibit 1), there has been no final judgment (*see Grievance Admin. v. Fieger,* 476 Mich. 231, 250, note 14), and the one-year limitation contained in Rule 60(b) therefore does not apply to allegations of fraud on the court, or for "any other reason justifying relief from the operation of the judgment" under Rule 60(b)(6), for which there is no statute of limitations.  *See Fuller v. Quire,* 916 F.2d 358 (6th Cir. 1990).  Wilson's subornation of perjury in order to obtain the Judgment would qualify as such a reason, if any additional reason were required.  Moreover, no statute of limitations applies to preclude "**a court** to entertain **an independent action** … to set aside a judgment for fraud on the court."  MCR 2.162(C)(3) (emphasis added).  *See Allen v. Allen,* 341 Mich. 543 (Mich. 1954); *Kiefer v. Kiefer,* 212 Mich. App. 176 (Mich. Ct. App. 1995).  The Rule does not specify that the court must be a state court, and therefore a federal court would qualify.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS BY THE CITY OF ANN ARBOR, WORTHINGTON AND STRONG

115.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

116.    42 U.S.C. §1983 states, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

117.    The City of Ann Arbor ("City") requires any resident who is going to have insulation installed in their home must purchase a permit in order to allow the contractor or sub-contractor to perform the installation.

118.    As part of the permit process, an inspector employed by the City is required to inspect the installation after it is concluded in order to determine that it was done and was done correctly.  If the inspector determines that it was done and done properly, the inspector issues a permit "pass" so indicating.

119.    Evans purchased an insulation permit for $350.00.

120.    Worthington was employed by the City as an inspector and claimed to have conducted an inspection of the Home in order to determine that the insulation had been installed, and had been installed properly.  In so doing he was a state actor under color of law.

121.    Meadowlark, Selby and Wilson used that pass as an exhibit at trial to prove to the court that Meadowlark had performed the insulation work which was required under its contract with Evans, and that it was therefore entitled to be paid for the insulation work it claimed it did, and which the pass confirmed that it did.

122.    When Welch questioned Worthington whether he had performed the inspection and how, Worthington told Welch that the inspectors are not able to see behind the walls and that Evans could trust that Meadowlark had done the work and done it properly, because he had worked with Meadowlark in the past and trusted them.

123.    In point of fact, Meadowlark had not injected insulation into all of the walls, and had not injected it properly in those spaces where it had done so, as demonstrated by Strong's inspection and the thermography analysis performed by Riley.  Strong, the chief inspector for the City at the time the events giving rise to this lawsuit occurred, indicated to Welch that the City

should not be issuing permits for insulation work, because the City did not have the means to confirm that such work had been done, or had been done properly. This demonstrated that the City had a pattern and practice of issuing such insulation permits, rendering it liable under *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978).

124.  Strong, as an employee of the City, was operating under state law. After discovering that Meadowlark had failed to install the insulation properly, he should have revoked the pass which Worthington had issued, but he failed to do so, allowing it to be used as proof at trial that Meadowlark had done the work for which it was seeking payment from Evans.

125.  By requiring that Evans purchase a permit in order to have the insulation work done on her Home, knowing that its inspectors could not determine if the work had been done properly by an inspection, the City's requirement that Evans pay $350.00 for a permit which the City could not enforce constituted a taking in violation of the Fifth Amendment, and a deprivation of property without due process, in violation of the Fourteenth Amendment, thereby rendering the City liable under 42 U.S.C. §1983. In addition, by allowing Worthington to give a pass for insulation work which had not been done, the City is responsible for allowing Meadowlark to recover payment for the insulation work it had not performed.

126.  By their actions, the City and the City Defendants have caused Evans a significant loss of money and have caused her extreme emotional distress, mental anguish and anxiety.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Evans' compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Evans costs and reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Evans such

other and further relief as the Court may deem just and proper.

## COUNT II

## CIVIL CONSPIRACY BETWEEN THE CITY, WORTHINGTON, STRONG, MEADOWLARK, SELBY, BRANDON, ANDERSON, RAMSDEN, ARBOR INSULATION, MEADOLARK ENERGY, AND PATTERSON IN VIOLATION OF 42 U.S.C. §1983

127.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

128.    Under 42 U.S.C. §1983, a private citizen can be deemed to be acting under color of state law and qualify as a state actor where the evidence indicates that the private citizen was "jointly engaged with state officials in the prohibited action ... [and] is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970).

129.    State agents, by their inaction in failing to enforce the law, may have "elected to place [their] power, property and prestige behind" the private conduct, thereby qualifying the private citizen committing the unlawful conduct as a state actor. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725 (1961).

130.    The permit for the insulation work to be done by Meadowlark, which subcontracted the work to Meadowlark Energy and Arbor Insulation, was purchased by Meadowlark from the deposit money which Evans had paid to Meadowlark.

131.    Worthington indicated that he gave pass approval for the insulation work based on his trust of Meadowlark, rather than by virtue of confirming that it had in fact been done. Contrary to his and Strong's assertion, there were means available to confirm whether such work had been done, and done properly, via thermography.  Worthington's approval based on his trust of Meadowlark constituted a practice utilized by the City to promote Meadowlark's business, whose services it advertises on the City's website.

132.    This practice was contrary to the purpose of requiring that residents purchase permits from the City, which is intended to insure that construction work performed in the City is done properly.

133.    "Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Haffner v. Brown,* 983 F.2d 570, 577 (4ᵗʰ Cir. 1992).  "[S]uch 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct evidence." *Pangburn v. Culbertson,* 200 F.3d 65, 73 (2d Cir. 1999). "[N]othing more than an 'understanding' and 'willful participation' between private and state defendants is necessary to show the kind of joint action that will subject private parties to §1983 liability." *Benburg v. Dempsey,* 909 F.2d 463, 469 (11ᵗʰ Cir. 1990).

134.    "It is fundamental that a conspiracy need not be established by direct evidence of an unlawful agreement. Its existence may be shown by proof of facts from which the logical inference is that the unlawful overt acts were committed in furtherance of a common design of the alleged conspirators. ... Participation in the formation of the conspiracy was not essential ... to culpability. If, after it was formed, [the governmental officer] aided or abetted it with an understanding of its purpose, he became a party to it. The rule of acquiescence in or failure to prevent a conspiracy or criminal act is not sufficient to render one liable ... does not apply in every circumstance to one whose duty it is under the law to prevent the act. [A]cquiescence may amount to purposeful furtherance; it may be the deliberate removal of an otherwise troublesome obstacle from the path of the law violator and thus become affirmative cooperation." *Burkhardt v. United States,* 13 F.2d 841, 842 (6ᵗʰ Cir. 1926) (Citations omitted).

135.    By their actions, the named Defendants have caused Evans a significant loss of money and have caused her extreme emotional distress, mental anguish and anxiety.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that the named Defendants and the City Defendants have engaged in a civil conspiracy to infringe on Evans' 5th and 14th Amendment rights and have violated 42 U.S.C. §1983; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Evans' compensatory damages against the City and her compensatory and punitive damages against the individual Defendants and the individual City Defendants named in their individual capacities; award costs and Plaintiffs' attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

<u>COUNT III</u>

<u>DECLARATORY JUDGMENT HOLDING THAT JUDGE CONNORS VIOLATED EVANS' FIRST AND FOURTEENTH AMENDMENT RIGHTS AND REQUESTING ENTRY OF AN INJUNCTION TO PRECLUDE THE COURT FROM REPEATING THE VIOLATION AGAINST OTHER LITIGANTS IN THE FUTURE</u>

136.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

137.    By failing and refusing to afford Evans' additional time in order to retain another attorney, after Castmore abandoned Evans in violation of his duties and obligations under the Michigan Rules of Professional Conduct, and proceeding to conduct a trial and grant a judgment against Evans without her being represented by counsel, Judge Connors violated Evans' 1st Amendment right to petition the government for a redress of grievances, which incorporates the right of access to the courts.  *See, e.g., California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972); *Berryman v. Rieger,* 150 F.3d 561, 567 (6th Cir. 1998); *In re A.L.Z.,* 247 Mich. App. 264, 276 (Mich. Ct. App. 2001)).

138.    Judge Connors also violated Evans' right to procedural due process under the 14th Amendment, particularly since the record indicates that he acted vindictively in retaliation

against Evans because he was irritated by the conduct of Evans' mother, Welch. *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306 (1950); *Wasman v. United States,* 468 U.S. 559 (1984).

139.   Although Judge Connors is an employee of the State of Michigan, the 11th Amendment does not preclude this lawsuit because Evans is not seeking to recover damages from Judge Connors or the Washtenaw County Circuit Court, but only requests a declaratory judgment that he violated her Constitutional rights and to enjoin the Chief Judge of the Washtenaw County Circuit Court, the Hon. Carol Kuhnke, to institute procedures to ensure that such conduct does not recur against other litigants in the future. *See Ex parte Virginia,* 100 U.S. 339, 346  (1879) ("The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power.  It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial."; *Ex parte Young,* 209 U.S. 123  (1908) *Kentucky v. Graham,* 473 U.S. 159, 167, n. 14 (1985); *Supreme Court of Virginia v. Consumers Union,* 446 US. 719, 735 (1980) ("[W]e have never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts."); *Barachkov v. 41B Dist. Court,* 311 F. App'x 863 (6th Cir. 2009); *Jackson v. Hayakawa,* 682 F.2d 1344 (9th Cir. 1982).

**WHEREFORE,** Plaintiffs respectfully request that the Court enter a declaratory judgment pursuant to 42 U.S.C. §2201 holding that Judge Connors violated Evans' 1st Amendment right of access to the courts and her 14th Amendment right to procedural due process by failing to afford Evans additional time to retain an attorney and proceeding to trial without an attorney present representing her interests, and to enjoin the Chief Judge of the Washtenaw County Circuit Court, the Hon. Carol Kuhnke, to institute procedures to prevent such conduct from happening again against other litigants in the future.

## COUNT IV

### CIVIL CONSPIRACY BETWEEN THE TRIAL COURT, MEADOWLARK, SELBY, WILSON AND HOWARD & HOWARD IN VIOLATION OF 42 U.S.C. §1983

140. Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

141. Wilson and Selby obtained their Judgment against Evans by multiple instances of committing a fraud on the court and subornation of perjury.

142. In so doing, they participated in a conspiracy to subvert the power of the court to their ends and as such were acting as state actors under color of law. *See Dennis v. Sparks,* 449 U.S. 24, 27 (1980) ("The [5th Circuit Court of Appeals] ruled that there was no good reason in law, logic, or policy for conferring immunity on private persons who persuaded the immune judge to exercise his jurisdiction corruptly."); *Shelley v. Kraemer,* 334 U.S. 1 (1948); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *Norton v. Liddel,* 620 F.2d 1375 (10th Cir. 1980).

143. By his actions in committing a fraud on the court, Wilson, a partner at Howard & Howard, was acting as a final policy maker for the law firm, thus making Howard & Howard liable for Wilson's actions under 42 U.S.C. §1983. Likewise, Selby was the final policy maker for Meadowlark, rendering Meadowlark liable for Selby's actions. *Pembaur v. Cincinnati,* 475 U.S. 469 (1986).

144. Because the Judgment was obtained by committing fraud on the court and the subornation of perjury, the Judgment should be declared null and void *ab initio*.

145. By their actions as state actors, Selby, Wilson and Howard & Howard have violated Evans' procedural due process rights under the Fourteenth Amendment and their conduct "shocks the conscience," thereby violating her substantive due process rights under the Fourteenth Amendment.

146. By their actions, the named Defendants have caused Evans a significant loss of

money and have caused her extreme emotional distress, mental anguish and anxiety.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that the named Defendants have engaged in a civil conspiracy to infringe on Evans' 14th Amendment due process rights and have violated 42 U.S.C. §1983; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Evans' compensatory and punitive damages against the named Defendants; award Evans costs and reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Evans such other and further relief as the Court may deem just and proper.

### COUNT V

### VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS BY KRICHBAUM AND PMSI AND A REQUEST FOR INJUNCTIVE RELIEF

147.   Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

148.   As a court appointed receiver, Krichbaum is a state actor acting under color of law. *Lebbos v. Judges of Superior Court, Santa Clara County,* 883. F.2d 810, 811 (9th Cir. 1989).

149.   Since Krichbaum contracted with PMSI to manage the property owned by Evans located at 1701 Hatcher Crescent, PMSI was acting as a state actor under color of law.

150.   Since the Judgment upon which the creation of the receivership was obtained by fraud on the court and the subornation of perjury, and is therefore null and void, the receivership should be dissolved.

151.   Since the receivership should never have been created, any fees which Krichbaum claims he is owed for his services as receiver are null and void.  Likewise regarding any fees PMSI claims it is owed for managing Evans' property located at 1701 Hatcher Crescent.

152.   Despite repeated requests by Evans that Krichbaum and PMSI provide her

information about the rental income which was generated by leasing her house to tenants, Krichbaum and PMSI have refused to provide her with that information.

153.    Evans is entitled to an accounting by Krichbaum and PMSI regarding all income which was obtained by renting her house at 1701 Hatcher Crescent.  PMSI violated Evans' constitutional and statutory rights by destroying its file related to its management of Evans' property located on Hatcher Crescent.

154.    Any income which was obtained from renting Evans' house at 1701 Hatcher Crescent should immediately be provided to Evans, and failure to do so will constitute a taking in violation of the 5th Amendment and a deprivation of property without due process in violation of the 14th Amendment.

155.    PMSI should be required to repair all the damage to the property located at 1701 Hatcher Crescent which was caused by the tenants PMSI rented the house to, or compensate Evans for the cost required to have the repairs done.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans and enter an injunction dissolving the receivership and canceling all fees which Krichbaum and PMSI claim they are owed; requiring Krichbaum and PMSI to account for all rental income received from the leasing of Evans' property located at 1702 Hatcher Crescent and charge Krichbaum and PMSI with violating Evans' 5th Amendment and 14th Amendment rights to the extent that they are unable or refuse to provide such an accounting; require PMSI to repair all the damage to the property located at 1701 Hatcher Crescent which was caused by the tenants PMSI rented the house to, or compensate Evans for the cost required to have the repairs done; award Evans costs and reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

**PENDENT STATE CLAIMS**

**COUNT VI**

**FRAUD BY MEADOWLARK, SELBY, BRANDON, ANDERSON, RAMSDEN, ARBOR INSULATION, MEADOWLARK ENERGY AND PATTERSON**

156.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

157.    By representing to Evans that the insulation work had been completed and done properly, the named Defendants committed fraud: (1) they continued to maintain after AI claimed it had completed the insulation work that the work had been completed correctly. Ramsden and Patterson assured Welch, when she questioned whether it had been done, that insulation had been injected from the two bedrooms on either side of the wall which Welch raised concerns about; (2) the representations were false; (3) when they made these representations they either knew they were false, or they made them recklessly, without any knowledge of their truth and as a positive assertion; (4) that they made the assertions with the intention that Evans would act upon them by paying them the balance due on the contract; (5) that Evans acted in reliance on their false representations by not terminating the contract and hiring another contractor to do the insulation job correctly; (6) and Evans suffered injury thereby because she continued to allow Meadowlark and its subcontractors to continue to work on the Home, resulting in their doing the electrical work incorrectly and her having to hire another electrical contractor to correct their mistakes and complete the electrical work properly.  *Title Ins. Co., supra.*

158.    By their actions, the named Defendants have caused Evans a significant loss of money and have caused her extreme emotional distress, mental anguish and anxiety.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that the named Defendants have committed fraud; that the Court conduct a jury

trial in order to determine any disputable issues of fact and to determine Evans' compensatory and punitive damages against the named Defendants; award costs and Plaintiffs' attorney reasonable attorney fees; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

## COUNT VII

## CIVIL CONSPIRACY BY MEADOWLARK, SELBY, BRANDON, WILSON AND HOWARD & HOWARD TO COMMIT FRAUD ON THE COURT

Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

159.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

160.    Meadowlark, Selby, Brandon, Wilson and Howard & Howard acted in concert to accomplish an unlawful purpose by committing a fraud on the court in the following respects:

a.    By attaching a five-page document to the original Complaint as the contract which Evans executed, when the only document she signed was the first page of the five-page document.  The additional four pages were included to convey to the court that Evans had agreed to the exclusions contained in the four additional pages.

b.    By alleging in the First Amended Complaint that Evans had agreed to pay for the work done pursuant to the change orders, when the MDLARA had ruled that the change orders violated Michigan law and Selby had signed a Stipulation acknowledging this.

c.    By attaching to the FAC the same five-page document as the contract which Evans signed, even after the MDLARA had ruled that the five-page document violated Michigan law, and after Selby had signed a Stipulation acknowledging that claiming the five-page document was the contract violated Michigan law.

d.    By having Anderson at trial identify the five-page document as the

contract which Evans had signed, contrary to the MDLARA Consent Order and Selby's Stipulation.

      e.    By having Selby at trial identify the several change orders as work which Evans had agreed to having done, and for which she owed Meadowlark money, when the MDLAR had ruled that the change orders violated Michigan law and Selby had signed a Stipulation acknowledging this.

      f.    By having Selby at trial identify the original Claim of Lien, which included as part of the balance due the charges for the change orders which the MDLARA had ruled violated Michigan law and which Selby acknowledged by signing the Stipulation.

      g.    By requesting damages at the conclusion of the trial for breach of contract in the amount of $27,918.00, since that amount included the charges for the change orders, which the MDLARC ruled violated Michigan law and which Selby had acknowledged by signing the Stipulation.

      h.    By requesting foreclosure on a construction lien in the amount of $27,918.00 when that amount exceeded the amount stated as owed in the Amended Claim of Lien, which was the only lien before the court, since it had replaced the original Claim of Lien and was the only lien attached to the FAC.

      i.    By presenting a Judgment to the court which listed Meadowlark's damages for breach of contract as $27,918.00 and which granted foreclosure on a construction lien in the same amount.

161.    Howard & Howard is vicariously liable for Wilson's conduct.

162.    By their actions, the named Defendants have caused Evans a significant loss of

money and have caused her extreme emotional distress, mental anguish and anxiety.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that the named Defendants have engaged in a civil conspiracy; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Evans' compensatory and punitive damages against the named Defendants; award costs and Plaintiffs' attorney reasonable attorney fees; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

<u>**COUNT VIII**</u>

<u>**STATUTORY CONVERSION BY MEADOWLARK, SELBY, BRANDON, WILSON AND HOWARD & HOWARD**</u>

163.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

164.    Meadowlark, Selby, Brandon, Wilson and Howard & Howard have committed conversion as defined under MCL §600.2919a by converting Evans' property via committing fraud and fraud on the court.

165.    The property unlawfully converted by the named Defendants includes:

a.      The deposit which Evans paid in the amount of $25,446.00.

b.      The $27,918.00 which Evans paid to remove the construction lien which Meadowlark had obtained by committing fraud on the court.

c.      The additional $85,593.57 in attorney fees which Evans was required to pay in order to remove the judgment lien, which the named Defendants obtained by committing fraud and fraud on the court.

d.      The disability payments in the amount of $682.32 which were unlawfully garnished.

166.    Under MCL §600.2919a, Evans is entitled to recover 3 times the amount of her

actual damages, plus costs and reasonable attorney fees.

167.    Evans is accordingly entitled to recover from the named Defendants $418,919.67, plus her costs and reasonable attorney fees.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that the named Defendants have engaged in conversion as defined under MCL §600.2919a; that the Court award Evans the statutory damages to which she is entitled in the amount of $418,919.67; award costs and reasonable attorney fees; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

## COUNT IX

### SLANDER OF TITLE BY MEADOLARK, SELBY AND BRANDON

168.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

169.    By placing a fraudulent construction lien on Evans' property located at 1513 Brooklyn Ave., Ann Arbor, Michigan, Meadowlark, Selby and Brandon committed slander of title under MCL §565.108.

170.    In order to remove the fraudulent construction lien, Evans had to pay $27,918.00.

171.    Evans is entitled to recover her damages in the $27,018.00, plus her costs and attorney fees she had to pay her former attorney.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that the named Defendants have engaged in conversion as defined under MCL §600.2919a; that the Court award Evans the statutory damages to which she is entitled in the amount of $477,636.00; award costs and reasonable attorney fees; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

## COUNT X

## INTENTIONAL INLICTION OF EMOTIONAL DISTRESS BY MEADOWLARK, SELBY, BRANDON, WILSON AND H & H

172.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

173.    By committing fraud on the court and perjury in order to obtain the Judgment against Evans; deliberately impeding her efforts to deliver the cashiers checks in order to pay off the construction lien the day before her Home was scheduled to be sold at the sheriff's sale; refusing to give her receipt for the payment; and threatening to file a frivolous lawsuit accusing Evans and Welch of defamation of Meadowlark, the named Defendants' conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

174.    A recitation of the facts involved in this lawsuit regarding the Defendants' conduct would lead an average member of the community to exclaim "Outrageous!"

175.    The Defendants' conduct has caused Evans and Welch to experience extreme emotional distress.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans and Welch holding that the named Defendants have intentionally inflicted emotional distress on them; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiffs' compensatory, exemplary and punitive damages against the named Defendants; award costs and Plaintiffs' attorney reasonable attorney fees; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

## COUNT XI

## FRAUD BY MICHIGAN QUALITY ELECTRIC, TUCK, GILES AND McCRUM

176.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

177.    MQE, Tuck, Giles and McCrum committed fraud against Evans in the following respects: (1) they represented to Evans that McCrum was a licensed electrician; (2) the representation was false; (3) when they made the representation, they knew it was false; (4) that they made the representation with the intention that Evans would act upon it by retaining them to do the electrical work in the Home and would pay them for the work; (5) Evans acted in reliance on the false representation by paying the deposit on the contract; (6) Evans suffered injury thereby because the Defendants walked off the job, leaving the electrical work incomplete, requiring Evans to hire and pay another electrician to complete the work they left uncompleted.

178.    By their actions, the named Defendants have caused Evans a significant loss of money and have caused her extreme emotional distress, mental anguish and anxiety.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that the named Defendants have committed fraud; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Evans' compensatory and punitive damages against the named Defendants; award costs and Plaintiffs' attorney reasonable attorney fees; and grant Plaintiffs such other and further relief as the Court may deem just and proper.

## COUNT XII

## ASSAULT AND BATTERY OF WELCH BY SELBY

179.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

180.    On September 22, 2019, Selby committed an assault and battery on Welch by running at her, creating a well-founded fear that he was going to harm her, and then colliding into her as she raised her arm in self-defense.

181.    Selby's conduct constituted a wilful, unwelcome touching of Welch.

182.    As a result of Selby's battery, Welch suffered pain and emotional distress.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Welch holding that Selby committed a battery against her; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Welch's compensatory and punitive damages against Selby; award Welch costs and reasonable attorney fees; and grant Welch such other and further relief as the Court may deem just and proper.

<u>COUNT XIII</u>

<u>ASSAULT AND BATTERY OF WELCH BY ROPERTI</u>

183.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

184.    On July 10, 2019, Roperti committed an assault on Welch by raising the window of her car while Welch's was inserting her arm into the car in order to give Roperti two cashiers checks in order to pay off the fraudulent construction lien. By raising the window on Welch's arm, Roperti created a well-founded fear in Welch that the window was going to strike her arm, thereby constituting an assault.

185.    As Welch tried to extract her arm from Roperti's vehicle, the window struck Welch's arm and caused her pain, thereby constituting a battery.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Welch holding that Roperti committed an assault and battery against her; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Welch's compensatory and punitive damages against Ropati; award Welch costs and reasonable attorney fees; and grant Welch such other and further relief as the Court may deem just and proper.

<u>**COUNT XIV**</u>

**BREACH OF FIDUCIARY DUTY BY KRICHBAUM**

186.     Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

187.     Under MCR 2.622(A), "A receiver appointed under this section is a fiduciary for the benefit of all persons appearing in the action or proceeding."  Since Evans has appeared in the proceeding, Krichbaum owed fiduciary duties to Evans.

188.     Among Krichbaum's duties as a receiver are, under MCR 2.662(D)(4), "The receiver shall account for all receipts, disbursements and distribution of money and property of the receivership estate" and MCR 2.662(D)(6), "The receiver shall furnish information concerning the receivership estate and its administration as reasonably requested by any party to the action or proceeding."

189.     Despite numerous requests by Evans that Krichbaum provide her information regarding the amount of income from the rental of her property located at 1701 Hatcher Crescent, Krichbaum has failed and refused to provide this information to Evans or to her malpractice attorney in a coherent format.  Krichbaum has thereby breached his fiduciary duties to Evans.

190.     Krichbaum breached his fiduciary duties to Evans by arranging to sell her property at 1701 Hatcher Crescent for substantially less money than the house was worth, to a friend of Selby's, so that he could recover his receiver fees.  In so doing Krichbaum was engaging in self-dealing, in violation of his fiduciary duties as a receiver.

191.     Krichbaum's breach of his fiduciary duties has caused Evans extreme emotional distress.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of

Evans holding that Krichbaum has breached his fiduciary duties to Evans; that Krichbaum be ordered to provide a detailed accounting of all of his billing and of his receipt of income from the rental property; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Evans' compensatory and punitive damages against Krichbaum; award Evans costs and reasonable attorney fees; and grant Evans such other and further relief as the Court may deem just and proper.

## COUNT XV

## NEGLIGENCE BY PMSI

192.    Plaintiffs incorporate herein all of the prior averments as if fully stated herein.

193.    PMSI had a duty to Evans to manage her property located at 1701 Hatcher Crescent to insure that it was not damaged, and to correct and repair any damage caused to the property by tenants to whom PMSI decided to lease the property.

194.    The tenants whom PMSI chose to lease the property damaged the property in many respects, including cracked tiles in the bathroom causing a leak into the basement, damage to the hardwood floors, and damaged kitchen cabinets.

195.    By not repairing this damage to Evans' property, which occurred while it was under PMSI's control, PMSI has breached its duty to Evans.

196.    The existence of this unrepaired damage has caused Evans emotional distress.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Evans holding that PMSI has been negligent and has breached its duty to Evans; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Evans' compensatory and punitive damages against PMSI; award Evans costs and reasonable attorney fees; and grant Evans such other and further relief as the Court may deem just and proper.

Marc M. Susselman

Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
P29481

By: _____s/ Marc M. Susselman_____
   Attorney for Plaintiffs

Dated: March 15, 2021

## <u>JURY DEMAND</u>

Plaintiffs hereby demands a jury trial for all issues triable by a jury.

Marc M. Susselman
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
P29481

By: _____s/ Marc M. Susselman_____
   Attorney for Plaintiffs

Dated: March 15, 2021