# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Emily Evans and Melanie Welch,

     Plaintiffs,

vs.

    Civil Action No.:  3:21-cv-10575
    Hon.  Robert H. Cleland

The City of Ann Arbor, et al.

     Defendants, Jointly and Severally.

_____/

| | |
|---|---|
| Marc M. Susselman (P29481) | Sonal H. Mithani (P51984) |
| 43834 Brandywyne Rd. | mithani@millercanfield.com |
| Canton, MI 48187 | (734) 668-7786 |
| Attorney for Plaintiffs | Caroline B. Giordano (P76658) |
| (734) 416-5186 | giordanao@millercanfield.com |
| marcsusselman@gmail.com | (734) 668-7732 |
| | Attorneys for the Hon. Carol Kuhnke and |
| | Judge Timothy Connors |
| | Miller, Canfield, Paddock and Stone, P.L.C. |
| | 101 N. Main St., Ann Arbor, MI 48104 |
| | |
| Steven M. Wolock (P38497) | Stephen K. Postema (P38871) |
| Maddin Hauser | Timothy W. Wilhelm (P67675) |
| Attorney for Defendant Matthew Krichbaum | Jennifer A. Richards (P79962) |
| 28400 Northwestern Highway | OFFICE OF THE CITY ATTORNEY |
| Southfield, MI 48034 | Attorneys for Defendants City of Ann |
| (248) 354-4030 | Arbor, Worthington, and Strong |
| swolock@maddinhauser.com | 301 E. Huron St., 3rd Floor |
| | Ann Arbor, MI 48107-8647 |
| | (734) 794-6170 |
| | spostema@a2gov.org |
| | twilhelm@a2gov.org |
| | jrichards@a2gov.org |
| Keefe A. Brooks (P31680) | Mark C. Vanneste (P73001) |
| Brooks Wilkins Sharkey & Turco PLLC | Joseph W. Barber (P827728) |
| Attorneys for Defendants Howard & Howard | 450 West Fourth Street |
| PLLC and Wilson | Royal Oak,MI 48067-2557 |
| 401 S. Old Woodward, Ste. 400 | (248)723-0456 |
| Birmingham, MI 48009 | mv@h2law.com |
| (248) 971-1710 | jwb@h2law.com |
| brooks@bwst-law.com | Attorneys for Meadowlark Builders, et al. |

_____/

<u>**PLAINITFFS' CORRECTED RESPONSE TO HOWARD & HOWARD ATTORNEYS AND BRANDON WILSON'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12 (b)(1)and 12(b)(6)**</u>

Plaintiffs, by and through their attorney Marc M. Susselman, hereby file this Response to  Defendants Howard & Howard and Brandon Wilson's Motion To Dismiss Plaintiffs' Complaint Pursuant To FRCP 12(b)(1) and FRCP 12(b)(6), and state as follows:

The motion should be denied for the reasons set forth in the accompanying brief.

**WHEREFORE,** Plaintiffs request that the motion to dismiss be denied in its entirety.

Respectfully submitted,

   /s/  Marc M. Susselman
Marc M. Susselman
Attorney for Plaintiffs

Dated:  June 17, 2021

2

**BRIEF IN SUPPORT OF RESPONSE TO RECEIVER KRICHBAUM'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................... ii

QUESTIONS PRESENTED ................................................ v

PRELIMINARY STATEMENT .............................................. 1

COUNTER-STATEMENT OF FACTS ............................................ 3

ARGUMENT    ........................................................ 22

STANDARD OF REVIEW .................................................... 22

I.    THE *ROOKER-FELDMAN* DOCTRINE DOES NOT APPLY
      TO THIS LAWSUIT AND DOES NOT DEPRIVE THE
      COURT OF JURISDICTION. ................................................ 24

      A.    It Is Indisputable Selby and Wilson Committed A
            Fraud On The Court By Committing Perjury And
            The Subornation Of Perjury. ........................................... 24

      B.    The Lawsuit Is Not Barred By The *Rooker-Feldman*
            Doctrine.    ........................................................ 29

II.   THE LAWSUIT IS NOT BARRED BY COLLATERAL
      ESTOPPEL.    ........................................................ 39

III.  PLAINTIFFS HAVE PLED A COGNIZALBE CLAIM
      AGAINST THE DEFENDANTS UNDER 42 U.S.C. §1983... 43

IV.   THE PENDENT STATE CLAIMS HAVE BEEN PROPERLY
      PLED.    ........................................................ 60

      A.    The State Civil Conspiracy Claim Has Been Adequately
            Pled.    ........................................................ 60

i

**B.** **The Statutory Conversion Claim Has Been Adequately Pled.** ........................................................................ 61

**C.** **Plaintiffs Have Pled A Viable Claim For Intentional Infliction Of Emotional Distress.** ................................... 62

**CONCLUSION AND RELIEF** ............................................................. 63

**CERTIFICATE OF SERVICE** ............................................................ 66

# INDEX OF AUTHORITIES

**Cases**                                                                                              **Page**

    **Federal**

*Adickes v. Kress Co.,* 398 U.S. 144 (1970)................................................ 49

*Barrow v. Hunton,* 99 U.S. 80 (1878)........................................................ 35

*Brentwood Acad. V. Tenn. Secondary Sch. Athletic Ass'n,*
    531 U.S. 288 (2001).......................................................... 52

*Brucar v. Rubin,* 638 F.2d 987 (7th Cir. 1980)........................................ 12,52,56

*Burkhardt v. United States,* 13 F.2d 841 (6th Cir. 1926)......................... 60

*Burton v. Wilmington Parking Authority,* 365 U.S. 715 (1961)............. 49

*Chapman v. Higbee Co.,* 319 F.3d 825 (6th Cir. 2003),
    *cert. denied,* 542 U.S. 945 (2004)..................................... 46

*Constitution Party of Pennsylvania v. Aichele*,
    757 F.3d 347 (3d Cir. 2014) ......................................... 22

*Demjanjuk v. Petrovsky,* 10 F.3d 338 (6th Cir. 1993) ............................ 32,44

*Dennis v. Sparks,* 449 U.S. 24 (1980)...................................................... 29,53

*Directtv, Inc. v. Tyreesh,* 487 F.3d 471 (6th Cir. 2007)........................... 23

*Evans v. Newton,* 382 U.S. 296 (1966).................................................... 48

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280 (2005)   30

*Haffner v. Brown,* 983 F.2d 570 (4th Cir. 1992)..................................... 59

*Hazel-Atlas Co. v. Hartford Co.,* 322 U.S. 238 (1944) .......................... 31,44

*Iannucci v. Michigan,* Case No. 16-cv-10255 (E.D. Mich. 2016).......... 38

*In re Sun Valley Foods Co.,* 801 F.2d 186 (6th Cir.1986)...................... 38

*Loubser v. Thacke,* 440 F.3d 439 (7th Cir. 2006).................................... 59

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982) .............................. 50

*MacArthur v. Miltich,* 110 Mich. App. 389 (Mich. Ct. App. 1981)....... 32

*McCormick v. Braverman,* 451 F.3d 382 (6th Cir. 2006)...................... 32,35

*Mitchum v. Foster*, 407 U.S. 225 (1972) ................................................ 61

*Overseas Motors, Inc. v. Imp. Motors Ltd., Inc.,* 375 F. Supp. 499
    (E.D. Mich. 1974), *aff'd,* 519 F.2d 119 (6th Cir. 1975)............... 42

*Pangburn v. Culbertson,* 200 F.3d 65 (2d Cir. 1999)............................ 59

*Pembaur v. Cincinnati,* 475 U.S. 469 (1986) ........................................ 43

*Sayyah v. Herman,* Case No. 1:15-cv-326 (S.D. Ohio 2016)................ 36

*Scott v. Reif,* 659 F. App'x 338 (6th Cir. 2016) (unpublished)............... 26

*Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396 (5th Cir. 1981) ................... 25

*Shelley v. Kraemer,* 334 U.S. 1 (1948) ................................................. 46

*Simon v. Southern Railway,* 236 U.S. 115 (1915) ................................. 35

*Smith v. Brown,* Civil Action Case No. 15-2784 (E.D. La. 2016).......... 36

*Todd v. Weltman, Weinberg Reis Co., L.P.A.*, 434 F.3d 432 (6th Cir. 2006) 33,35

*Wasman v, United States,* 468 U.S. 559 (1984).................................... 25

*Wickersham v. City of Columbia,* 48 F.3d 591 (8th Cir. 2007) .............. 52

*Yee v. Michigan Supreme Court,* No. 06-cv-15142 (E.D. Mich. 2007) . 35,42

**Michigan**

*Belle Isle Grill Corp. v. City of Detroit,* 256 Mich. App. 463
  (Mich. Ct. App. 2003) ..................................................................... 27

*Bye v. Ferguson,* 138 Mich. App. 196 (Mich. Ct. App. 1984) .............. 25

*Cabana v. City of Hart,* 327 Mich. 287 (Mich. 1950) ........................... 40

*Cardillo v. Canusa Extrusion,* 145 Mich. App. 361 (Mich. Ct. App. 1985)  27

*Dana Corp. v. Emp. Security Comm.,* 371 Mich. 107 (Mich. 1963) ...... 26

*Federoff v. Ewing,* 386 Mich. 474 (Mich. 1971) ................................... 27

*Lichon v. American In. Co.,* 435 Mich. 408 (Mich. 1990) .................... 27

*Longo v. Minchella,* 343 Mich. 373 (Mich. 1955) ................................. 26,27

*Mahoney v. Lincoln Brick Co.,* 304 Mich. 694 (Mich. 1943) ................ 27

*Margita v. Diamond Mortgage Corp.,* 159 Mich. App. 181
  (Mich. Ct. App. 1987) ..................................................................... 63

*Matley v. Matley,* 243 Mich. App. 100 (Mich. Ct. App. 200) ............... 60

*Mead v. Rehm,* 256 Mich. 488 (Mich. 1932) ........................................ 27

*Monat v. State Farm Ins. Co.,* 469 Mich. 679 (Mich. 2004) ................. 39

*Morris Pumps v. Centerline Piping,* 273 Mich. App. 187 (Mich. Ct. App. 2006)  27

*Peeples v. Detroit,* 99 Mich. App. 285 (Mich. Ct. App. 1980) .............. 27

*Taskey v. Paquette,* 324 Mich. 143 (Mich. 1949) .................................. 40

*Zerillo v. Dyksterhouse,* 191 Mich. App. 228 (Mich. Ct. App. 1991) .... 25

**U.S. Constitution**

U.S. Const. amend. XIV ......................................................... *passim*

**Statutes**

   **Federal**

Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e and 1692f ...... 34

42 U.S.C. §1983 ......................................................... *passim*

   **Michigan**

MCL §750.422 ......................................................... 55

**Rules**

   **Federal**

Fed. R. Civ. P. 12(b)(1) ......................................................... 22

Fed. R. Civ. P. 12(b)(6) ......................................................... 23,60

   **Michigan**

MCR 2.61©(1)(c) ......................................................... 61

Michigan Administrative Code R. 338.1533(1) .................................... 8

Michigan Administrative Code R. 338.1536 ......................................... 8

## <u>QUESTIONS PRESENTED</u>

1.    WHETHER THE PRINCIPAL WITNESS IN THE STATE COURT TRIAL
       COMMITTED PERJURY, SUBORNED BY HIS ATTORNEY.

       Plaintiffs answer "Yes."

       Defendants did not address this issue.

2.    WHETHER THE LAWSUIT IS BARRED BY THE *ROOKER-FELDMAN*
       DOCTRINE.

       Plaintiffs answer "No."

       Defendants answer "Yes."

3.    WHETHER THE LAWSUIT IS BARRED BY COLLATERAL ESTOPPEL.

       Plaintiffs answer "No."

       Defendants answer "Yes."

4.    WHETHER PLAINTIFFS HAVE ADEQUATELY PLED A CLAIM
       UNDER 42 U.S.C. §1983

       Plaintiffs answer "Yes."

       Defendants answer "No."

5.    WHETHER PLANITFFS HAVE ADEQUATELY PLED A CIVIL
       CONSPIRACY CLAIM.

       Plaintiffs answer "Yes."

       Defendants answer "No."

6.      WHETHER PLAINTIFFS HAVE ADEQUATELY PLED A STATUTORY
        CONVERSION CLAIM.

        Plaintiffs answer "Yes."

        Defendants answer "No."

7.      WHETHER PLAINTIFFS HAVE ADEQUATELY PLED A CLAIM FOR
        INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

        Plaintiffs answer "Yes."

        Defendants answer "No."

## PRELIMINARY STATEMENT

At the center of this lawsuit is Plaintiffs' contention that the principal witness for the plaintiffs in the underlying lawsuit in the Washtenaw County Circuit Court, Defendant Douglas Selby, committed perjury, and that the perjury was suborned by his then attorney, Defendant Brandon Wilson.  Plaintiffs maintain that the fact that Selby committed perjury, suborned by Wilson, is irrefutably demonstrated by documents which have been attached to the Complaint, and are attached to this Response, and by Selby's testimony at trial which contradicted the documents in question.  One of the documents is a Stipulation which Selby signed as part of a Consent Order to settle a complaint which Plaintiff Evans had filed with the Michigan Department Of Licensing And Regulatory Affairs ("MDLARA").  In that Stipulation, which Selby signed "approved as form and substance," Selby admitted that the five-page document which he claimed constituted the contract between Evans and Selby's business, Defendant Meadowlark Builders, LLC, violated Michigan law.  As such, under Michigan law the document was void and unenforceable.

In addition, in the Stipulation Selby agreed that certain change orders which he claimed were also part of the contract with Evans, also violated Michigan law, and were therefore, in turn, void and unenforceable.  Wilson knew that Selby had signed this Stipulation, "approved as to form and substance."  Yet, at the trial, Wilson asked Selby to identify the five-page document as the contract between Evans

and Meadowlark, a contract which Selby claimed Evans had breached.  Wilson also had Selby identify the change work orders, which he testified Evans had approved and were therefore also part of the contract, testimony which likewise contradicted the Stipulation Selby had signed.  The five-page document and the change work orders were marked and admitted as trial exhibits, and formed the basis for the court's conclusion that Evans had breached the contract, and was the basis for the court's defaulting Evans and entering a judgment against her.

Since the judgment was obtained by virtue of the perjury by Selby, and subornation of perjury by Wilson, that judgment was void *ab initio*, and Plaintiffs request that this Court so rule.  It is from this void judgment, obtained by the plaintiffs in the underlying lawsuit by committing a fraud on the trial court via perjury, that all of the other claims against the Defendants arise.  It is notable that nowhere in their brief do the Defendants address the perjury and subornation of perjury issue, which is the independent basis for this lawsuit being filed in federal court under 42 U.S.C. §1983. This is the most critical issue ins this case, yet Wilson and Howard & Howard have chosen ot ignore it. Plaintiffs expressly referred to the commission of perjury in in the first sentence of the Preliminary Statement of the Complaint, and again in ¶s 84, 86, 89, 114, 141, 144, 150, and 173.  Instead of addressing the issue of perjury, however, Defendants seek to obfuscate this issue by addressing only other forms of fraud on the court referred to in the Complaint– e.g., that Selby claimed the

insulation work had been done, when the evidence demonstrates it was not – and argue that since these issues were rejected by the Court of Appeals in its decision denying Evans' *pro se* appeal, that Plaintiffs are collaterally estopped from arguing the Judgment was obtained by a fraud on the court.  However, the most serious fraud on the court was the perjury committed by Selby, suborned by Wilson, an issue which was never addressed by the Michigan Court of Appeals or by the Michigan Supreme Court, because Evans was not represented by an attorney during the trial, and therefore no objection to the testimony which constituted the perjury was made, and consequently could not be raised on appeal.

Contrary to defense counsels' arguments, these claims are not precluded by the *Rooker-Feldman* or collateral estoppel doctrines. The case law is clear that the *Rooker-Feldman* doctrine does not apply to judgments obtained by the commission of a fraud upon the trial court in the form of perjury or the subornation of perjury. Likewise, collateral estoppel does not apply to Plaintiffs' claims because the questions of whether Selby and Wilson committed perjury and the subornation of perjury, and thereby committed a fraud upon the court, have never been addressed or adjudicated by the Michigan Court of Appeals or the Michigan Supreme Court. Therefore collateral estoppel cannot preclude these issues from being raised in federal court.

## **COUNTER-STATEMENT OF FACTS**

Emily Evans purchased a house (hereinafter "Home") located at 1513

Brooklyn Ave., Ann Arbor, Michigan, on August 6, 2015. She contacted Amica Mutual Insurance Company ("Amica") in order to purchase homeowner's insurance. Amica informed her that in order to obtain a homeowner's policy she would need to show written proof that all active knob and tube wiring had been removed from the Home, since such wiring in older homes was considered a fire hazard.

Evans contacted Meadowlark Builders, LLC, and was directed to speak with Dave Anderson, Meadowlark's client account manager. Evans informed Anderson of Amica's requirement and he recommended that Evans contact Michigan Quality Electric ("MQE"). Evans contacted MQE and spoke to David Giles. Giles inspected the Home and advised Evans that knob and tube wiring was present throughout the entire Home. He provided Evans with an Electrical Proposal on August 25, 2015, which called for a variety of electrical work and upgrading at the Home.

Because Evans was in poor health and recovering from a traumatic head injury, her mother, Plaintiff Melanie Welch, assumed the responsibility of identifying contractors and overseeing their work. After receiving the electrical proposal from Giles, Welch contacted Anderson regarding repairing the walls once the electrical work at the Home had been completed. They agreed that Meadowlark would repair the walls once the electrical work was completed. Anderson advised Welch that it would be a good idea to install insulation in the walls and attic at the time the walls were being repaired, and Welch agreed.

4

On November 23, 2015, Anderson sent an email to Evans with a proposal for the renovations they had discussed. At the end of the email, Anderson stated: "Let me know if you have any questions. We need 50% deposit to get the work scheduled, **and the rest after completion when you are satisfied.**" (Emphasis added.) (Email attached hereto as Exhibit 1.) On November 25, 2015, Evans signed a one-page contract with Meadowlark for all the electrical and insulation work to be done for a fixed price contract sum of $50,893. The one-page contract she signed did not include any limitations on the scope of the electrical work. (*See* Evans' Affidavit with one-page contract attached, Exhibit 2; Evans' deposition transcript, pp. 49-61, attached as Exhibit 3.) The contract required that Evans pay an up-front deposit of $25,446.00, before any of the work had started.  Evans gave Meadowlark a check in that amount.

As Meadowlark's employees and sub-contractors began doing the home improvement work, Evans and Welch started complaining to Meadowlark and its CEO, Douglas Selby, regarding the quality of the work.  As Evans and Welch continued to complain, on February 18, 2016, Selby ordered that his employees and sub-contractors cease their work.  (*See* pp. 73-74 of the trial transcript, attached hereto as Exhibit 4.)  They walked off the job, leaving the work incomplete, with jagged wiring hanging out of the walls throughout the Home.

Meadowlark informed Evans and Welch it would not return to the Home to complete the work until Evans paid what Meadowlark claimed was the balance due

under the contract, in the amount of $27,918.00.  This amount exceeded the contract price which Meadowlark had indicated was the total price for the work it was contracting to perform ($50,893.00), minus the $25,446.00 Evans had paid as a deposit. This was contrary to Anderson's assertion in his November 23, 2015, email that the balance of the contract would not be due until "completion when you are satisfied."

When none of the Meadowlark employees had returned to the Home for over two weeks to complete the work, Evans sent Meadowlark a letter on or about March 7, 2017, in which she listed all of the deficiencies in Meadowlark's work and indicated that she was terminating the contract.  (*See* letter attached as Exhibit 5.)  Evans had to hire a different electrical contractor to obtain a new permit to complete the electrical work on the Home.

On April 4, 2016, Wilson sent Evans a letter charging her with breaching the contact and demanding payment of what he claimed was the outstanding balance in the amount of $27,918.00. (*See* letter attached hereto as Exhibit 6.) Attached to the letter was a Sworn Statement, sworn and attested to by Selby, which purported to list and itemize the work which Meadowlark claimed it had completed on the Home, and the price being charged for each item of work. The Sworn Statement listed Insulation, in the amount of $7,820.00, of which it claimed $3,910.00 was still owed. It also listed Electrical, in the amount of $31,550.00, of which it claimed $15,888.00 was still owed. Also attached to the letter was a Claim of Lien, signed by Selby,

6

which Meadowlark had filed with the Register of Deeds, claiming a lien on the Home in the amount of $27,918.00. Following the Claim of Lien was a First Amended Claim of Lien signed by Selby and claiming that the construction lien amount was $25,447.00, rather than $27,918.00.

On April 20, 2016, Meadowlark filed a Complaint in the Washtenaw Circuit Court against Evans alleging breach of contract and foreclosure of a construction lien. The lawsuit was assigned to Judge Connors. Meadowlark attached four exhibits to the Complaint. (*See* Complaint, attached as Exhibit 7.) The first exhibit was a document Meadowlark claimed was the contract between it and Evans. The purported contract consisted of the one-page contract which Evans had signed on November 25, 2015, plus four additional pages which were not attached to the contract which Evans had signed. The other three exhibits were the First Amended Claim of Lien; Proof of Service of Claim of Lien; and a Lis Pendens filed on April 20, 2016.

On August 8, 2016, Evans' then attorney, Joshua Castmore, filed an Answer to the Complaint, with a jury demand, as well as a Counter-Complaint And Third Party Complaint.  The Counter-Complaint contained five counts for unjust enrichment; breach of implied covenant of good faith and fair dealing; civil conspiracy; and negligence.  On August 26, 2016, Meadowlark filed a motion for summary disposition.  The Court held a hearing on October 13, 2016, and granted the motion to dismiss with the exception of the claim of unjust enrichment.

7

Evans filed a complaint regarding Meadowlark with the Michigan Department of Licensing and Regulatory Affairs ("MDLARA"). On December 27, 2016, the MDLARA issued a Formal Complaint against Meadowlark and Selby. (Copy attached as Exhibit 8.) The Complaint contained four counts. The First Count asserted that Meadowlark had violated the Michigan Administrative Code. R. 338.1533(1), by failing to put all agreements between it and Evans in writing and have all agreements signed by both parties. The Second Count asserted that the contract had been procured by a salesperson who was not licensed as a builder or contractor, in violation of Michigan Administrative Code R. 338.1536. The Third Count asserted that Meadowlark had violated the Code by aiding and abetting a person in the unlicensed practice of an occupation. The Fourth Count asserted that Meadowlark's conduct had evidenced a willful departure from, and disregard of, plans or specifications in a material respect, violating Code §2411(d). Attached to the Complaint as Exhibit A was the one-page contract which Evans had signed, plus four "Scope of Work" pages which had not been provided to Evans, and which were not part of the contract. Attached to the Complaint as Exhibit B were three work change orders which MDLARA asserted Meadowlark had "failed to provide copies of the change orders to Homeowner that were signed by both parties."

On June 13, 2017, a Consent Order was entered with respect to the Formal Complaint which had been issued by the MDLARA. (Copy of Consent Order is

attached as Exhibit 9.)  The Consent Order stated, in relevant part:

> Respondents [Meadowlark and Selby] admit the allegations in the Complaint, with the exception of Counts III and IV, which Respondents deny and shall be dismissed.  The Michigan Board of Residential Builders and Maintenance and Alteration Contractors has reviewed this Consent Order and Stipulation and agrees that the public interest is best served by resolution of the outstanding Complaint.

> Therefore, IT IS FOUND that the facts alleged in the Complaint constitute violation(s) of MCL 338.604(h) and MCL 339.604(l).

> IT IS ORDERED that Counts III and IV of the Complaint are DISMISSED.

The Stipulation attached to the Consent Order was executed by Meadowlark

and Selby on April 21, 2017.  The Stipulation stated, in relevant part:

> 1.     Respondent and the Department agree that Counts III and IV of the Complaint shall be dismissed by the Board.

> 2.     **The facts alleged in the Complaint constitute violation(s) of MCL 339.604(h) and MCL 339.604(l).**
> 3.     Respondents understand and intend that by signing this Stipulation Respondents are waiving the right, pursuant to the Occupational Code, the rules promulgated thereunder, and the Administrative Procedures Act, MCL 24.201 *et seq.,* to require the Department to prove the charges set forth in the Complaint by presentation of evidence and legal authority, and Respondents are waiving the right to appear with an attorney and such witnesses as Respondents may desire to present a defense to the charges.
> ….
> 6.     This Order is approved **as to form and substance by Respondents** and the Department and may be entered as the final order of the Board in this matter.  (Emphasis added.)

Meadowlark's and Selby's attorney, Brandon Wilson, was aware of the entry of the Consent Order and of Selby's Stipulation as to form and substance.[1]

Meadowlark had filed a motion for leave to file a First Amended Complaint to add a claim for unjust enrichment on June 8, 2017. On June 30, 2017, Evans filed a motion for leave to file a First Amended Counter-Complaint which proposed to add fraud claims against Meadowlark. On July 13, 2017, the court held a hearing on both motions and granted Meadowlark's motion, but denied Evans' motion. The court entered an Order granting Meadowlark the right to amend, and denying Evans the right to amend, on July 14, 2017. (Copy attached as Exhibit 11.)

Meadowlark then filed Plaintiff's First Amended Complaint ("FAC"), which continued to plead breach of contract, and contained the additional unjust enrichment count. (Copy of First Amended Complaint attached hereto as Exhibit 12.) In ¶8 of the FAC, Meadowlark alleged that Evans had agreed to pay it $50,893. In ¶9, Meadowlark alleged, "Defendant subsequently agreed to pay Plaintiff to perform additional work on the Project in the amount of $2,471 (the "Extras Contract"). The Original Contract and the Extras Contract are referred to together as the 'Contract.'"

---

[1] On p. 5, Defendants state that "LARA proposed to resolve the administrative complaint 'with a Consent Order and payment of a fine, without an admission of guilt on any counts.'" This statement is misleading. The proposal was included in an email which the MDLARA sent to Selby on March 17, 2017. (Copy attached as Exhibit 10) However, no such disclaimer was included in the final Consent Order or in the Stipulation, which Selby agreed to as to "form and substance," thereby constituting an admission of guilt.

In making this allegation, Meadowlark and Wilson were committing a fraud on the court, because it was precisely the additional amount for additional work which the MDLARA had charged Meadowlark and Selby with violating Michigan law in Count I of the Formal Complaint, and had attached the change orders charging those additional amounts to the Compliant which Evans had not seen and had not agreed in writing to pay for, **and as to which Selby had signed a Stipulation acknowledging that the allegations in Count I of the Formal Complaint were true which stated that those charges, and the purported contract encompassing them, were unlawful.** Meadowlark again committed fraud on the court by attaching to the FAC as Exhibit A the one-page contract which Evans had signed, plus the four additional pages itemizing the exclusions to the  scope of work, pages which were not presented to Evans when she signed the one-page contract, **and which the MDLARA had included in its Count I as violating Michigan law, and which again Selby had agreed violated Michigan law when he signed the Stipulation**.[2]

On September 13, 2017, Wilson filed a motion in limine to exclude a number of documents from being offered as evidence in the upcoming trial.  Included among the documents, Wilson requested that Evans' attorney be precluded from offering as

---

[2] Attached to the FAC as Exhibit B was the First Amended Claim of Lien, which was for less money than the original Claim of Lien, since it deducted the amount of $2,471.00 which had been included in the original Claim of Lien for work which Meadowlark claimed Evans had agreed to orally.  The balance due under the First Amended Claim of Lien was $25,447.00.

evidence either the MDLARA Complaint against Meadowlark, or the Consent Order and Selby's signed Stipulation. Both of these documents were attached to the motion as Exhibits G and I. (*See* copy of motion, attached as Exhibit 13.) Evans' then attorney, Joshua Castmore, did not file a response opposing the motion. Judge Connors granted the motion. (*See* Order attached as Exhibit 14.)

On September 28, 2017, Castmore attorney filed an Emergency Motion To Withdraw As Counsel. (Copy attached as Exhibit 15.)[3] Attached to the motion was an email from Evans terminating Castmore. Castmore requested the court grant his motion to withdraw and afford "Evans a reasonable amount of time to either retain new counsel or to prepare to represent herself *in Pro Per.*" On that same date, Evans filed an Emergency Motion To Update Court Records As Of This Date to Show that Emily Evans Is Representing Herself. (Copy of motion attached as Exhibit 16.)[4]

Judge Connors did not rule on either motion. On the date of trial, October 2,

---

[3] On p. 6, Defendants erroneously assert that Castmore did not file a motion to withdraw. Plaintiffs asserted that the motion was filed in ¶88 of the Complaint, and a copy of the motion was attached to the Complaint as Exhibit 32. "We recognize the inclination of litigants to present the facts in the light most favorable to them. However, there is a line between zealous argument and outright disingenuity. That line should not be overstepped." *Brucar v. Rubin,* 638 F.2d 987, 990, note 3 (7th Cir. 1980).

[4] In point of fact, Castmore had told Evans that he wanted to withdraw from representing her because he did not have sufficient time to prepare for the trial. He told Evans that the only way Judge Connors would allow him to withdraw was if Evans sent him an email terminating him. (*See* email from Castmore explaining Evans has to fire him in order for Judge Connors to allow him to withdraw, attached as Exhibit 17.) Evans accordingly sent Castmore an email terminating him, as requested.

2017, neither Castmore nor Evans appeared. Welch was in the courthouse and was informed that Judge Connors was going to adjourn the trial so Evans could retain a new attorney. (*See* ¶82 of the Complaint.) When Judge Connors took the bench, however, he remarked that this was the date and time set for the jury trial and the only people present were the Plaintiff, Plaintiff's attorney, and court staff. (*See* Exhibit 4. p. 4.) He then made a remark about a relative of the Defendant making communications in the building "in forms of emails and personal appearance, who is not the attorney of record and is not the plaintiff but is a relative of the plaintiff [*sic*]," referring to Welch, who was in the courtroom and was observing the proceeding. He proceeded to note that he had not discharged the Defendant's attorney, who was not present, nor was the Defendant. (*Id.* at 4-5) He then stated, Exhibit 4, p 5:

> My suggestion, counsel, is, given the rather unusual and unorthodox communications that have been taking place, most recently, but, frankly, throughout this trial and throughout these proceedings, is that we pick a jury, that you present your proofs. I do not know if the lawyer will show up. If they do, they'll have their right to cross-examine any witnesses that you bring.

> When you rest your case, I'll see if there's any defendant here to put something forward. If not, of course, I would suspect you'd move for a directed verdict.

> I say this because I don't think that this is over, okay.

> So are we ready to proceed with the jury?

This obviously took Wilson by surprise, because he was under the impression that the trial was going to be adjourned and he responded, *id.* at 5:

13

MR. WILSON:      Yes, Your Honor.  I do need to contact two witnesses–

THE COURT:      Okay.

MR. WILSON: -- who I indicated should not appear, **based upon what I was told before you took the benc**h.

THE COURT:      Okay.

MR. WILSON:      So I need to contact them and, obviously, see if they can come back.  (Emphasis added.)

The trial resumed and a jury was selected. When Wilson called Selby to testify, he asked Selby if there were exclusions in "your contract, Exhibit 4?" which had previously been identified by Anderson as the contract between Meadowlark and Evans. Selby testified that the contract excluded electrical work on the kitchens and bathrooms, "because they were previously remodeled." (Exhibit 4, pp. 60-61) He asked Selby about work on the lower bathroom and garage, all of which Selby testified were excluded based on exclusions in Exhibit 4. But Exhibit 4 was not the contract Evans had signed.  It was the five-page document which Selby had acknowledged violated Michigan law by signing the Stipulation as part of the settlement with the MDLARA, all of which Wilson knew, thereby suborning perjury by Selby.

Wilson proceeded to ask Selby to identify various change orders for work that he claimed was not included in the original contract and which he claimed Evans was refusing to pay for. (Exhibit 4, pp. 67-74).  But all of the change orders which Selby accused Evans of not paying for were included in Exhibit B of the MDLARA

Formal Complaint, which the MDLARA charged in Count I of the Complaint also violated Michigan law because Evans had not signed them.  Selby conceded this point by signing the Stipulation "as to form and substance."  Yet Wilson, knowing this, offered the change orders as evidence of work which was part of the contract and which Evans was refusing to pay for, again committing fraud on the court and suborning perjury by Selby.

Wilson proceeded to ask Selby to identify the claim of lien which he had filed with the Register of Deeds. (Exhibit 4, p. 83) But this was the claim of lien which included charges for the additional change orders which the MDLARA had charged violated the law, and which Selby had stipulated violated the law. Moreover, the claim of lien had been replaced by the First Amended Claim of Lien, which was the only lien which Wilson had attached to the FAC, which had deleted those charges, and which was at this stage in the litigation the only lien which Meadowlark would have had a basis to collect on. By offering as evidence the Original Lien, rather than the corrected First Amended Lien, Wilson committed another fraud on the court.

At the close of the proofs, Judge Connors entered a default against Evans on the breach of contract claim, and a directed verdict on her Counter-Complaint. He entered the Judgment on October 30, 2017, which Wilson had drafted. (A copy of the Judgment is attached as Exhibit 18.) The Judgment stated the Plaintiff had placed proofs on the record in support of its claims for breach of contract and foreclosure

of its Claim of Lien pursuant to the Michigan Construction Lien Act. This assertion was false, and constituted another fraud on the court, since the contract which Selby had identified and entered in the record as the contract was not the contract Evans signed, but the five-page contract which the MDLARA had determined violated Michigan law, a determination which Selby had stipulated was true and accurate, and which therefore rendered the contract void and unenforceable under Michigan law, and accordingly could not be breached. Likewise, the Claim of Lien pursuant to which the court granted a construction lien was not the lien upon which Meadow-lark had sought relief, because it was not attached to the FAC and had been replaced by the First Amended Claim of Lien, and therefore the construction lien was not granted pursuant to the Michigan Construction Lien Act, which it violated.

The Judgment awarded Meadowlark damages for breach of contract in the amount of $27,918.00, which constituted another fraud on the court, since that amount was the amount specified as being due in the original Claim of Lien, which included charges for the change orders, which the MDLARA had determined also violated Michigan law and which Selby stipulated violated Michigan law, and were therefore void and unenforceable under Michigan law. Those charges had in fact been omitted from the First Amended Claim of Lien because, as stated in the First Amended Claim of Lien, "The original claim of lien is amended as follows: The lien claimant's contract amount, including extras, is $53,364.00. $2,471.00 in extras

**were contracted for orally and therefore are not included in this construction lien**." (Emphasis added.) Because they were contracted for orally, they violated the Statute of Frauds. The Judgment assessed another $26,758.00 in attorney fees, and $420.27 in costs. The total money judgment was in the amount of $55,096.27, a Judgment which is, and was, void and unenforceable because it was obtained by multiple frauds on the court, including Selby's perjury, suborned by Wilson.

Evans, acting *pro se,* filed a Claim of Appeal with the Michigan Court of Appeals. On February 5, 2019, the Court issued an unpublished decision denying the appeal.  (Copy of decision attached as Exhibit 19.)  The Court denied the appeal in large part because Evans, not being an attorney, failed to cite any case authority in support of her arguments.  Evans then retained an attorney (not the undersigned) to file an application for leave to appeal with the Michigan Supreme Court  (The same attorney is currently representing Evans in a legal malpractice lawsuit against Castmore.)  The Michigan Supreme Court denied the application on November 26, 2019.

On April 3, 2018, Wilson filed a Request And Writ For Garnishment with Evans' employer, the University of Michigan.  *(See* Request attached as Exhibit 20.) Evans filed an Objection to the periodic garnishment with the court on May 1, 2018, on the basis that disability benefits are exempt from garnishment under Michigan law.  (*See* copy of Objection with some exhibits omitted, attached as Exhibit 21.) Evans contacted the Legal Services of South Central Michigan ("LSSCM"), which

17

filed a brief in support of the Objection. (*See* First Amended Brief attached as Exhibit 22.) Wilson filed a Response, arguing that the Objection had not been timely filed. (Response attached as Exhibit 23.) The LSSCM filed a Response, contesting Wilson's arguments. (Response attached as Exhibit 24.) On July 18, 2017, the court entered an Order discontinuing the garnishment. (Order attached as Exhibit 25.) However, Meadowlark did not voluntarily restore the disability payments which it had unlawfully taken from Evans. Consequently, it was necessary for the LSSCM to file a motion on November 5, 2018, to compel Meadowlark to return the funds it had unlawfully confiscated. (*See* Verified Motion For Return Of Funds Exempt From Garnishment, minus exhibits, attached as Exhibit 26.) The LSSCM withdrew the motion on December 11, 2018, when Meadowlark agreed to repay Evans the money it had illegally taken. However, Meadowlark did not pay Evans interest on the payments which it had taken.

Wilson then arranged for a sheriff's sale of the Home to take place on July 11, 2019, to pay off the construction lien in the amount of $27,918.00. Meadowlark had placed a bid to purchase the house for the amount of the construction lien. On July 10, 2019, Evans was able to borrow enough money to pay off the construction lien and stop the sheriff's sale, using two cashiers checks. One of the checks, in the amount of $25,447.00, was money Evans borrowed from Welch. The other check in the amount of $2,471.00 was drawn on Welch's account.

18

Wilson and Evans' then attorney arranged for Evans to deliver the payment to Meadowlark at Meadowlark's office. However, when Evans and Welch went to the Meadowlark's office to deliver the two cashiers checks, Meadowlark's staff would not allow them in. (*See* Complaint, ¶95.) Tina Roperti, Meadowlark's Administrative & HR Director, left the office by a rear door and got into her car to leave. Welch approached the car to hand Roperti the two checks to pay off the construction lien, but Roperti would not accept the checks and tossed them out her car window, and then began to close her car window on Welch's hand. The car window scraped Welch's hand as she tried to remove it from the moving window.

Roperti then called 911 and asked police to come to the Meadowlark office. Evans called the Washtenaw County Sheriff's Office and asked that a deputy sheriff be dispatched to Meadowlark's office. Two deputy sheriffs arrived and Evans and Welch explained the situation to them, indicating they were trying to deliver two checks to pay off the construction lien to avoid the foreclosure sale of the Home the next day. One of the deputies took the checks and was allowed to enter the office to deliver them, as a group of Meadowlark's employees were in the office laughing. The office manager accepted the checks, but stated that their attorney, Wilson, had instructed them not to give Evans a receipt. The office manager asked the deputy to issue a trespass notice to Evans and Welch, ordering them not to come back unto Meadowlark's property for a year. The deputy exited the office, prepared the

Trespass Notice and handed it to Welch. (Plaintiffs have a copy of the deputy's body cam recording of these events.)

On July 30, 2019, Wilson moved to have a receiver appointed over Evans' property in order to generate monies to pay off the balance of the Judgment, which, since the construction lien had been paid, consisted solely of Wilson's attorney fees and costs, plus interest. On August 8, 2019, Judge Connors entered an Order appointing Matthew Krichbaum as receiver. (*See* Order, attached as Exhibit 27.)[5] Krichbaum than requested leave of the court to list another house for sale which Evans owned, located at 1701 Hatcher Crescent, Ann Arbor. Judge Connors granted Krichbaum's request. In order to prevent the sale of her home on Hatcher Crescent, Evans applied for a loan at the University of Michigan Credit Union to pay off the Judgment. On September 21, 2020, the Credit Union approved her loan for the exact amount of the Judgment. The payment was delivered to Meadowlark on December 23, 2020, just in time to prevent Evans' home from being sold.

---

[5] At the hearing, Judge Connors made the following statement on the record regarding Welch: "The statements that have been made, the behavior that has been exhibited by your client's mother, demonstrate to me that I cannot count on [her] representations as being truthful or motivated by an attempt to resolve the dispute." (Hearing Transcript, p. 10, attached as Exhibit 28.) Welch was not even present in the courtroom as a witness, and had never testified at any hearing presided over by Judge Connors. Yet her claims of fraudulent conduct by Meadowlark and Selby, regarding the failure to insulate the walls, for example, have turned out to be accurate, while Judge Connors has been willing to believe Selby, who committed perjury, and Wilson, who suborned the perjury.

20

On April 1, 2021, after this lawsuit was filed, Krichbaum filed his Notice of Filing Final Report, in which he claimed that Evans owed him $21,835.33 and requested that Judge Connors impose a judgment lien on Evans' property for that amount. (*See* copy of Notice attached as Exhibit 29.) Krichbaum then filed a motion to have the Final Report approved by Judge Connors. Evans filed a Response opposing the motion. (*See* Response, attached as Exhibit 30.) Evans also filed a motion for recusal of Judge Connors and a motion for stay, scheduled to be heard on April 15. In her Response, Evans informed the court of the perjury and subornation of perjury which had been committed at the trial, and argued that the Judgment was therefore void *ab initio*, that the receivership should not have been created, and that therefore Krichbaum was not entitled to recover any of his attorney fees from Evans. Evans stated that, instead, Krichbaum should recover his fees by filing a cross-claim against Meadowlark, Selby and Wilson in this lawsuit, by virtue of whose fraud on the court the void Judgment was obtained, resulting in his appointment as Receiver.

During the hearing, Judge Connors denied the motion for recusal and then cut Evans' attorney off and would not allow him to argue the motion for a stay. (*See* hearing transcript attached as Exhibit 31, p. 19.) Judge Connors granted Krichbaum's motion to approve his Final Report and granted him a continuing judgment lien on all of Evans' real property. (*See* Order, attached as Exhibit 32.) Evans has filed an Application For Leave To Appeal regarding this Order in the Michigan

Court of Appeals, which is currently pending.

On May 25, 2021, Krichbaum filed a motion requesting that Judge Connors approve additional attorney fees associated with his filing an Answer opposing Evans' Application For Leave To Appeal to the Michigan Court of Appeals. (*See* motion attached as Exhibit 33.) He has also requested that the court grant him a lien on any recovery which Evans may obtain in her legal malpractice lawsuit against Castmore. Evans filed a Response opposing the motion, arguing that Judge Connors does not have jurisdiction to award attorney fees for Krichbaum's responding to an application for leave to appeal filed in the Michigan Court of Appeals, and that any potential recovery from the legal malpractice lawsuit is not part of Evans' estate over which Krichbaum has authority. (*See* Response, attached as Exhibit 34.) The motion was heard on June 17, 2021. Judge Connors granted Krichbaum's motion.

## ARGUMENT

## STANDARD OF REVIEW

Defendants are raising a facial challenge to the Court's subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and maintain pursuant to Fed. R. Civ. P. 12(b)(6)that Plaintiffs have failed to state any cognizable claim for relief in any of the claims pled against them in the Complaint. With respect to the facial challenge to the Court's subject matter jurisdiction, the standard of review has been set forth in *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir. 2014), as

22

follows, *id.* at 358:

> In reviewing a facial attack, "the court must only consider the allega-
> tions of the complaint and documents referenced therein and attached
> thereto, in the light most favorable to the plaintiff." ... Thus, a facial
> attack calls for a district court to apply the same standard of review it
> would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*,
> construing the alleged facts in favor of the nonmoving party. ... This is
> in marked contrast to the standard of review applicable to a factual at-
> tack, in which a court may weigh and "consider evidence outside the
> pleadings." ...

> The District Court here construed the Aspiring Parties' motion to dis-
> miss as a "factual attack" and said that, "to the extent that certain of the
> plaintiffs' jurisdictional allegations are challenged on the facts, those
> claims receive no presumption of truthfulness." ... That was error. The
> Commonwealth filed the attack before it filed any answer to the Com-
> plaint or otherwise presented competing facts. Its motion was therefore,
> by definition, a facial attack. ... (Citations omitted.)

Since Defendants filed their motion prior to answering, the motion constitutes

a facial challenge. They are precluded from relying on information or documents

outside the pleadings in challenging the Court's subject matter jurisdiction.

The standard of review for a motion brought pursuant to Fed. R. Civ. P.

12(b)(6) was set forth in *Directtv, Inc. v. Tyreesh,* 487 F.3d 471 (6th Cir. 2007), as

follows, *id.* at 476:

> "[A] Rule 12(b)(6) motion should not be granted unless it appears be-
> yond doubt that the plaintiff can prove no set of facts in support of his
> claim which would entitle him to relief." ... **In reviewing a motion
> to dismiss, we construe the complaint in the light most favorable to
> the plaintiff, accept its allegations as true, and draw all reasonable
> inferences in favor of the plaintiff.** ... The defendant has the burden
> of showing that the plaintiff has failed to state a claim for relief. ...
> While all the factual allegations of the complaint are accepted as true,

23

"we need not accept as true legal conclusions or unwarranted factual inferences." … (Emphasis added; citations omitted.)

I.   **THE *ROOKER-FELDMAN* DOCTRINE DOES NOT APPLY TO THIS LAWSUIT AND DOES NOT DEPRIVE THE COURT OF JURISDICTION.**

   A.   **It Is Indisputable Selby and Wilson Committed A Fraud On The Court By Committing Perjury And The Subornation Of Perjury.**

The ineluctable fact in this lawsuit is that Selby committed perjury, and Wilson suborned Selby's perjury, in a trial conducted before Judge Connors, a trial in which Judge Connors proceeded to hold a jury trial when Evans' attorney failed to appear and in which he had not granted Evans' motion to represent herself. Since he stated on the record Mr. Castmore was still the attorney of record, Evans had no right under the court rules to represent herself. Moreover, even if she had appeared at the trial, there was nothing she could have done to protect herself against the misrepresentations and perjury committed by Selby, suborned by Wilson – she had no right to object, no right to call witnesses in her defense, no right to offer any evidence in her defense. So the fact she did not appear at the trial is irrelevant.

Rather than adjourn the trial and afford Evans an opportunity to retain new counsel to replace the attorney who had abandoned her, Judge Connors held the jury trial after having first conveyed that he was going to adjourn the trial – as unequivocally indicated by the fact that Wilson had sent his witnesses home, and by the fact that employees in Chief Judge Swartz's office had indicated to Welch that the trial was going to be adjourned, an averment pled in the Complaint which, for purposes

24

of a 12(b)(6) motion must be accepted as true.  It is apparent from the record that Judge Connors reversed his initial decision to adjourn the trial because he was irritated by the conduct of the Defendant's mother, an action of vindictiveness against a party for the conduct of a relative, a vindictive action which violated Evans' right to due process.  *See Wasman v. United States,* 468 U.S. 559 (1984) (A judge violates due process when his decision is motivated out of vindictiveness.)[6]

There is no question Selby committed perjury when he identified the five-page document as the contract between Meadowlark and Evans, when he had signed a Stipulation **approved as to form and substance** admitting the five-page document he claimed was the contract violated Michigan law. The four additional pages which Evans had not seen and had not signed included room exclusions which Meadowlark was declining to perform work on, and which were included in the work change orders for which Meadowlark was charging Evans additional money, but which Evans was refusing to pay for, and for which Meadowlark was claiming Evans had breached the contract. But Meadowlark and Selby stipulated that the contract which they maintained applied to Evans violated two sections of the Michigan Occupational Code. "But once stipulations have been received and approved they are

---

[6] The Michigan Court of Appeals has held that it constitutes an abuse of discretion for a trial judge to proceed to conduct a trial when a party's attorney has failed to appear. *See Zerillo v. Dyksterhouse,* 191 Mich. App. 228 (Mich. Ct. App. 1991); *Bye v. Ferguson,* 138 Mich. App. 196 (Mich. Ct. App. 1984); *see also Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396 (5th Cir. 1981).

sacrosanct. Neither a hearing officer nor a judge may thereafter alter them. … Any

deviation therefrom results in a denial of due process for the obvious reason that

both parties by accepting the stipulation have been foreclosed from making any tes-

timonial or other evidentiary record." *Dana Corp. v. Emp. Security Comm.,* 371

Mich. 107, 110 (Mich. 1963).  In *Longo v. Minchella,* 343 Mich. 373 (Mich. 1955),

the Court observed, *id.* at 377:

> We are of the opinion that the cross bill of complaint was cor-
> rectly dismissed and the motions to set aside and modify the decree
> were correctly denied.  The consent foreclosure decree was a true con-
> sent decree.  It was approved as to form and substance by intervenors'
> attorneys, was labeled as such and was considered and referred to as
> such by all parties.  …  The record before us does not indicate other-
> wise.  There is no claim made that intervenors' consent to the entry of
> the decree was involuntarily given or was the result of fraud, misrepre-
> sentation or mistake.  Therefore the parties cannot attack it or appeal
> from it. …

*See also Scott v. Reif,* 659 F. App'x 338, *4, note 4 (6th Cir. 2016) (unpublished) ("In

Michigan, a stipulation as to form – **rather than form and substance** – concedes

only that the order correctly embodies the ruling of the court.") (emphasis added)

(copy attached as Exhibit 35.)[7]

---

[7] In his motion *in limine,* Wilson made reference to an email which was sent to Selby
by Lone Carignan as a spokesperson for the MDLARA.  (*See* copy of letter, Exhibit
10.)  At the end of the email, Carignan stated, "Also, would you please indicate
whether you are willing to consider resolving this matter with a Consent Order and
payment of a fine, without an admission of guilt on any of the counts?  Please let me
know."  Wilson argued that this offer by Carignan entails that the Consent Order did
not constitute an admission of guilt.  But the Consent Order is separate from the
(Footnote continued.)

26

Given Selby's Stipulation, the five-page document he claimed was the contract, as well as the change orders he claimed were also part of the contract, violated Michigan law, and as such violated public policy, by virtue of which they were void and unenforceable. *See Mahoney v. Lincoln Brick Co.,* 304 Mich. 694 (Mich. 1943); *Federoff v. Ewing,* 386 Mich. 474 (Mich. 1971); *Peeples v. Detroit,* 99 Mich. App. 285 (Mich. Ct. App. 1980).[8]  On p. 2 of their brief, Defendants misleadingly state, "[Plaintiffs'] theory, as pled, is that the Consent Order somehow extinguished Meadowlark's contract, and that it was a 'fraud on the court' for Meadowlark (and Movants as their counsel) to proceed to trial on the contract." This is **not** what Plaintiffs are contending. They are contending that **the Stipulation** Selby signed, approved as

---

Stipulation.  Moreover, nowhere in the Stipulation does it indicate that it is not an admission of guilt, particularly given that it was approved as to form and substance. Wilson cannot incorporate into the Stipulation language which is not there, based on an offer by an employee of MDLARA, an offer which was not reduced to writing in the Stipulation.  Without such qualifying language in the Stipulation, Selby's signing the Stipulation - **approved as to form and substance – was an admission of guilt.** Wilson also argued that the Consent Order was the equivalent of a *nolo contendere* plea in a criminal matter, citing *Lichon v. American In. Co.,* 435 Mich. 408 (Mich. 1990). But as the Court stated, *id.* at 418, a *nolo contendere* plea is expressly inadmissible under MRE 410.  There is no rule of evidence which makes a stipulation approved as to form and substance inadmissible, as demonstrated by *Longo, supra.*
[8] In addition, since Meadowlark elected to sue for breach of a written contract, given that the contract violated Michigan law and was therefore void, it was not entitled to recover either on an implied contract or *quantum meruit* theory.  *See Morris Pumps v. Centerline Piping,* 273 Mich. App. 187 (Mich. Ct. App. 2006); *Belle Isle Grill Corp. v. City of Detroit,* 256 Mich. App. 463 (Mich. Ct. App. 2003); *Mead v. Rehm,* 256 Mich. 488 (Mich. 1932); *Cardillo v. Canusa Extrusion,* 145 Mich. App. 361 (Mich. Ct. App. 1985).

to form and substance, agreeing Counts I and II of the Consent Order were factually and legally correct, extinguished what Selby claimed was the contract, which he later contradicted at trial and thereby committed perjury, suborned by Wilson.

The fact that Wilson filed a motion *in limine* to prevent Castmore from introducing the MDLARA Formal Complaint, the Consent Order and the Stipulation as evidence demonstrates two things (1) he was clearly aware prior to trial that Selby had signed the Stipulation, approved as to form and substance; (2) he appreciated their significance and that they would support both Evans' defense against the breach of contract claim, as well as Evans' counter-claim for unjust enrichment. The fact, moreover, that he succeeded in precluding Castmore from introducing the documents as evidence did not thereby give Wilson free rein to have Selby contradict his own Stipulation by identifying as the contract between Meadolark and Evans the five-page document which he had stipulated violated Michigan law, nor the work change orders which he had also stipulated violated Michigan law. The fact that an attorney succeeds in preventing an opposing counsel from introducing evidence which is detrimental to that attorney's legal position does not mean that the attorney is thereby allowed to have his client commit perjury by denying the substance of the evidence which the attorney has succeeded in excluding. For example, in the context of a criminal trial, suppose the criminal defendant has signed an admission of guilt, and the defense attorney files a motion *in limine* to exclude the confession on the

grounds that his client was not told his Miranda rights, or that admitting the confession would be more prejudicial than probative, and the motion is granted. This does not then allow the defense attorney to put his client on the stand to testify that when the crime was committed he was out of the country on vacation. This would constitute the subornation of perjury, which is precisely what Wilson did.[9]

Notably, nowhere in their brief do Defendants discuss the issue of the perjury and subornation of perjury committed by Selby and Wilson, nor do they dispute that it occurred. This is the central issue in this lawsuit, with significant implications for all of the claims pled in the Complaint, but defense counsel has chosen to ignore it.

Judge Connors, moreover, had seen the Stipulation, since it was attached to the motion *in limine,* yet when Selby identified the very document which he had admitted by signing the Stipulation violated Michigan law, Judge Connors said nothing, did not question Selby or his attorney as to how they could introduce evidence which contradicted the Stipulation. This constitutes circumstantial evidence in support of the civil conspiracy claim alleged in Count IV of the Complaint. *See Dennis v. Sparks,* 449 U.S. 24 (1980).

**B.    The Lawsuit Is Not Barred By The *Rooker-Feldman* Doctrine.**

---

[9]  This conclusion is not invalidated by virtue of the fact that Castmore failed to oppose the motion *in limine.* Castmore's failure to appreciate the legal significance of the MDLARA documents is just another instance of his legal malpractice. It is not a justification for Wilson to then proceed to suborn perjury by Selby.

29

Contrary to Defendants' claim, the *Rooker-Feldman* doctrine does not bar this lawsuit, rather it expressly allows this kind of lawsuit – a lawsuit which challenges the legitimacy of a state court judgment because the judgment was obtained via a fraud on the state court via perjury and the subornation of perjury. This was made clear in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280 (2005), in which the Supreme Court held that the lower courts were improperly applying the *Rooker-Feldman* doctrine to dismiss cases on the purported basis of lack of jurisdiction, when they in fact had jurisdiction. The Court stated, *id.* at 284, 293:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.
>
> * * *
>
> Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law. The Full Faith and Credit Act, 28 U.S.C §1738 … requires the federal court to "give the same preclusive effect to a state-court judgment as another court of that State would give." … Preclusion, of course, is not a jurisdictional matter. See Fed. Rule Civ. Proc. 8(c) (listing res judicata as an affirmative defense). In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in state court.

Nor does §1257 stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. **If a federal plaintiff "present[s] some independent claim, albeit one that denies a legal**

**conclusion that a state court has reached in a case to which he was a party ... then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."** ...(Emphasis added; citations omitted.)

This is precisely the nature of Evans' claim here – she is asserting an independent claim based on the fact that the judgment was obtained by a fraud on the state court, via the commission of perjury during the trail. Courts have recognized the inherent equitable authority of a federal court to correct an injustice perpetrated by the commission of a fraud on a court. Thus in *Hazel-Atlas Co. v. Hartford Co.,* 322 U.S. 238 (1944), the Supreme Court reversed a 1932 judgment 12 years after it had been issued, based on fraud on the court, Justice Black, writing for the majority, stated, *id.* at 244-46:

> Out of deference to the deep-rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. ... But where the occasion has demanded, where enforcement of the judgment is "manifestly unconscionable," ... they have wielded the power without hesitation. Litigants who have sought to invoke this equity power customarily have done so by bills of review or bills in the nature of bills of review, or by original proceedings to enjoin enforcement of a judgment. ... But whatever form the relief has taken in particular cases, the net result in every case has been the same: where the situation has required, the court has, in some manner, devitalized the judgment even though the term at which it was entered had long since passed away.
>
> * * *
>
> Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. **This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately**

31

**planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.** …

\* \* \*

Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.  Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants.  **The public welfare demands that the agencies of pubic justice be not so impotent that they must always be mute and helpless victims of deception and fraud.**  (Emphasis added; citations and footnotes omitted.)

*See also Demjanjuk v. Petrovsky,* 10 F.3d 338, 351-52 (6th Cir. 1993).

Under Michigan law, "A fraud is perpetrated on the court when some material fact is concealed from that court or when some material misrepresentation is made to that court."  *MacArthur v. Miltich,* 110 Mich. App. 389, 391 (Mich. Ct. App. 1981).  Note, *MacArthur* does not state that the material misrepresentation must deceive the court, only that it is made to the court.

None of the cases cited by defense counsel calls for a different result.  In fact, one of the cases which defense counsel cite as supporting their position actually does the opposite – it supports Plaintiffs' position.  The facts in *McCormick v. Braverman,* 451 F.3d 382 (6th Cir. 2006), are convoluted, involving a divorce proceeding extending over 28 years, from 1976-2004. The central issue was who possessed ownership rights to marital real property which the husband had conveyed his interest to the wife via a quitclaim deed in 2004.  The wife in turn conveyed the entire interest to

her three daughters.  When the husband passed away, his estate  argued in state court

that the property belonged to the estate.  This issue percolated for several years in

various Michigan courts, until one of the daughters filed two lawsuits in the United

State District Court for the Eastern District of Michigan.  The District Court dis-

missed both lawsuit, on the basis that in did not have jurisdiction under the *Rooker-*

*Feldman* doctrine.  The Sixth Circuit reversed, stating, *id.* at 392:

> The *Rooker-Feldman* doctrine does not preclude subject matter juris-
> diction in this case of Counts I through V. in Case No. 04-70613 and
> Count III in Case No. 04-70622.  In these counts, Plaintiff does not
> complain of "injuries caused by the state court judgments," …; she does
> not claim that the state court judgments, with respect to Mary's divorce
> and to the order of receivership, in and of themselves violate the federal
> Constitution or federal law, unlike the plaintiffs in *Rooker* and in *Feld-*
> *man.*  Instead, Plaintiff claims that certain Defendants acted illegally
> and that a state statute is unconstitutionally vague and overbroad.  In
> Count I of Case No. 04-70613, Plaintiff claims that Defendants Braver-
> man and McCormick committed fraud and misrepresentation in the di-
> vorce proceedings between Mary and Edward's estate. … In Count III,
> Plaintiff repeats her claim that Defendants Braverman and McCormick
> committed fraud and misrepresentation in the divorce proceedings be-
> tween Mary and Edward's estate. …
>
> None of [Plaintiff's] claims assert an injury caused by the state court
> judgments; Plaintiff does not claim that the state court judgments them-
> selves are unconstitutional or in violation of federal law.  Instead, Plain-
> tiff asserts *independent claims* **that those state court judgments were**
> **procured by certain Defendants through fraud, misrepresentation**
> **or other improper means, and that a state statute is vague and over-**
> **broad**.  Certainly, these independent claims may deny a legal conclu-
> sion of the state court, *i.e.*, the Henry Ruff Property is the sole property
> of Edward's estate; however, this fact does not lead to a divestment of
> subject matter jurisdiction in the federal courts.  Instead, the Supreme
> Court has instructed that preclusion law is the appropriate solution for
> these independent claims.  (Italics in the original; emphasis added.)

33

In *Todd v. Weltman, Weinberg Reis Co., L.P.A.,* 434 F.3d 432 (6th Cir. 2006), the plaintiff was sued for failing to pay for furniture he had purchased.  After the judgment was entered against him, the creditor's attorney filed a garnishment of the plaintiff's social security benefits being deposited in his bank.  As part of the garnishment process, the attorney filed an affidavit with the court which stated, "[T]he affiant has a reasonable basis to believe that the person named in the affidavit as the garnishee may have property, other than personal earnings, of the judgment debtor that is not exempt under the law of this state or the United States." *Id.* at 435.  The affidavit was false, since social security benefits are exempt from garnishment by law.[10]  After the state court initially froze the plaintiff's account, the state court ruled that the social security benefits were exempt.  The plaintiff then filed a lawsuit in federal District Court, claiming that the lawyer had violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e and 1692f.  The defendant filed a motion to dismiss, arguing that the lawsuit was barred by the *Rooker-Feldman* doctrine.  The District Court rejected the motion, and the Sixth Circuit affirmed, stating, *id.* at 437:

> The *Rooker-Feldman* doctrine does not preclude jurisdiction over Plaintiff's claim. Defendant in the instant case claims this Court lacks subject matter jurisdiction because Plaintiff's federal claim is inextricably intertwined with the Ohio state court decision that Defendant's affidavit was valid.  This argument ignores the fact that Plaintiff here does not complain of injuries caused by this state court judgment, as the

---

[10] Notably, Wilson similarly unlawfully garnished Evans' disability benefit payments from the University of Michigan.  *See* Exhibits 20-26.

plaintiffs did in *Rooker* and *Feldman*.  Instead, after the state court judgment, Plaintiff filed an independent federal claim that Plaintiff was injured by Defendant when he filed a false affidavit.  This situation was explicitly addressed by the *Exxon Mobil* Court when it stated that even if the independent claim was inextricably linked to the state court decision, preclusion law was the correct solution to challenge the federal claim, not *Rooker-Feldman. ...* While Defendant is technically correct that this guidance was not essential to the holding on the facts of *Exxon-Mobil,* as that case dealt with parallel state and federal proceedings, the Supreme Court went beyond the facts of the case to give clear instructions to the circuits on how to address additional factual situations.  To follow the reasoning of Defendant would be to ignore these unambiguous directives from the Supreme Court.

As in *McCormick* and *Todd,* Plaintiffs are not contending that the Judgment entered by Judge Connors was itself unconstitutional or violated federal or state law. Based on the evidence which was offered at the trial, the Judgment is perfectly defensible. Plaintiffs are not objecting to the Judgment itself. They are objecting that the evidence which supported it was obtained by a fraud on the court, due to the admission of perjured testimony, suborned by Selby's attorney. This constitutes an independent claim that is not barred by *Rooker-Feldman.*[11]

The cases which Defendants cite are all distinguishable.  In *Yee v. Michigan Supreme Court,* No. 06-cv-15142 (E.D. Mich. 2007), the plaintiff had sued in the

---

[11] *See also Barrow v. Hunton,* 99 U.S. 80, 83  (1878) ("[I]f the proceedings are tantamount to a bill in equity to set aside a decree for fraud in the obtaining thereof, then they constitute an original and independent proceeding[.]"; *Simon v. Southern Railway,* 236 U.S. 115 (1915) (Federal court has equity jurisdiction to overturn judgment obtained in state court via fraud.).

Michigan state courts in order to establish a maximum lake level of Bambi Lake in Shiawassee County, Michigan, on the shore of which his home was located. He maintained that actions by neighbors were increasing the lake level, and thereby damaging his property. He filed several lawsuits in state court, naming different defendants, all of which were dismissed by the trial court, and the dismissal was affirmed by the Michigan Court of Appeals and leave to appeal was denied by the Michigan Supreme Court. He then filed a lawsuit in the United States District Court for the  Eastern District of Michigan, alleging that the various rulings in the state trial court were erroneous, and making a general claim of conspiracy on the part of the judge and various state administrators. He simply rehashed arguments he had made in state court which were rejected. Unlike the instant case, he offered no evidence of fraud or perjury. His federal claims were paradigm examples of the type of claims which the *Rooker-Feldman* doctrine was intended to preclude.

In *Sayyah v. Herman,* Case No. 1:15-cv-326 (S.D. Ohio 2016), the plaintiff had filed a lawsuit in federal court claiming that in a lawsuit in an Ohio state court the judge and others had violated his constitutional rights and engaged in a racketeering enterprise in violation of RICO. In the federal court he claimed the judge magistrate made rulings without the plaintiff's consent. This aberrant lawsuit has no bearing on the applicability of the *Rooker-Feldman* doctrine to the instant lawsuit.

*Smith v. Brown,* Civil Action Case No. 15-2784 (E.D. La. 2016), arose out of

a divorce proceeding in Louisiana state court in which the wife claimed that her husband and his attorney had conspired with the state court judge to fabricate evidence and commit perjury in order to deprive her of her property.  She claimed that her signature on a stipulated agreement had been forged and filed a petition to have the stipulation annulled.  When she lost in the state court, she filed suit in federal court, making the allegations of conspiracy between her former husband, his attorney and the state judge.  While the general terms of conspiracy, fraud and perjury were raised in that case, there is a significant difference between the use of those labels in that case and this case.  In that case the plaintiff was seeking to overturn a stipulation which she claimed she had never signed.  Once the court rejected that argument, under *Rooker-Feldman* the plaintiff could not then simply go into federal court and seek to have that ruling overturned.  Here, however, Evans is not seeking to overturn her own stipulation.  Rather, she is claiming that a Stipulation which Selby signed and accepted as to "form and substance" precluded him from contradicting that Stipulation at trial.  Selby has not claimed that the signature on the Stipulation is not his own or was obtained by fraud.  Instead, he and Wilson's attorneys are ignoring this Stipulation, hoping that this Court, too, will ignore it.[12]

---

[12] This is another example of the Defendants and their attorneys ignoring a basic principle that we were all taught in our first year of law school – that decisions do not just turn on the legal principles which apply to them, but they turn more importantly on the specific facts of the case.  All of the cases which we studied in law
(Footnote continued.)

Contrary to defense counsel's prediction, Plaintiffs' counsel is not going to cite *In re Sun Valley Foods Co.,* 801 F.2d 186 (6th Cir.1986), in support of their position.  Despite the fact that *Sun Valley* was decided before the Supreme Court decision in *Exxon Mobil* was rendered, the Court in *Sun Valley* held that the *Rooker-Feldman* doctrine barred the plaintiff's federal lawsuit, because "A United States district court 'has no authority to review final judgments of a state court in judicial proceedings.' … This is true, even though the state court judgment may have been erroneous." *Id.* at 189.  But in *Sun Valley,* unlike here, there were no allegations that the state court judgment had been procured by perjury and the subornation of perjury, with irrefutable documentary proof that this was the case.

Finally, in *Iannucci v. Michigan,* Case No. 16-cv-10255 (E.D. Mich. 2016), the plaintiff had challenged a child support order entered in state court, and a criminal judgment for failure to pay child support. He filed in federal court seeking to overturn these rulings. The District Judge held the lawsuit was barred by *Rooker-Feldman,* stating, *id.* at *12: "The Complaint does not identify any 'fraud' that led to the entry of the child support order. Instead, the Complaint alleges that the

---

school involved the repetitive use of the same legal principles in different factual contexts.  The outcome was determined by the factual differences in those cases, notwithstanding that the same legal principles were being applied.  In each of the briefs filed by the defense counsel in support of their motions to dismiss, they cite cases, and quote general passages from those cases, without discussing the facts of the cases, as if they apply to this case willy-nilly.

Macomb County Friend of the Court and the Macomb County Circuit Court made legal errors in calculating his child support obligations. … And the Complaint does not identify any fraud that led to the entry of judgment against him in the criminal case. … " Absent such allegations, and proof of such allegations, *Iannucci* is not relevant to this lawsuit. The *Rooker-Feldman* doctrine thus does not preclude the claims pled against Wilson and Howard & Howard.

## II.    THE LAWSUIT IS NOT BARRED BY COLLATERAL ESTOPPEL.

The Michigan Supreme Court explained the doctrine of collateral estoppel in *Monat v. State Farm Ins. Co.,* 469 Mich. 679 (Mich. 2004), as follows, *id.* at 683:

> Generally, for collateral estoppel to apply three elements must be satis-fied: (1) "a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment"; (2) "the same parties must have had a full [and fair] opportunity to litigate the issue"; and (3) "there must be mutuality of estoppel." … "[M]utu-ality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action.  In other words, '[t]he estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him."  (Bracketed words in the original; citations omitted.)

In *Monat,* the Court held that mutuality of estoppel was no longer required if the claim of estoppel was being asserted defensively, as it is by Defendants here. Neither of the remaining prerequisites applies, however. The central factual issue in this lawsuit is whether Selby committed perjury, suborned by Wilson. This factual issue was not "actually litigated and determined by a valid and final judgment."  It

is being raised for the first time in this lawsuit. Nor was the issue regarding Judge Connors' violation of Evans' constitutional rights litigated or discussed on appeal.

Nor did Evans "have … a full [and fair] opportunity to litigate the issue," since she was not afforded time to obtain a new attorney, and she was not allowed to represent herself at the trial. Defendants' claim Evans is at fault for having failed to appear at the trial is specious. There was nothing she could do to defend herself if she had appeared, since Judge Connors ruled Castmore was the attorney of record and he would not grant her motion to represent herself. In the absence of anyone to defend her, Selby and Wilson were permitted to commit perjury and the subornation of perjury. This would hardly qualify as a fair trial. Since no one had objected at trial to the commission of perjury, because no one was at the trial to defend Evans, since Judge Connors refused to allow Evans time to retain a new attorney, and because Judge Connors would not allow Evans to represent herself, the claim Selby had committed perjury, and that Wilson had suborned perjury, could not be raised on appeal, since no objection had been made to preserve it for appeal. *Taskey v. Paquette,* 324 Mich. 143 (Mich. 1949); *Cabana v. City of Hart,* 327 Mich. 287 (Mich. 1950). While the Court of Appeals addressed the issue of whether Judge Connors improperly denied Evans' motion to amend her counter-complaint to add charges of fraud, the fraud claims in question had nothing to do with Selby's and Wilson's acts of perjury, since they had not yet occurred at the time the motion to amend was argued.

40

Defendants make several specious arguments in support of their contention collateral estoppel precludes Evans from raising claims that Selby committed a fraud on the court. First, they focus exclusively on allegations of fraud related to the quality of Meadowlark's work and whether the work was actually done, claims which they assert were addressed by the Court of Appeals and rejected, and therefore may not be raised again in this Court. But this is only one form of fraud on the court which Selby committed. The more serious form of fraud on the court – his commission of perjury by giving testimony which contradicted the Stipulation which he signed and approved as to "form and substance" - was not addressed anywhere in the Court of Appeals' decision.

Defendants then argue that because the trial court granted the motion *in limine,* and that Castmore failed to oppose the motion, a ruling that was affirmed by the Court of Appeals, has bearing on collateral estoppel.  As discussed above, this argument is a red herring.  The fact that the motion *in limine* was not contested by Castmore, and therefore he was precluded form introducing the MDLARA documents in opposition to the Meadowlark's breach of contract claim, or in support of Evans' unjust enrichment counter-claim, did not mean that Selby had the right to commit perjury by contradicting the contents of those documents.

Defendants refer to three briefs which Evans filed in the Michigan Court of Appeals and which are attached as Exhibits D, F, and H to the Defendants' brief.  A

review of these briefs, however, reveals that nowhere in those briefs did Evans assert that Selby committed perjury by identifying the five-page document as the contract between Meadowlark and Evans, testimony which directly contradicted the Stipulation he approved as to form and substance, and that this perjury was suborned by Wilson.  The excerpts from the briefs which Defendants quote on p. 15 of their brief have nothing to do with an allegation that Selby committed perjury.  Likewise, the fact that the Formal Complaint was attached to Evans' brief is not an assertion that Selby committed perjury.  Evans did not raise these issues in her briefs because no objection to the admission of that testimony had been raised at the trial, nor could it have been raised, because there was no attorney at the trial to make such an objection on behalf of Evans.  The fact that Castmore violated his professional obligation to Evans by not appearing at the trial does not legitimize what Selby did by committing perjury, nor Wilson's subornation of that perjury.  In addition, nowhere in the Michigan Court of Appeals decision is the issue of perjury at the trial, or the subornation of perjury, raised or discussed.  Consequently, collateral estoppel does not apply to these issues being raised in this lawsuit.

Defendants' quotation on p. 14 from the *Yee* decision has no bearing on the collateral estoppel issue here, because no claim of fraud on the court or perjury was raised in that case.  The only other case which Defendants cite, *Overseas Motors, Inc. v. Imp. Motors Ltd., Inc.,* 375 F. Supp. 499 (E.D. Mich. 1974), *aff'd,* 519 F.2d

119 (6th Cir. 1975), involved a contract dispute between a United States distributor of foreign cars and the foreign car manufacturers.  When the distributor claimed that the manufacturers had breached their contract and violated American anti-trust laws, the manufacturers demanded arbitration under the contract.  The arbitrator ruled in favor of the manufacturers, and the distributor filed suit in federal court to contest the arbitration decision.  The District Court held that all of the issue which the distributor was raising in the federal lawsuit had already been addressed by the arbitrator, and were therefore barred by collateral estoppel.  The distributor made no claim that the manufacturers had committed a fraud on the arbitrator, or had committed perjury.  This case has no bearing on the issue of collateral estoppel as it relates to this lawsuit. In sum, collateral estoppel does not preclude any of the claims pled against Wilson and Howard & Howard.

## III.   PLAINTIFFS HAVE PLED A COGNIZALBE CLAIM AGAINST THE DEFENDANTS UNDER 42 U.S.C. §1983.

Plaintiffs agree that in order to plead a cognizable claim against the Defendants under 42 U.S.C. §1983 they must demonstrate that the Defendants – particularly Wilson - were state actors.[13]  Defendants acknowledge that one way in which a private citizen can be sued as a state actor is if the private citizen's conduct has been

---

[13] Howard & Howard's liability is derivative of Wilson's liability, since all of Wilson's actions giving rise to his liability arose when he was a partner at Howard & Howard, and therefore qualified as a policy maker for Howard & Howard under *Pembaur v. Cincinnati,* 475 U.S. 469 (1986).

part of a conspiracy with a state actor. In this case, Plaintiffs maintain that the state actor with whom Wilson was involved in a conspiracy was Judge Connors. The Defendants contend that Plaintiffs cannot succeed in making this claim because to do so they are impaled on the horns of the following dilemma: In order for Judge Connors to have been a party to a conspiracy with Wilson, he had to have known about the acts which Wilson committed which Plaintiffs maintain constituted the commission of a fraud on the court, in this case the subornation of perjury. However, an essential element of a fraud on the court, they argue, is that Judge Connors was not aware that a fraud was being committed on him. Therefore, Defendants maintain, Plaintiffs cannot prove this claim.

Despite the cognitive appeal of this argument at first blush, the argument is specious, for the following reasons. The principle behind the concept of a "fraud on the court" is not limited to the court in which the fraud was allegedly committed. As the Supreme Court stated in *Hazel-Atlas Co., supra,* a fraud committed in a trial court via perjury is not just a fraud on the trial court alone; it adversely affects "the integrity of the judicial process" itself and reverberates up through the appellate process to the appellate courts, as it did in *Hazel-Atlas Co.* The 6th Circuit made a similar observation in *Demjanjuk v. Petrovsky, supra,* stating, 10 F.3d at 351-52:

> Fraud on the court is a somewhat nebulous concept usually discussed in civil cases. No court system can function without safeguards against actions that interfere with its administration of justice. This concern must be balanced against the necessity for finality of court judgments,

44

thus, only **actions that actually subvert the judicial process** can be the basis for upsetting otherwise settled decrees.

Professor Moore's definition is frequently cited:

> Fraud upon the court should … embrace that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court **so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication**, and relief should be denied in the absence of such conduct.

7 *Moore's Federal Practice and Procedure* 60.33.  Cases dealing with fraud on the court often turn on whether the improper actions are those of parties alone, or if the attorneys in the case are involved.  As an officer of the court, every attorney has a duty to be completely honest in conducting litigation.  Professor Moore emphasizes this element of fraud in his treatise:

> [W]hile an attorney should represent his client with singular loyalty, that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court.  And when he departs from that standard in the conduct of a case he perpetrates fraud upon a court.
> (Emphasis  added.)

The perjury which Selby committed before Judge Connors, suborned by Wilson, continued to reverberate as a fraud on the Michigan Court of Appeals, and up through the Michigan Supreme Court, because based on that perjury the Court of Appeals accepted Meadowlark's claim that the contract between it and Evans was the five-page document which Selby perjuriously identified as the contract at the trial, and therefore Evans' failure to pay the balance which Selby claimed was still

due under the contract constituted a breach of contract. The continuing effect of the perjury committed before Judge Connors therefore continued to constitute a fraud on the court system up through the Michigan Court of Appeals and the Michigan Supreme Court. Whether Judge Connors was a passive or an active participant in accepting the perjury committed in his courtroom, a fraud on the court was committed on the judicial court system in general.

Even if Judge Connors was a passive participant in accepting the perjury committed by Selby, suborned by Wilson, under Supreme Court precedent this would suffice to render Selby and Wilson as state actors. An analysis of whether Selby and Wilson were rendered state actors by virtue of Judge Connors' conduct and decisions requires a somewhat detailed discussion of the evolution of state action jurisprudence. In *Chapman v. Higbee Co.,* 319 F.3d 825 (6th Cir. 2003), *cert. denied,* 542 U.S. 945 (2004), the Court set forth three traditional tests for determining whether private action may be "fairly attributable to the state." 319 F.3d at 833. They are (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. Plaintiffs maintain the Selby and Wilson qualify as state actors under the symbiotic relationship/nexus test. A seminal case in the evolution of the applicability of this test in the context of a judicial proceeding is *Shelley v. Kraemer,* 334 U.S. 1 (1948), which involved the enforcement of racially restrictive covenants in real estate transactions being conducted by private individuals. The issue had

been raised in state courts in Missouri and Michigan, which had enforced the restric-

tive covenants.  The Missouri lawsuit was filed by Kraemer to prevent the sale of

property covered by a restrictive covenant to Shelley, an African-American.  The

Supreme Court held that voluntary adherence to the restrictive covenants did not

violate the Constitution, stating, *id.* at 13:

> We conclude, therefore, that the restrictive agreements standing alone
> cannot be regarded as violative of any rights guaranteed to petitioners
> by the Fourteenth Amendment.  So long as the purposes of those agree-
> ments are effectuated by voluntary adherence to their terms, it would
> appear clear that there has been no action by the State and the provisions
> of the Amendment have not been violated.

But the issue before the Court was whether a state court could enforce such

restrictive covenants to prevent owners of property covered by the covenants from

selling real estate to African-Americans.  The Supreme Court held that this consti-

tuted state action which violated the Equal Protection Clause, stating, *id.* at 14-20:

> That the action of state courts and judicial officers in their official ca-
> pacities is to be regarded as action of the State within the meaning of
> the Fourteenth Amendment, is a proposition which has long been es-
> tablished by decision of this Court.  That principle was given expression
> in the earliest cases involving the construction of the terms of the Four-
> teenth Amendment. …
>
> * * *
>
> **The short of the matter is that from the time of the adoption of the
> Fourteenth Amendment until the present, it has been the consistent
> ruling of this Court that the action of the States to which the
> Amendment has reference includes action of state courts and state
> judicial officials.**  Although, in construing the terms of the Fourteenth
> Amendment, differences have from time to time been expressed as to
> whether particular types of state action may be said to offend the
> Amendment's prohibitory provisions, it has never been suggested that

state court action is immunized from the operation of those provisions simply because the act is that of the judicial brand of the state government.

\* \* \*

We hold that in granting judicial enforcement of the restrictive agreements in these cases, the States have denied petitioners the equal protection of the laws and that, therefore, the action of the state courts cannot stand.   We have noted that freedom from discrimination by the States in the enjoyment of property rights ws among the basic objectives sought to be effectuated by the framers of the Fourteenth Amendment.   That such discrimination has occurred in these cases is clear.   Because of the race or color of these petitioners they have been denied rights of ownership or occupancy enjoyed as a matter of course by other citizens of different race or color. … (Emphasis added; footnote omitted.)

While the Court held that the state courts had violated the Constitution, it did not address whether by so doing the courts rendered the private citizens who were seeking to enforce the restrictive covenants thereby became state actors.  This question was addressed by subsequently decided Supreme Court decisions.

In *Evans v. Newton,* 382 U.S. 296 (1966), a Georgia Senator, Augustus O. Bacon, devised a tract of land to the Mayor and Council of the City of Macon.  In his will, he specified that the land was to be used as a park for white people only. While the City honored Sen. Bacon's wishes for several years, maintaining its whites only status, but with the passage of time allowed African-Americans to also use the park, recognizing that keeping the public park segregated violated the 14th Amendment.  Members of the Board of Members responsible for administering the park filed suit in state court requesting that the City be removed as trustee and that title in

the property be transferred to private white citizens who would enforce Sen. Bacon's request for segregation. The Georgia court accepted the resignation of City as trustee and appointed three new trustees. Several African-American citizens moved to intervene and appealed the decision to the Georgia Court of Appeals, which affirmed, and then to the Georgia Supreme Court, which also affirmed

The Supreme Court granted *certiorari* and reversed. Citing its decision in *Burton v. Wilmington Parking Authority,* 365 U.S. 715 (1961), the Court stated, 382 U.S. at 299: "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. The action of a city in serving as trustee of property under a private will is an obvious example." The Court proceeded to hold that by virtue of its prior administration, the transfer to the new trustees continued to constitute state action, concluding, *id.* at 302, "[O]n this record we cannot say that the transfer of title *per se* disentangled the park from segregation under the municipal regime that long controlled it."

In *Adickes v. Kress Co.,* 398 U.S. 144 (1970), a white school teacher who was accompanied by African-American students was denied service at a restaurant in Hattiesburg, Mississippi. When she exited the restaurant, she was arrested by a police officer on a charge of vagrancy. She sued the restaurant in federal court under 42 U.S.C. §1983, claiming that by refusing to serve her because she was in the

company of African-Americans, the restaurant had violated the Equal Protection Clause.  She claimed that the restaurant was a state actor on two grounds: (1) that the restaurant was acting in accordance with a state enforced custom of segregating the races; (2) that there was a conspiracy between the restaurant and the police officer.  The District Court granted a directed verdict regarding the first claim in favor of the restaurant after a trial; it dismissed the second claim on summary judgment.  The Supreme Court reversed regarding both rulings, and remanded the case.  Justice Black, in a  concurring opinion, wrote, with respect to the conspiracy claim, *id.* at 176:

> The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide.  In this case petitioner may have had to prove her case by impeaching the store's witnesses and appealing to the jury to disbelieve all that they said was true in the affidavits.  The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases.  The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment.  "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.  Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473 (1962).

In *Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982), the appellee, Edmondson Oil Co., was an oil supplier to the appellant, a lessee operator of a truck stop.  Edmondson sued Lugar in a Virginia state court for failure to pay a debt,

and, pursuant to Virginia law, sought prejudgment attachment of Lugar's property.  The clerk of the state court issued a writ of attachment, which prevented Lugar from accessing his property.  After a hearing, the state judge dismissed the attachment on the basis that Edmondson had failed to establish the requisite grounds for its justification.  Lugar then sued Edmondson in federal court under 42 U.S.C. §1983, charging Edmondson with seizing his property without due process in violation of the 14th Amendment.  The District Court dismissed the lawsuit, holding that Edmondson was not a state actor.  The 4th Circuit Court of Appeals affirmed, on the grounds that, "[A] private party acts under color of state law within the meaning of §1983 only when there is a usurpation or corruption of official power by the private litigant or a surrender of judicial power to the private litigant in such a way that the independence of the enforcing officer has been compromised to a significant degree."  *Id.*  at 926.

The Supreme Court reversed, stating, *id.* at 941:

> [W]e have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a "state actor" for purposes of the Fourteenth Amendment.  The rule in these cases is the same as that articulated in *Adickes v. S. H. Kress Co., ...*

> " 'Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute.  To act "under color" of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents[.]" ...

51

This test has evolved into what has become known as the "entwinement" or "entanglement" test, as set forth in *Brentwood Acad. V. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288 (2001). In *Brentwood,* the question was whether the Tennessee Secondary School Athletic Association ("Association"), a not-for-profit athletic association which regulated interscholastic sports among Tennessee's public and private high schools, was so entwined with the Tennessee State Board of Education as to render it a state actor. The Association had penalized the Brentwood Academy, a private parochial high school, with an alleged recruiting violation, the Academy sued the Association in federal court claiming that the Association was a state actor and had violated the Academy's rights under the 1st and 14th Amendments. The District Court held that the Association was a state actor. The 6th Circuit Court of Appeals reversed. The Supreme Court reversed the 6th Circuit and held that by virtue of the Association's "entwinement" with the State of Tennessee, it was a state actor and therefore subject to the dictates of the 14th Amendment. *See also Wickersham v. City of Columbia,* 48 F.3d 591 (8th Cir. 2007) (A nonprofit organization which sponsored an annual Memorial Day tribute to veterans was so "entangled with the city" that it was a state actor, so that speech restrictions which it implemented at the festival were subject to the protections of the 1st Amendment.)

In *Brucar v. Rubin,* 638 F.2d 987 (7th Cir. 1980), the plaintiff filed a

lawsuit against her brother and her brother's attorneys, alleging that they had

conspired with a state judge to deprive her of her due process rights during a

proceeding to have their mother, Dora Weisberg, declared incompetent and have

her brother appointed conservator of her estate.  There was no allegation, unlike

in *Dennis v. Sparks,* 449 U.S. 24 (1980), that the judge had conspired with the

defendants as reciprocity for a bribe.  The District Court dismissed the lawsuit

for failure to state a claim, ruling that the brother and his attorneys were not state

actors.  The 7th Circuit reversed, stating, *id.* at 993-94:

> The Brucars make five allegations in particular that are sufficient to raise the reasonable inference that Judge Kogut acted in violation of their due process rights because he was corrupted by the defendants. The first and most serious allegation is that Judge Kogut was in private conference with Mr. Rubin just moments before the hearing on Dora Weisberg's competency.  This *ex parte* conference was followed immediately by Judge Kogut's summary finding of incompetency without taking any evidence at all – without, indeed, even bothering to question Dora Weisberg, the alleged incompetent – and his summary appointment of Mr. Weisberg as conservator.  Taken separately, neither the *ex parte* conference nor the summary rulings necessarily show a conspiracy.  But taken together they do acquire suggestive overtones.
>
> The Brucars further contend that the ease with which Mr. Rubin was able to maneuver the August 1977 contempt proceedings into Judge Kogut's courtroom suggests that Judge Kogut must have played an active role in this maneuver.  This suggestion is buttressed by the allegation of the manner in which Judge Kogut rebuffed Mrs. Brucar's objection to the proceedings: rather than merely overrule the objections, he threatened to imprison Mrs. Brucar for raising it.  Concededly, none of these alleged facts is conclusive – or even direct – evidence of a conspiracy between the judge and Messrs. Weisberg, Rubin and Juron. Nonetheless, they do constitute the "overt acts … reasonably related to the promotion of the claimed conspiracy[.]" …

… Conspiracies are ordinarily clandestine, so that proof of them will often be by purely circumstantial evidence.  We believe a fact finder could reasonably conclude on the basis of the Brucars' allegations, "not only that the private party used the state court proceedings to produce a constitutional wrong, but that there was agreement between the party and judge beyond ordinary request and persuasion by the prevailing party, and that the state court judge invidiously used his office to deprive the §1983 plaintiff of a federally protected right." … We hold, therefore, that the Brucar's allegations of conspiracy between Judge Kogut and the defendants are sufficiently specific to state a claim of state action under §1983.  (Footnotes and citations omitted.)

Here there is sufficient circumstantial evidence that Judge Connors' conduct and rulings have sufficient "suggestive overtones" and  were sufficiently entangled with Selby's commission of perjury, suborned by Wilson, such that the latter are rendered state actors.  The most suggestive aspect of this conduct is the fact that Judge Connors saw the Stipulation which Selby had signed and approved as to "form and substance," since the Stipulation and Consent Order were attached as exhibits to the motion *in limine* which Wilson filed.  It must be presumed that Judge Connors reviewed and read all of the exhibits which were attached to that motion prior to ruling on the motion, otherwise how could he rule, including the Stipulation, by virtue of which Selby admitted that the five-page document he claimed constituted the contract between Meadowlark and Evans was in fact not the contract she executed, and that the document Selby claimed was the contract violated Michigan law and was therefore unenforceable.  Likewise, by signing the Stipulation approved as "form and substance,"

54

Selby also acknowledged that none of the additional work orders which he claimed had been agreed to by Evans, were likewise not part of the contract and were not enforceable. It can be assumed, moreover, that Judge Connors appreciated the significance of a Stipulation agreed to as to "form and substance."

Why then, one is compelled to ask, when Wilson, at the trial, asked Selby to identify the five-page document as the contract, and to identify the work orders as designating work which Evans was improperly refusing to pay for (Exhibit 4, pp. 60-74) did Judge Connors not interject and ask Mr. Wilson how he could offer these exhibit when his client had already agreed in a Stipulation approved as to "form and substance" that they were not the contract and violated Michigan law?  Selby was obviously committing perjury, suborned by his attorney, felonies under Michigan law, MCL §750.422, yet Judge Connors said absolutely nothing.  The fact that Evans did not have an attorney present in the courtroom to protect her interests – a circumstance resulting from Judge Connors refusal to adjourn the trial to allow Evans to retain a new attorney - did not mean that Wilson had free rein to introduce whatever evidence he wished, without Judge Connors objecting to the commission of a felony before his very eyes.

Add to this Judge Connors' obvious hostility to Evans' mother, as indicated by his irritation with her protestations on the day of trial, causing him to change his mind about adjourning the trial, and his comment at the hearing on

the appointment of a receiver to the effect that he would never believe anything Ms. Welsh said, and there is sufficient circumstantial evidence that there is something suspicious going on. While, as in *Brucar*, this is not direct evidence of a conspiracy, it is sufficient to constitute adequate circumstantial evidence of an entanglement with Selby and Wilson such that they qualify as state actors, as well as sufficient to deny a motion for dismissal under Rule 12(b)(6), where all reasonable inferences are to be in favor of the non-moving party.

One cannot explain away Judge Connors' failure to note that Selby was committing perjury in his courtroom as due to an oversight, or that he failed to remember the contents of the Stipulation, because, even up to the present day, despite the fact that the evidence that Selby committed perjury, suborned by Wilson, has been presented to him, he has failed to acknowledge it, and has insisted on continuing to enforce the Judgment which was obtained via the perjury and subornation of perjury by granting every motion Matthew Krichbaum has filed in order to collect attorney fees for his work as a receiver in enforcing the Judgment which was void *ab initio.* Thus, at the hearing on Evans' motions to recuse Judge Connors and place a stay on further proceedings regarding Krichbaum's motion to approve his Final Report, the undersigned stated to Judge Connors the following (Exhibit 31, pp. 5-8):

> And you also violated [Evans'] 14th Amendment right to due process by proceeding with the trial. And during that trial – and the documents support this claim, uh, indisputably, uncontestably – Mr. Selby perjured himself because earlier that year on April 21, 2017, Mr. Selby

had signed the stipulation approved as to form and substance and conceded that he had violated Michigan law by claiming before this Court that a five-page document was the contract which had been executed by Ms. Evans.  The Michigan Department of Licensing and Regulations filed a formal complaint against Mr. Selby and his company, Meadowlark Builders.  And in that formal complaint there were four counts.  The first count claimed that the contract that Mr. Selby claimed ws the contract Ms. Evans had signed, uh, was not in fact  a contract because the contract she signed was only one page long and the contract which Mr. Selby purported to be the contract violated Michigan law 'cause it had not been signed by Ms. Evans.

And he also, uh, in the trial offered as evidence change work orders.  Uh, in which he charged Ms. Evans for additional work.  And the Michigan Department of Licensing and Regulatory Affairs found that those change work orders – which he was charging Ms. Evans for – also violated Michigan law because, again, Ms. Evans had not signed them and she was not even aware of them.  Mr. Selby on, uh, April 17th of two thousand – uh, excuse me – April 21, 2017 signed a stipulation not as only to form but as to substance.  And under Michigan law, signing a stipulation as to substance is a concession that what the individual is being charged and accused of is true both as to law and as to fact.  And when Mr. Selby signed that stipulation, he was conceding that the contract – the five-page document he claimed was the contract was not in fact the contract.  That it violated Michigan law and thereby under Michigan law was null and void and unenforceable.

Now, Mr. Wilson was well aware that Mr. Selby had signed that stipulation.  Uh, and I can – I can prove to you that he knew that if you wish me to go into detail but that  - but he knew it.  And yet, at the trail he had Mr. Selby identify the five-page document which Mr. Si – Selby had already stipulated was not the proper contract and violated Michigan law, Mr. Selby identified that document as the contract and it was offered as an exhibit in the absence of any attorney representing Ms. Evans to contradict tis and point out, Your Honor, Mr. Selby is committing perjury, you accepted that exhibit.

Mr. Se – Wilson then had Mr. Selby identify the change work orders.  Which he had included as a basis to file a lien on Ms. Evans' home.  And Mr. Selby again identified those change work orders as part

of the contract and that he was charging Ms. Evans for breach of contract for failing to pay.  Yet, that also contradicted Mrs. – Mr. Selby's stipulation as to form and substance that those change work orders were not part of the contract, had not been signed by Ms. Evans, and violated Michigan law and therefore also were unenforceable and void.

The undersigned proceeded to explain to Judge Connors that since the Judgment which had been obtained via perjury was therefore void *ab initio*, that no receivership should have been created and no receiver appointed.  The undersigned then said the following (Exhibit 31, p. 14):

> Now, in, uh, Mr. Krichbaum's  - uh, and I wanna repeat, Your Honor, under the Canons of Judicial Ethics, if I have demonstrated to you that Mr. Wilson suborned perjury, you have an absolute obligation under Canapa (sic) – Canon of Ethics two or three, sub-(b), sub (2) to do the following.  Sub – no. Sub (3).  A judge should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which a judge may become aware.  Now, I'm making you aware here and now – if you weren't aware of it before – the Mr. Wilson suborned perjury from this – on this Court.  And you have a judicial obligation to report that to Michigan Attorney Grievance Commission.

Judge Connors proceeded to deny the motion to recuse himself, and then, when the undersigned attempted to argue the motion for a stay, cut the undersigned off, stating (*id.* at 19-20):

> THE COURT: Sir, I'm not going to stay the proceedings. It's denied.  Otherwise if –
>
> MR. SUSSELMAN: But you – so, you're making a decision –
>
> THE COURT: - you – you –
>
> MR. SUSSELMAN: - without hearing my oral argument. Is that

what you're saying?

> THE COURT:  Sir, I'm not gonna stay the proceedings.
> Go ahead, Mr. Krichbaum.

There is no question anymore that Judge Connors has been informed, and has been provided the documentation proving, that Selby and Wilson committed perjury and the subornation of perjury in his courtroom on the day of trial – perjury and subornation of perjury which were facilitated by his refusal to adjourn the trial to allow Evans to find a new attorney. Yet he continues to refuse to acknowledge that this occurred, and continues to grant Krichbaum's motions requiring Evans to pay him attorney fees which are the product of a Judgment procured by perjury and the subornation of perjury. This constitutes circumstantial evidence he is, and was, so entangled with the misconduct of Selby and Wilson as to qualify them as state actors.

Defendants' assertion that Plaintiffs have failed adequately to plead the conspiracy claim in Count IV is spurious.  "[W]e have recognized that ... 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson,* 200 F.3d 65, 73 (2d Cir. 1999). "Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Haffner v. Brown,* 983 F.2d 570, 577 (4th Cir. 1992). "The dates on which the particular defendants joined the conspiracy are not alleged, but that is not the kind of information that a plaintiff can be expected to have when she files her complaint." *Loubser v. Thacke,* 440 F.3d 439, 443 (7th Cir. 2006). In

59

*Burkhardt v. United States,* 13 F.2d 841, 842 (6th Cir. 1926), the Court observed:

> It is fundamental that a conspiracy need not be established by direct
> evidence of an unlawful agreement. Its existence may be shown by
> proof of facts from which the logical inference is that the unlawful overt
> acts were committed in furtherance of a common design of the alleged
> conspirators. ... Participation in the formation of the conspiracy was not
> essential ... to culpability. If, after it was formed, [the governmental of-
> ficer] aided or abetted it with an understanding of its purpose, he be-
> came a party to it. **The rule of acquiescence in or failure to prevent
> a conspiracy or criminal act is not sufficient to render one liable ...
> does not apply in every circumstance to one whose duty it is under
> the law to prevent the act. [A]cquiescence may amount to purpose-
> ful furtherance; it may be the deliberate removal of an otherwise
> troublesome obstacle from the path of the law violator and thus be-
> come affirmative cooperation.** (Emphasis added; citations omitted).

Plaintiffs' claim against Wilson and Howard & Howard under 42 U.S.C.

§1983, contrary to their assertion, is not impaled on the horns of a dilemma.  It has

been adequately pled to survive their Rule 12(b)(6) motion.

## IV.    THE PENDENT STATE CLAIMS HAVE BEEN PROPERLY PLED.

Plaintiffs have pled three pendent state claims against Wilson and Howard &

Howard.  They will only survive if Count IV survives.  If Count IV survives, the

pendent state claims have been adequately pled.

### A.    The State Civil Conspiracy Claim Has Been Adequately Pled.

Defendants assert that there can be no unlawful conspiracy "without the com-

mission of acts causing damage."  Obviously.  Here, the damage is obtaining a judg-

ment based on perjury which can be enforced by requiring payments pursuant to the

judgment.  Defendants' citation of *Matley v. Matley,* 243 Mich. App. 100 (Mich. Ct.

App. 200) is inapposite, since, as argued in Argument III, Judge Connors did know the facts constituting the fraud on the court, i.e., the perjury which contradicted the Stipulation which had been attached to the motion *in limine*, but Evans could do nothing to prevent it, since she was not represented by an attorney to make an objection to the perjury, and she was not allowed to represent herself, so the perjury was not known by both parties – Meadowlark and Evans – when it occurred during the trial.  Moreover, there was no way that Evans could bring "the fraud to the attention of the first court" because she was not allowed to represent herself, and therefore could not have made an objection to the perjury even if she had attended the trial.

Defendants' contention that Evans could have sought relief from judgment pursuant to MCR 2.61(C)(1)(c) is specious, since such a motion would have had to have been assigned to Judge Connors, who, as demonstrated by what occurred at the hearing quoted from in Argument III, would have refused to acknowledge that any perjury had occurred.  The right to seek relief from judgment under the Michigan court rule, did not preempt Plaintiffs' right to seek that relief in federal court under 42 U.S.C. §1983. *See Mitchum v. Foster*, 407 U.S. 225 (1972).  The state conspiracy claim is therefore adequately pled to survive Defendants' Rule 12(b)(6) motion.

## B.    The Statutory Conversion Claim Has Been Adequately Pled.

If Count IV survives, then the claim that the Judgment was procured by the perjury and subornation of perjury by Selby and Wilson survives, in which case all

of the monies which Evans was forced to pay Meadowlark, including Wilson's attorney fees, have been unlawfully converted.  On p. 23, Defendants state, "The obvious flaw in Plaintiffs' statutory conversion claim is that Evans *paid* Meadowlark all of the sums of money which she claims were converted."  (Italics in the original.) This is only true of the down-payment she paid Meadowlark prior to their beginning the home improvement.  Everything else she paid pursuant to a fraudulent Judgment, all of which was unlawfully converted, including the interest on the disability payment which Wilson garnished in violation of Michigan law.

### C.    Plaintiffs Have Pled A Viable Claim For Intentional Infliction Of Emotional Distress.

The claim of intentional infliction of emotional distress has been adequately pled.  The Defendants were not insisting on their legal rights in a permissible way when Wilson suborned perjury in order to obtain the Judgment; when he advised Meadowlark not to accept the cashiers checks which Evans and Welch brought to Meadowlark's offices to pay off the construction lien in order to avoid the sale of Evans' home scheduled to occur at the sheriff's sale the next day; when he advised Meadowlark's employees not to give Evans a receipt for the payment; or when Veneste, another Howard & Howard attorney, threatened to sue Evans and Welch for defamation if they failed to retract the true statements they were making about Meadowlark's shabby work and Selby's dishonesty.  All of these actions, taken together,

would cause an average member of the community to exclaim, "Outrageous!"  *See*

*Margita v. Diamond Mortgage Corp.,* 159 Mich. App. 181 (Mich. Ct. App. 1987).

## <u>CONCLUSION AND RELIEF</u>

The Defendants would have this Court believe this is a routine case involving a feckless and pertinacious Plaintiff who simply won't accept that justice has already been done, that she legitimately lost a breach of contact case in a Michigan state court, and that she has come to this Court out of a deluded belief that she has been wronged, that she is no more than a state court loser seeking to undo a just decision obtained in a state court, a decision which has been thoroughly reviewed by the appellate courts of Michigan, and therefore beyond consideration by this Court.

But that is not what this case is about. Emily Evans is burdened for the rest of her life by a debt exceeding $100,000 – a debt that it will take the rest of her life to pay off, if she lives long enough; a debt which keeps growing because the judge who presided over the trial refuses to acknowledge, even today, despite the documentary and testimonial proof which has been laid before him, that the Judgment which he issued was obtained in his courtroom by a witness who committed perjury, suborned by his attorney. By virtue of that perjury and its subornation, Emily Evans is burdened with that debt for the rest of her life, simply because she refused to agree that she owed Selby's home improvement company money for allegedly breaching a contract she never signed, and refusing to pay money for work which was never

done. The fact that Selby committed perjury, suborned by Wilson, has never been reviewed by a Michigan appellate court, because it was never raised, and under Michigan procedural law, could not be raised on appeal, because no one in the court-room on October 2, 2017, objected to the introduction of that perjurious testimony, because there was no one in that courtroom representing the legal interests of Emily Evans, due to the decision by Judge Connors to proceed with the jury trial rather than afford Evans time to obtain a new attorney. As demonstrated above, neither the *Rooker-Feldman* doctrine nor collateral estoppel bars this lawsuit.

On October 2, 2017, Douglas Selby took an oath in a Michigan state court to tell the truth, the whole truth, and nothing but the truth. On that date, in a Michigan court of law, he violated that oath, by testifying that a five-page document was the contract which Evans agreed to, when he had previously signed a legal document, approved as to form and substance, admitting that the five-page document was not the contract which Emily Evans had agreed to, and that that five-page document, and the change orders accompanying it, violated Michigan law, and therefore under Michigan law were void and unenforceable. When Douglas Selby offered that tes-timony, at the invitation of his attorney, Brandon Wilson, Selby lied, prevaricated and committed perjury – all at the invitation of his attorney, Brandon Wilson, an officer of the court.

If the Defendants are correct, that that patently unjust Judgment cannot be

64

undone in a federal court – that a witness can be allowed to lie under oath at the invitation of his attorney, an officer of the court, with impunity, then we have no need of courts, federal or otherwise.  We may as well close the doors of all the courts in this country, because they are operating under a falsehood – that the courts are the last refuge for truth in this country, the place where truth and justice are served.  And the citizens of this country should instead be left to the barbarism of their own resources to resort to obtaining justice by self-help.

Emily Evans believes, and fervently hopes she can continue to believe, that this vision of how the courts in this country operate is a distortion, that that is not how they operate and not how they are supposed to operate.  She is hopeful that justice will, finally, actually prevail in this Court, and that this Court, recognizing the gross injustice which occurred in the Washtenaw County Circuit Court due to perjury and the subornation of perjury, will deny the motion to dismiss filed by Howard & Howard and a former partner of that law firm, Brandon Wilson, an officer of the court, an officer of the court who, on October 2, 2017, irrefutably suborned perjury in a Michigan state court in order to win a lawsuit.

*Fiat Justitia ruat caelum.*

Respectfully submitted,

   /s/  Marc M. Susselman
Marc M. Susselman
Attorney for Plaintiffs

Dated June 17, 2021

65

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2021, I electronically filed with the Clerk of the Court the foregoing document using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Marc  M. Susselman (P29481)
Marc M. Susselman
Attorney for Plaintiffs
