**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

EMILY EVANS and MELANIE WELCH,

     Plaintiffs,

v.                                                    Case No. 21-10575

CITY OF ANN ARBOR, *et al.*,

     Defendants.

_____/

**OPINION AND ORDER DISMISSING PLAINTIFFS' FEDERAL CLAIMS, DIRECTING PLAINTIFFS TO SHOW CAUSE AS TO CLAIMS AGAINST DEFENDANT PMSI, AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PENDENT STATE CLAIMS**

Plaintiff Emily Evans and her mother, Plaintiff Melanie Welch, bring a fifteen-count complaint against individuals and companies that provided Plaintiff Evans electrical and insulation work for her house, lawyers representing those companies and individuals, the City of Ann Arbor, Ann Arbor officials, and judicial officers of the Washtenaw County Circuit Court. (ECF No. 57.) The complaint alleges a wide array of claims that range from federal claims brought under 42 U.S.C. § 1983 to state law claims such as fraud, conversion, intentional infliction of emotional distress, breach of fiduciary duty, negligence, and assault and battery. (*Id.*, PageID.4929-48.)

All Defendants except for Defendant Property Management Specialists, Inc. ("PMSI") have filed a motion to dismiss. (ECF Nos. 80, 86, 88, 91, 93.) Defendants collectively advance a number of grounds for dismissal under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). (*Id.*)

## I. BACKGROUND

In a motion to dismiss, the court accepts a plaintiff's factual allegations as true but makes no overt finding as to truth or falsity. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The following facts are either alleged in Plaintiffs' complaint or otherwise established by the record.[1]

This case stems from an action in Washtenaw County Circuit Court between Defendant Meadowlark—owned by Defendant Douglas Selby—and Plaintiff Evans. (ECF No. 57, PageID.4871.) On August 6, 2015, Plaintiff Evans purchased a home in Ann Arbor, Michigan ("Home"). (*Id.*, PageID.4877-78.) She wanted to obtain a homeowners insurance policy, but the insurance company informed her that she needed proof that "all active knob and tube wiring had been removed from the Home, since such wiring in older homes was considered a fire hazard." (*Id.*) Accordingly, she sought out contractors for the home improvement work; Plaintiff Evans' mother, Plaintiff Welch, helped Plaintiff Evans identify contractors required for such a job. (*Id.*, PageID.4877-78.) Plaintiff Evans contacted Defendant Meadowlark, whose services were listed on Ann Arbor's city website. (*Id.*, PageID.4878.) She made a call to Defendant Dave Anderson, an account manager for Defendant Meadowlark, and Defendant Anderson referred her to Michigan Quality Electric ("MQE"). (*Id.*) According to Plaintiff, the parties agreed that after MQE finished the electrical work in the Home, Defendant Meadowlark would repair the walls. (*Id.*) Defendant Anderson "advised

---

[1]     The court will recount the material facts, as Plaintiffs' complaint spans nearly eighty pages and is accompanied by over 1,000 pages of exhibits.

Welch that it would be a good idea to install insulation in the walls and attic at the time the walls were being repaired, and Welch agreed." (*Id.*)

On November 23, 2015, Defendant Anderson sent an email to Plaintiffs with a proposal for the renovations they had discussed, and Plaintiff Evans "signed a one-page contract with Meadowlark for all the electrical and insulation work to be done for a fixed price contract sum of $50,893." (*Id.*, PageID.4879.) The contract required a deposit of $25,446.00. (*Id.*) In December 2015, Defendant Meadowlark, MQE, and other subcontractors began work on the Home following issuance of the necessary permits. (*Id.*, PageID.4880.) Defendant Meadowlark paid for the permits after receiving the deposit from Plaintiff Evans. (*Id.*) The permits were $225 for electric work and $350 for insulation. (*Id.*)

On January 5, 2016, the Home "passed a rough electric inspection conducted by the City inspector," and the next day Arbor Insulation, a subsidiary of Meadowlark, began the insulation process. The two men who came to the Home indicated it "was their first job" for Arbor Insulation. (*Id.*) According to Plaintiffs, there were "serious issues" with the work. (*Id.*) For example, Plaintiff Welch reached out to Harry Ramsden, the project manager, "asking why the baseboard had not been removed in the upstairs closet with a ten-foot exterior wall, as the baseboards in all of the other walls where insulation was installed had been removed." (*Id.*) Plaintiffs were concerned that the wall was not insulated. (*Id.*) Ramsden reassured Welch that the wall had been filled with insulation from the walls due to the bedrooms on either side being insulated. (*Id.*)

On January 11, 2016, Defendant James Worthington, an inspector for Defendant Ann Arbor, "inspected the Home to confirm that the insulation had been properly

3

installed and issued a pass indicating that it had." (*Id.*) But this proved to be false, according to Plaintiffs. (*Id.*) On June 17, 2016, Defendant Craig Strong, chief inspector for Defendant Ann Arbor, came to the Home and conducted another inspection; he discovered that, behind the relevant wall, there was no insulation. (*Id.*, PageID.4880-81.) At this time, he told Plaintiff Welch that "he believed Ann Arbor should not be issuing permits to conduct insulation work," because he had no way to see inside the walls. (ECF No. 58-1, PageID.5061.)

On January 22, 2016, Plaintiff Welch walked through the Home with Defendant Rob McCrum, an MQE supervisor of the electrical work. (ECF No. 57, PageID.4881.) Plaintiff Welch "pointed to each outlet and fixture, and McCrum verified that each outlet and fixture no longer had knob and tube wiring," but "Welch later learned from a different contractor that there was no way that the fixture had been checked for knob and tube wiring because some were still sealed with old paint." (*Id.*, PageID.4882.) Plaintiff Welch identified other concerns and emailed "many parties" about her concerns. (*Id.*, PageID.4883.)

On February 5, 2016, Plaintiff received a letter from MQE in response to her request for certification that the live knob and tube wiring had been removed from the Home, but Plaintiffs were concerned because it certified that the wiring had been removed only from "open areas." (*Id.*, PageID.4882-83.) On February 10, 2016, Plaintiffs walked through the Home with a new Meadowlark supervisor of the project, Kirk Brandon. (*Id.*, PageID.4883.) Plaintiffs pointed out other problems, and he agreed to remedy the issues. (*Id.*)

4

On February 18, 2016, Defendant Meadowlark and its subcontractors "walked off the job," despite the work being incomplete. (*Id.*, PageID.4883.) Plaintiffs allege that Defendant Meadowlark refused to return to the Home until it had the remaining balance of the contract, $27,918.00. (*Id.*, PageID.4883-84.) Plaintiffs argued that was not the correct remaining balance. (*Id.*) Moreover, Plaintiffs claimed they were "not satisfied" with the work and therefore were not obligated to pay under the terms of their contract. (*Id.*, PageID.4884.)

The following week, Plaintiffs attempted to reach an agreement regarding the home, but Defendant Meadowlark insisted on payment and the signing of a confidentiality agreement before returning to work; Plaintiffs refused these requests. (*Id.*) In addition, Defendant Selby refused "to close the electric permit on the Home," which apparently "prevented Evans from hiring a new company to complete the electrical work." (*Id.*) Plaintiffs claim that "Selby was telling the City that he could not close the permit because he had a contract with Evans, and he would not close the permit unless and until Evans had paid what he claimed she still owed on the contract." (*Id.*) Plaintiff Evans thereafter sent a letter to Defendant Meadowlark, which listed all the deficiencies in the work, informed Defendant Meadowlark that she was terminating the contract, and made clear that the contractors "[were] no longer allowed to enter [Evans'] house." (*Id.*) Plaintiffs changed the locks, and Defendant Ann Arbor consequently closed the permits, allowing her to hire a new contractor to complete the electrical work on the home. (*Id.*)

On or about March 15, 2016, Plaintiffs learned that Defendant McCrum, the supervisor of the project employed by MQE, was not a licensed electrician. (*Id.*,

PageID.4885.) Plaintiff Evans filed a complaint against MQE with the Michigan Department of Licensing and Regulatory Affairs ("LARA") as a result; LARA informed MQE on April 1, 2016, that because its supervisor was not licensed, MQE was in violation of pertinent statutes and subject to civil fines. (*Id.*; ECF No. 58-2, PageID.5211.)

In approximately April 2016, Defendant Meadowlark, through its attorney Brandon Wilson of Howard & Howard, filed a complaint in the Washtenaw County Circuit Court against Plaintiff Evans. (*Id.*, PageID.4888.)  The complaint alleged breach of contract and sought foreclosure of a construction lien. (*Id.*) Attached to the complaint "was a document Meadowlark claimed was the contract between it and Evans. The purported contract consisted of the one-page contract which Evans had signed on November 25, 2015, plus four additional pages which were not attached to the contract which Evans had signed on November 25, 2015." (*Id.*) Plaintiffs filed counterclaims for unjust enrichment, breach of implied covenants, civil conspiracy, and negligence. (*Id.*) The trial court dismissed the counterclaims. (*Id.*, PageID.4889.)

LARA issued a formal complaint against Defendants Meadowlark and Selby for violating various regulations, and attached as an exhibit "the one-page contract which Evans had signed" as well as the four "Scope of Work" pages, which Plaintiffs claim were not part of their contract. (ECF No. 58-3; ECF No. 57, PageID.4889.) On June 13, 2017, LARA entered a consent order. (ECF No. 57, PageID.4890.) In the order, LARA dismissed two counts of the complaint, but it determined that there had been two violations of Michigan's Occupational Code, in part due to the failure to ensure all

agreements with its clients are in writing. (ECF No. 58-3, PageID.5319-20.) Defendants

Meadowlark and Selby signed a stipulation that accompanied that consent order. (*Id.*)

      In approximately July 2017, Defendant Meadowlark amended its complaint in the

state court action against Plaintiffs and included the allegation "Defendant subsequently

agreed to pay Plaintiff to perform additional work on the Project in the amount of

$2,471." (*Id.*, PageID.4893.) Plaintiffs allege that this was a serious problem, calling it a

"fraud on the court." (*Id.*) They explain:

> [A fraud on the court occurred] because [the $2,471] was precisely the
> additional amount for additional work which the MDLARA had charged
> Meadowlark and Selby with violating Michigan law in Count I of the Formal
> Complaint, and had attached the change orders charging those additional
> amounts to the Formal [Complaint] which Evans had not seen and had not
> agreed in writing to pay for, and as to which Selby had signed a
> Stipulation acknowledging that the allegations in Count I of the Formal
> Complaint were true which stated that those charges, and the purported
> contract encompassing them, were unlawful.

(*Id.*, PageID.4894.) Moreover, according to Plaintiffs,

> Meadowlark again committed fraud on the court by attaching to [its
> amended complaint in state court] the one-page contract which Evans had
> signed, plus the four additional pages itemizing the exclusions to the
> scope of work, pages which were not presented to Evans when she
> signed the one-page contract, and which the MDLARA had included in its
> Count I as violating Michigan law, and which again Selby had agreed
> violated Michigan law when he signed the Stipulation.

 (ECF No. 57, PageID.4894.)

      The state court scheduled a jury trial for October 2, 2017. (*Id.*, PageID.4897.) On

September 13, 2017, Defendant Wilson filed a motion *in limine*, requesting exclusion of

particular documents at trial. (*Id.*, PageID.4897.) The motion asked that the state court

preclude Plaintiff Evans from "offering as evidence either the MDLARA Complaint

against Meadowlark, or the Consent Order and Selby's signed Stipulation." (*Id.*) No

response was filed in opposition to the motion, and Judge Connors granted the motion. (*Id.*)

On September 28, 2017, Plaintiff Evans' counsel filed a motion to withdraw as her attorney, while Plaintiff Evans filed an "Emergency Motion To Update Court Records As Of This Date to Show that Emily Evans Is Representing Herself." (*Id.*) Plaintiff Evans' counsel allegedly had "told Evans that he wanted to withdraw from representing her because he did not have sufficient time to prepare for the trial," and that "the only way Judge Connors would allow him to withdraw was if Evans sent him an email terminating him." (*Id.*) Notably, in his motion to withdraw, counsel for Plaintiff stated not that he had insufficient time to prepare for trial, but that he had been terminated as the result of "numerous disagreements . . . which can no longer be resolved." (*Id.*; ECF No. 59-1, PageID.5483-85.)

To the surprise of Plaintiffs, Judge Connors did not rule on either motion. (ECF No. 57, PageID.4897-98.) On October 2, 2017, the date of the trial, neither Plaintiff Evans nor her counsel appeared before the state court. (*Id.*) Judge Connors proceeded with the jury trial and permitted Defendant Meadowlark to put on its case for the jury. (*Id.*, PageID.4897-99.)

During the trial, Defendant Wilson offered an exhibit "as the contract which Evans had purportedly signed," even though it included an additional four pages which she had not signed. (*Id.*, PageID.4899.) But Plaintiffs allege "this was false, and Wilson knew it, because [it] was the same document which had been attached to the Formal Complaint filed by the MDLARA against Selby." (*Id.*) Plaintiffs explain that this contract "was void and unenforceable" because LARA determined it violated Michigan law. (*Id.*,

PageID.4900.) They further allege that by offering an allegedly void document, "Wilson committed a fraud on the court, and he also suborned perjury by Anderson." (*Id.*) Plaintiffs claim that Defendant Selby likewise testified that this document was the contract between the parties, and further used the inspection "passes" to help convince the jury that they did performed their contract. (*Id.*, PageID.4901-03.)

Toward the end of the trial, Plaintiff Welch interrupted the proceedings and asked to testify, but Judge Connors denied her request because she was not a party to the lawsuit and not an attorney. (*Id.*, PageID.4904.) Thereafter, Defendant Meadowlark moved for a default judgment as there had been no opposition to the claims, and Judge Connors granted the motion. (*Id.*, PageID.4904-05.) Judgment was entered on October 30, 2017—Plaintiffs allege that this judgment is "void and unenforceable because it was obtained by committing multiple frauds on the court, and by Wilson suborning perjury by Anderson and Selby." (*Id.*, PageID.4907.) Following a denied motion to set aside the default, Plaintiff Evans, without the help of an attorney, filed an appeal with the Michigan Court of Appeals on December 14, 2017, which was similarly denied, and the Michigan Supreme Court declined to hear her case. (*Id.*) Plaintiffs note they have filed a claim against their state court attorney for legal malpractice and that they, in September 2020, for the first time attempted to remedy any alleged constitutional violations via administrative procedures. (*Id.*; ECF No. 57, PageID.4815.)

Plaintiff Evans, as a result of the default judgment, owed Defendant Meadowlark $27,918.00 for the construction lien. (*Id.*, PageID.4911.) Plaintiffs claim to have satisfied this amount. (*Id.*)

9

On July 30, 2019, "Meadowlark moved to have a receiver appointed over Evans' property in order to generate monies to pay off the balance of the judgment, which, since the construction lien had been paid, consisted solely of Wilson's attorney fees and cost." (*Id.*, PageID.4912.) Defendant Matthew Krichbaum was appointed as the receiver. (*Id.*) The state court allowed Defendant Krichbaum to contract with Defendant PMSI "to lease another property [on Hatcher Crescent] which Evans owned in order to generate income to pay off the balance of the judgment." (*Id.*) Plaintiffs allege, *inter alia*, that "despite requests that Krichbaum and/or the property management company account for any rental receipts obtained from the tenants, Krichbaum has failed and refused to do so" in violation of Michigan law. (*Id.*, PageID.4873.) Plaintiffs also allege that PMSI wrongfully "destroyed its file relating to its management of the property located at Hatcher Crescent," and failed to "repair the damage which the tenants it approved to lease the house caused." (ECF No. 57, PageID.4912-13, 4917.)

## II. STANDARD

Defendants move to dismiss the complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for a failure to state a claim under Rule 12(b)(6). (ECF Nos. 80, 86, 88, 91, 93.)

### A. Rule 12(b)(1)

Rule 12(b)(1) permits parties to seek dismissal of claims for "lack of subject-matter jurisdiction." Such motions "fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (1994). For a facial attack, which concerns the legal sufficiency of the complaint, "the court must take the material

allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Id.* (internal citation omitted).

For an attack against "the factual existence of subject matter jurisdiction[,] . . . no presumptive truthfulness applies to the factual allegations and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (internal citation omitted). "[A] trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat. Life Ins. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). The "[p]laintiff bears the burden of establishing that subject matter jurisdiction exists," and factual findings made by the court to "are reviewed for clear error." *Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014).

### B. Rule 12(b)(6)

Under Rule 12(b)(6), a party can move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When reviewing motions under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "To survive a motion to dismiss, a complaint must contain factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining plausibility is "a context-specific task that requires the reviewing court to

11

draw on its judicial experience and common sense." *Id.* at 679. The plaintiff must present "more than labels and conclusions." *Twombly*, 550 U.S. at 545. "[A] formulaic recitation of a cause of action's elements will not do." *Id.*

When reviewing a motion to dismiss, the court "may not consider matters beyond the complaint." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009). However, the court may consider "documents incorporated into the complaint by reference . . . and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court may also consider "a document that is not formally incorporated by reference or attached to a complaint" when "[the] document is referred to in the complaint and is central to the plaintiff's claim." *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999).

### III. DISCUSSION

As a preliminary matter, Plaintiffs contend that this action was brought pursuant to Federal Rule of Civil Procedure 60(b)(3) and (6), maintaining that there was a "fraud upon the court" in their state court proceedings. (ECF No. 57, PageID.4871; ECF No. 108, PageID.10490.) It appears they alternatively attempt to characterize their lawsuit either as an independent action for relief from judgment or one to set aside a judgment for fraud on the court, though Rule 60(d) is not explicitly mentioned and is alluded to only ambiguously. (*Id.*, PageID.4874.) However, Plaintiffs expressly and unequivocally invoke 42 U.S.C. § 1983 in Counts I–V, seeking compensatory relief against Defendants for particular constitutional violations. (*Id.*, 4929-38.) Moreover, as it pertains to their federal claims, only Count IV bears a minimal relation to a "fraud on the

12

court" claim, while simultaneously alleging that the trial court played a role in the fraud.[2] (ECF No. 57, PageID.4935-37.) Reading their complaint as a whole, it appears Plaintiffs do not bring this as action in equity under Rule 60 to attack a district court judgment; rather, they seem to advance the notion that "a claim of fraud upon the court can be used to recover damages in a § 1983 action for fraud alleged to have occurred in a prior proceeding."[3] *Lewis v. Walke*r, No. 17-6041, 2018 WL 4348063, at *4 (6th Cir. Mar. 15, 2018). The Sixth Circuit has rejected such a proposition. *Id.* (citing *Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1272 (S.D. Fla. 2004) (holding that a plaintiff cannot maintain "an independent action for damages [for fraud upon the court] in a court that is not the one in which the alleged fraud was committed"), *aff'd*, 470 F.3d 1036 (11th Cir. 2006)). Additionally, courts within the Sixth Circuit have held that plaintiffs "may only maintain a fraud upon the court cause of action in the court where the alleged fraud was committed." *Stephens*, 2020 WL 435439, at *8.

---

[2]    Even if Plaintiffs purport to invoke Rule 60(d), it is not clear they can do so when Michigan's state courts provide avenues for bringing fraud to the attention of the courts. *See Stephens v. Nat'l City Corp.*, No. 1:19CV00784, 2020 WL 435439, at *8 (N.D. Ohio Jan. 28, 2020), *reconsideration denied*, No. 1:19-CV-00784, 2020 WL 3096735 (N.D. Ohio June 11, 2020), *aff'd*, No. 20-3746, 2021 WL 3027864 (6th Cir. June 14, 2021) ("Plaintiff may only maintain a fraud upon the court cause of action in the court where the alleged fraud was committed."); *see also Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc.,* No. 14-11358, 2016 WL 2622352, at *2-4 (E.D. Mich. May 9, 2016), *aff'd*, 872 F.3d 336 (6th Cir. 2017).

[3]    To this end, the court notes that Plaintiffs' complaint is often ambiguous as to which of the federal rules and statutes it intends to invoke and therefore—even with the support of their briefing—implicates Rule 8(a)'s requirement for a "short and plain statement of the claim." *See, e.g., Payne v. Secretary of Treasury*, 73 F. App'x. 836, 837 (6th Cir. 2003) (affirming sua sponte dismissal of complaint pursuant to Fed. R. Civ. P. 8(a)(2), and explaining that "[n]either this court nor the district court is required to create Payne's claim for her"); *cf. McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Accordingly, the court construes Plaintiffs' complaint as bringing five federal claims under § 1983. As discussed below, the court will dismiss Plaintiffs' federal claims and decline to exercise supplemental jurisdiction over the remaining pendent state claims.

### A. Counts I, II, & IV

Plaintiffs' claims under Counts I, II, & IV are all subject to dismissal because the statute of limitations period has expired.

Plaintiffs' first federal claim under Count I alleges that the City of Ann Arbor, inspector James Worthington, and chief inspector Craig Strong (collectively "the City Defendants") violated Plaintiff Evans' Fifth and Fourteenth Amendment rights.[4] In particular, they claim "[b]y requiring that Evans purchase a permit in order to have the insulation work done on her Home, knowing that its inspectors could not determine if the work had been done properly by an inspection, the City's requirement that Evans pay $350.00 for a permit" constitutes a taking and a deprivation of due process.[5] (ECF No. 57, PageID.4929-31.) Plaintiff Evans has allegedly suffered additional costs stemming

---

[4]    The parties agree that the claims against Defendants Worthington and Strong in their official capacities are duplicative of suits against the governmental entity and should be dismissed. *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). The court agrees and will address the claims against them in their individual capacities.

[5]    In their response, Plaintiffs clarify there are two "alternative theories of recovery" under Count I: (1) "the requirement that Evans purchase an insulation permit, followed by the City's issuance of a 'pass' without having conducted an appropriate inspection, constituted a taking under the 5th Amendment," and (2) the requirement Evans pay the permit fee without the conducting of the inspection constituted a deprivation of property without due process, in violation of the 14th Amendment and 42 U.S.C. § 1983." (ECF No. 90, PageID.7717.)

from the payment of $350 and emotional distress for which she seeks compensation. (*Id.*, PageID.4931.)

The City Defendants filed a motion to dismiss, arguing, *inter alia*, that Plaintiffs' claims are barred by the applicable Michigan three-year statute of limitations. (ECF No. 80, PageID.7288.) In opposition, Plaintiffs maintain that (1) because the Fifth Amendment Takings Clause claim is brought "directly under" the Fifth Amendment, as opposed to under § 1983, the applicable statute of limitations is six years, not three; and (2) the § 1983 claim for a deprivation of her property interest was timely filed within the applicable three-year statute of limitations. (*See* ECF No. 90, PageID.7717-24.) The court agrees that Count I is time-barred and will dismiss the claim. *See* Mich. Comp. Laws § 600.5805(2).

As an initial matter, Plaintiffs' assertion that they may bring a takings claim "directly under" the Fifth Amendment fails. The Sixth Circuit has "long held that § 1983 provides the exclusive remedy for constitutional violations." *Foster v. Michigan*, 575 F. App'x 377, 391 (6th Cir. 2014) (citing *Thomas v. Shipka*, 818 F.2d 496, 503 (6th Cir. 1987)); *accord Fox v. Cty. of Saginaw*, No. 19-CV-11887, 2021 WL 120855, at *13 (E.D. Mich. Jan. 13, 2021) (dismissing takings claim brought "directly" under Fifth and Fourteenth Amendment, as opposed to under § 1983); *Arkona, LLC v. Cty. of Cheboy*gan, No. 19-CV-12372, 2021 WL 148006, at *8 (E.D. Mich. Jan. 15, 2021); *Grainger v. Cty. of Ottawa*, No. 1:19-CV-501, 2021 WL 790771, at *11 (W.D. Mich. Mar. 2, 2021). Accordingly, both "theories" under Count I—the Fifth Amendment Takings and

Fourteenth Amendment Due Process claims—are subject to the same statute of limitations for § 1983 claims in Michigan.[6]

"Because Congress did not specifically adopt a statute of limitations governing § 1983 actions, 'federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought.'" *Wolfe v. Perry*, 412 F.3d 707, 713-14 (6th Cir. 2005) (quoting *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003)). In Michigan, "the appropriate statute of limitations to be borrowed for § 1983 actions . . . is the state's three-year limitations period for personal injury claims." *Id.*; *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 867 n.8 (6th Cir. 2020) (noting that "§ 1983 claims brought in Michigan are subject to its three-year statute of limitations").

The Sixth Circuit has consistently held that the limitations period for a § 1983 claim begins to run "when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." *See Garza*, 972 F.3d at 867 n.8 (quoting *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996)). *But see Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021) (recognizing that the Sixth Circuit approach for § 1983 accrual presents a "tension" with Supreme Court precedent since federal claims usually accrue when a plaintiff "has a complete cause of action," but ultimately declining to resolve the issue). Based on Plaintiffs' complaint, Plaintiffs' claims against the City Defendants are barred by the statute of limitations because they began to accrue on June 17, 2016, when "[Defendant] Strong poked a hole in one of the walls

---

[6]     Additionally, under Count I, Plaintiffs expressly restate the language of § 1983 in an evident attempt to bring their claims under this statute.

and found there was no insulation behind it." (ECF No. 90, PageID.7721.) At this point, Plaintiffs knew or should have known that their alleged taking and deprivation of due process occurred; indeed, Plaintiffs concede this is the date of accrual as it pertains to their takings claim. (*Id.*) Plaintiffs did not file this lawsuit until March 2021, nearly two years too late. (*See* ECF No. 1.) However, although only addressed in their sur-reply, Plaintiffs alternatively argue that dismissal of Count I based on the statute of limitations would be inappropriate because at the time the action accrued, they could not have filed an action until it exhausted its state law remedies. (ECF No. 106, PageID.10369.)

Before the Supreme Court decided *Knick v. Township of Scott*, *Pennsylvania*, 139 S. Ct. 2162, (2019), a plaintiff could not bring a takings claim in federal court until it sought "compensation through the procedures the State has provided"; the controlling law was that if a state "provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *See Williamson Cty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985), *overruled by Knick*, 139 S. Ct. 2162; *Hensley v. City of Columbus*, 557 F.3d 693, 696 (6th Cir. 2009). As explained by Plaintiffs, Plaintiff Evans' claims arose in 2016 "before *Knick* was decided," and accordingly, she was "required under *Williamson* to pursue her state administrative remedies before filing suit. Had she filed suit before [*Knick*], this Court would have been required to either dismiss the lawsuit, or stay the proceeding."[7] (ECF

---

[7]     *Knick* did not overrule *Williamson*'s requirement that there must be a "final" decision by the government before bringing a takings claim. *See Knick*, 139 S. Ct. at 2169. Plaintiffs briefly argue that their claim did not actually accrue until February 24, 2021, as that is when they received a "final" decision denying their administrative claim. (ECF No. 106, PageID.10371-72.) This theory of "finality" has been expressly rejected

17

No. 106, PageID.10371.) Plaintiffs therefore advance the theory that applying the three-year limitations period would be unjust. (*Id.*, PageID.10372.) Plaintiffs' arguments are unavailing.

First, the "Supreme Court has routinely held that when applying 'a rule of federal law to the parties before it, that rule [becomes] the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule.'" *4th Leaf, LLC v. City of Grayson*, 425 F. Supp. 3d 810, 819 n.9 (E.D. Ky. 2019) (alteration in original) (quoting *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993)). In fact, "[a] new rule is retroactive even if it makes a previously timely action untimely." *Id.* (citing *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995)). Thus, because Plaintiffs filed this action in March 2021 after *Knick*, Plaintiffs were *not* required to exhaust their remedies, and they could have filed this action any time after June 17, 2016, until June 17, 2019, when the statute of limitations was set to expire. *See, e.g.*, *Wireman v. City of Orange Beach*, No. CV 20-00005-KD-B, 2020 WL 5523403, at *6 (S.D. Ala. May 7, 2020) ("Thus, applying *Knick*, Plaintiffs' federal takings claim accrued and ripened at the time of the taking."), *report and recommendation adopted*, No. CV 1:20-00005-KD-B, 2020 WL 3073004 (S.D. Ala. June

---

by the Supreme Court. *See Pakdel v. City & Cty. of San Francisco*, 141 S. Ct. 2226, 2230-31 (2021) (per curiam). In *Pakdel*, the Court explained that the Ninth Circuit's approach to finality, "that a conclusive decision is not 'final' unless the plaintiff also complied with administrative processes in obtaining that decision—is inconsistent with the ordinary operation of civil-rights suits." *Id.* Plaintiffs' alleged injury was the loss of $350—their complaint makes clear that the government had already "reached a conclusive position" in requiring a $350 fee. *See id.* Accordingly, the court rejects Plaintiffs' February 2021 accrual date.

9, 2020). Therefore, "a strict application of the statute of limitations" bars Plaintiffs' claims as untimely. *See Stensrud v. Rochester Genesee Reg'l Transp. Auth.*, 507 F. Supp. 3d 444, 452 (W.D.N.Y. 2020) (noting that where the plaintiffs filed a § 1983 claim after *Knick*, the claims would be time-barred); *see also Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) (citing *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) ("[W]here one can determine from the face of the complaint that the statute of limitations has run, dismissal is appropriate.").

Second, although Plaintiffs do not expressly state it, they appear to contend that the statute of limitations should be tolled to avoid "injustice" because the Supreme Court overturned *Williamson*. (ECF No. 106, PageID.10370-72.) Other courts have framed Plaintiff's precise arguments as a tolling issue as well. *See 4th Leaf*, 425 F. Supp. 3d at 818-21; *Stensrud,* 507 F. Supp. 3d at 452-54; *Wireman*, 2020 WL 5523403, at *6-7; *Honchariw v. Cty. of Stanislaus*, 530 F. Supp. 3d 939, 947-51 (E.D. Cal. 2021). Just as federal courts apply a state's statute of limitations, they similarly apply the state's tolling principles. *See Hardin v. Straub*, 490 U.S. 536, 536-39; *accord Randy's Towing, LLC v. Charter Twp. of Oscoda*, No. 16-10806, 2016 WL 4429620, at *2 (E.D. Mich. Aug. 22, 2016) (citing *Hardin*, 490 U.S. at 539); *Siner v. City of Detroit*, No. 15-13532, 2017 WL 3434085, at *2 (E.D. Mich. Aug. 10, 2017). But Plaintiffs have not presented any Michigan authority as it relates to their taking or due process claims to justify tolling the applicable statute of limitations, and they are therefore "held to the legislatively enacted three-year statute of limitations." *Siner*, 2017 WL 3434085, at *2.

To the extent that Plaintiffs would argue their case qualifies for equitable tolling, the court disagrees. It is not clear equitable tolling exists in Michigan. *Citizens Bank v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* No. 11-CV-14502, 2012 WL 5828623, at *8 n.4 (E.D. Mich. July 6, 2012) (noting that "equitable tolling does not exist" in Michigan); *cf. Chabad-Lubavitch of Michigan v. Schuchman,* 862 N.W.2d 648 (Mich. 2015) (reversing lower court decision "because there are no grounds on which to equitably toll the statute of limitations," where Michigan's "statutory scheme is exclusive"). But even if it did, the authority that recognizes its existence requires that (1) the delay in filing results from confusion about the legal nature of the claim, (2) the confusion was created by the courts, and (3) the delay "does not result simply from the plaintiff's lack of diligence." *See Kucharski v. Leveille*, 526 F. Supp. 2d 768, 772-73 (E.D. Mich. 2007) (collecting Michigan case law to enumerate circumstances where equitable tolling may apply); *Siner*, 2017 WL 3434085, at *3 (quoting *Kucharski*, 526 F. Supp. 2d at 772-73). Plaintiffs concede that the "earliest date Evans discovered the City had taken her $350 without providing just compensation was the date Strong poked a hole in one of the walls and found there was no insulation behind it," on June 17, 2016. But they claim they began seeking out administrative remedies, as required under *Williamson*, on September 18, 2020. (ECF No. 90, PageID.7722.) This was apparently the first time they had attempted to resolve any constitutional claims. Thus, the court finds no evidence that Plaintiffs pursued their rights diligently—they did not attempt to resolve either their takings or due process claims for over *four years*. Plaintiffs cannot sit on their rights, file suit years later, and then benefit from their lack of diligence. *Cf. Harrison v. Montgomery Cty.*, 997 F.3d 643, 649 (6th Cir. 2021) (contemplating that a party's

delay "might implicate a statute of limitations defense," where, before *Knick* was decided, it does "nothing" for months instead of timely invoking state procedures).

Nor is there a basis for the court to apply the "continuing violations" doctrine as Plaintiffs contend. The doctrine "rarely extends . . . to § 1983 actions," and generally is relevant only in two categories of violations: (1) "those alleging serial violations," and (2) "those identified with a longstanding and demonstrable policy of discrimination." *Sharpe v. Cureton*, 319 F.3d 259, 266-67 (6th Cir. 2003). No series of constitutional violations has been alleged. Rather, "one alleged constitutional violation occurred . . . that simply was not reversed." *Ohio Midland, Inc. v. Ohio Dep't of Transp*, 286 F. App'x 905, 912 (6th Cir. 2008) Indeed, if the court accepted Plaintiffs' theory that the government's "taking" of their $350 is a continuing violation until it is reversed, "then all takings would constitute 'continuing violations,' tolling the statute of limitations. There would effectively be no statute of limitations, and the plaintiffs' theory could easily be extended to many other violations outside of the takings context." *Id.* at 912-13. Plaintiffs do not allege continuous unlawful acts, but only a single allegedly unlawful act of "taking" $350 from Plaintiffs. At best, Plaintiffs allege "continual ill effects from an original violation," which falls outside the scope of the continuing violations doctrine. *Broom v. Strickland*, 579 F.3d 553, 555 (6th Cir. 2009) (quoting *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007)).

Even if the statute of limitations did not bar Plaintiffs' § 1983 claims under Count I, Plaintiffs failed to state a claim against the City Defendants.[8] As to Plaintiffs'

---

[8]     It is not entirely clear if Plaintiffs allege that the violation of their rights was the loss of $350 (*See* ECF No. 90, PageID.7723, 7724 n.7) or that they were not given a "proper" inspection of their home for insulation (ECF No. 57, PageID.4930-31 (alleging

allegation that the government took their $350, Plaintiffs' complaint does not state that

the City Defendants took or deprived Plaintiffs of any payment or property. *See*

*Ashcroft*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the *defendant*

*is liable for the misconduct* alleged." (emphasis added)). As the City Defendants point

out, Plaintiffs fail to identify what, if anything, Defendants Worthington or Strong

*personally* did to deprive Plaintiffs of their property. (ECF No. 95, PageID.8178.) Indeed,

they inspected the home as requested by Plaintiffs and did not personally play a role in

taking or retaining any of Plaintiff's money. Rather, the complaint makes clear that

Plaintiffs voluntarily paid a private party—Defendant Meadowlark—for insulation work

pursuant to a contract and at the suggestion of Defendant Meadowlark's agents. (ECF

No. 57, PageID.4878-80.) Then, using funds from a $25,446.00 deposit payment,

Defendant Meadowlark obtained a building permit so that it could begin working on the

Home. While Plaintiff alleges the insulation job was not done "properly" because at least

one wall had not been injected with insulation (*Id.*, PageID.4908), the City Defendants

are simply not implicated—no governmental action required Plaintiffs to move forward

with the insulation work, and it was Defendant Meadowlark who ultimately paid the $350

permit fee, not Plaintiffs. *Cf. Gradisher v. Cty. of Muskegon,* 255 F. Supp. 2d 720, 728

---

that building permits should not be required to have insulation work done if inspectors
"could not determine if the work had been done properly" during an inspection).) The
court construes their complaint as alleging the former. However, even if Plaintiffs
alleged the latter, other courts have found no property interest in a proper insulation
inspection where there is nothing in a municipal ordinance indicating that inspections
are a property interest in itself, as opposed to merely part of the procedure for obtaining
a permit. *See Zahra v. Town of Southold*, 48 F.3d 674, 680-82 (2d Cir. 1995). (*See* ECF
No. 57, PageID.4930 (Plaintiff's allegations that an inspection is "part of the permit
process").)

(W.D. Mich. 2003) ("An individual's voluntary surrender of property to the government precludes a due process claim.") *aff'd,* 108 F. App'x 388 (6th Cir. 2004); *Oberhausen v. Louisville–Jefferson Cty. Metro Gov't*, 527 F. Supp. 2d 713, 725 (W.D. Ky. 2007); *McCarthy v. City of Cleveland*, 626 F.3d 280, 287 (6th Cir. 2010) (McKeague, J., concurring); *accord Manistee Apartments, LLC v. City of Chicago*, No. 14 C 6813, 2015 WL 10853988, at *2 (N.D. Ill. Apr. 3, 2015) ("Relinquishment and deprivation do not mean the same thing."), *aff'd*, 844 F.3d 630 (7th Cir. 2016); *L.L. Nelson Enterprises, Inc, v. Cty. of St. Louis*, 673 F.3d 799, 806 (8th Cir. 2012) ("When a person voluntarily surrenders liberty or property, the State has not *deprived* the person of a constitutionally-protected interest."). Thus, there was neither a *per se* physical taking nor a regulatory taking, in which "a governmental enactment" deprived Plaintiffs of some or all of "productive or economically beneficial use" of their property. *McCarthy*, 626 F.3d at 284 (6th Cir. 2010) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1017 (1992)).

Next, under Count II, Plaintiffs allege under § 1983 that a civil conspiracy existed between Defendants Ann Arbor, Strong, Meadowlark, Selby, Brandon, Anderson, Ramsden, Arbor Insulation, Meadowlark Energy, and Robert Patterson. (ECF No. 57, PageID.4931-33.) Plaintiffs claim that these Defendants conspired to violate her Fifth and Fourteenth Amendment rights. (*Id.*) They make these allegations based on the same facts alleged in Count I and advance the same arguments in response to the statute of limitations defense. Thus, for the reasons explained above, the takings and due process claims under Count II are barred by the statute of limitations.

Moreover, Plaintiffs fail to state a claim for civil conspiracy under Count II. The standard for pleading a § 1983 civil conspiracy claim is "relatively strict," requiring that plaintiffs plead conspiracy claims "with some degree of specificity." *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)). To survive dismissal, a plaintiff must allege facts that, when accepted as true, demonstrate that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (internal quotations omitted). "[V]ague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Id.* (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011)).

Three paragraphs of Plaintiffs' complaint are dedicated to pleading a conspiracy between the Defendants named in Count II:

> 137. The permit for the insulation work to be done by Meadowlark, which subcontracted the work to Meadowlark Energy and Arbor Insulation, was purchased by Meadowlark from the deposit money which Evans had paid to Meadowlark.
>
> 138. Worthington indicated that he gave pass approval for the insulation work based on his trust of Meadowlark, rather than by virtue of confirming that it had in fact been done. Contrary to his and Strong's assertion, there were means available to confirm whether such work had been done, and done properly, via thermography. Worthington's approval based on his trust of Meadowlark constituted a practice utilized by the City to promote Meadowlark's business, whose services it advertises on the City's website.
>
> 139. This practice was contrary to the purpose of requiring that residents purchase permits from the City, which is intended to insure that construction work performed in the City is done properly.

(ECF No. 57, PageID.4932.) It is not clear that a "single plan" existed between any of these Defendants, nor a "conspiratorial objective" to deprive Plaintiffs of any constitutional rights based on these facts, especially where Defendant Strong did in fact conduct an inspection on the permit to ensure any work completed by Defendant Meadowlark was done so properly.[9] (*Id.*, PageID.4880.) The factual statements give rise only to the conclusion that the City Defendants and Defendant Meadowlark have worked with each other in the past—what single plan to deprive constitutional rights exists? Reading the complaint in its entirety, the allegations to support a single plan and conspiratorial are not specific and amount to only vague, conclusory statements that could relate to *any* agreement. Where a plaintiff makes minimal, substantive allegations to support a conspiracy amidst numerous conclusory statements, that plaintiff fails to state a claim. *Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009). The court finds that the complaint, as it pertains to Count II, does not sufficiently state a claim because "it stops short of the line between possibility and plausibility," and at most pleads facts that are merely "consistent with" liability. *Twombly*, 550 U.S. at 557. The court will therefore dismiss Count II.

Count IV is likewise barred by the statute of limitations and fails to state a claim. Count IV alleges, under § 1983, a civil conspiracy between the state trial court, Defendants Meadowlark, Selby, Wilson, and Howard & Howard that violated Plaintiff Evans' substantive and procedural due process rights. Even taking the pertinent

---

[9]    To the extent the alleged constitutional violation is rooted in the mere fact that a "pass" was not revoked, the court discerns no property right in such a concept. *Cf. Zahra*, 48 F.3d at 680-82 (holding no property right in insulation inspection where it is merely part of a procedure to facilitate issuances of permits). Nor do Plaintiffs direct the court to any authority supporting such a proposition.

allegations as true, however, the court agrees with Defendants Meadowlark and Selby that Plaintiffs' constitutional claims in Count IV are barred by the statute of limitations. (ECF No. 91, PageID.8114.) Plaintiffs advance two major arguments in rebuttal: first, that there is no statute of limitations if Plaintiffs invoke Rule 60(b), and second, that the statute of limitations was tolled due to false representations or concealments of material facts. (ECF No. 108, PageID.10490-97.)

First, Plaintiffs argue that no statute of limitations applies to *any* of their claims because they purport to bring this action under Rule 60(b) and that there is no statute of limitations under these circumstances. As a threshold matter, Rule 60(b) cannot be used to set aside a state court judgment. "Rule 60(b) only provides a federal district court with subject matter jurisdiction over requests for relief from the federal district court's own decisions; it does not give the court jurisdiction to relieve a party from state court judgments." *See Mitchell v. Haas*, No. 13-14381, 2013 U.S. Dist. LEXIS 157451, at *2 (E.D. Mich. Nov. 4, 2013) (citing *Holder v. Simon*, 384 F. App'x 669, 669 (9th Cir. 2010)); *Frazier v. Slatery*, No. 19-6483, 2020 WL 9423916, at *3 (6th Cir. May 22, 2020) ("The rule does not authorize the district court to grant relief from a state court judgment."), *cert. denied*, 141 S. Ct. 2611 (2021); *James v. DLJ Mortg. Capital, Inc.*, No. 13-13936, 2015 WL 1119948, at *13 (E.D. Mich. Mar. 11, 2015). Here, Plaintiffs allege discrete constitutional violations, and "there is no authority to support [Plaintiffs'] argument that fraud upon the court can be invoked to overcome the statute of limitations [their] § 1983 claim[s]." *Lewis*, 2018 WL 4348063. Count IV, like Plaintiffs' other constitutional claims, are subject to the statute of limitations for § 1983 actions.

Second, Plaintiffs' argument that the doctrine of equitable estoppel tolls the statute of limitations fails. Plaintiffs point out that in Michigan, this judicially created exception to the "general rule" that the statutory period runs without interruption may apply where one establishes "(1) a false representation or concealment of a material fact, (2) an expectation that the other party will rely on the misconduct, and (3) knowledge of the actual facts on the part of the representing or concealing party." *Cincinnati Ins. Co. v. Citizens Ins. Co.*, 562 N.W.2d 648, 651 (1997). Plaintiffs ground their argument in the fact that Defendant Selby allegedly knowingly committed perjury and that his testimony "was based on an expectation that Plaintiffs would rely on him to tell the truth." (ECF No. 108, PageID.10497.) But absent any "intentional or negligent conduct *designed to induce a plaintiff to refrain from bringing a timely action*," the doctrine of equitable estoppel does not apply. *Doe v. Racette*, 880 N.W.2d 332, 334 (Mich. Ct. App. 2015) (emphasis added) (quoting *Cincinnati Ins. Co.*, 562 N.W.2d at 651). Plaintiffs allege that a perjurious statement occurred at trial, but not one that would have any effect on their ability to file a § 1983 claim for a due process violation.

Accordingly, the only issues that remain are (1) when Plaintiffs knew or had reason to know "that the act providing the basis of his or her injury has occurred," *see Garza*, 972 F.3d at 867 n.8 (quoting *Collyer*, 98 F.3d 211 at 220), and (2) whether Plaintiffs filed within three years of that date. *Wolfe*, 412 F.3d at 714 ("[T]he appropriate statute of limitations to be borrowed for § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims."). Here, Plaintiffs claim that a "civil conspiracy to infringe on Evans' 14th Amendment due process rights" occurred when Defendants Selby and Wilson offered evidence that contradicted a stipulation.

(ECF No. 57, PageID.4936.) Clearly, they had reason to know of this alleged

constitutional violation no later than December 14, 2017, when they filed an appeal of

the breach of contract action. (*Id.*, PageID.4907.) Plaintiffs do not dispute this accrual

date but instead maintain the arguments the court has rejected above. Having filed this

complaint on March 15, 2021, Count IV is barred by the statute of limitations.

In addition, like Count II, the court further finds that Plaintiffs have not sufficiently

stated a claim for civil conspiracy under § 1983. The following is alleged as part of a

conspiracy between Defendants:

> 148. Wilson and Selby obtained their Judgment against Evans by multiple
> instances of committing a fraud on the court by committing perjury and the
> subornation of perjury.

> 149. In so doing, they participated in a conspiracy to subvert the power of
> the court to their ends and as such were acting as state actors under color
> of law.

> 150. Judge Connors' failure to intercede and question Wilson why he was
> offering evidence which contradicted his client's Stipulation which he had
> signed and approved as to form and substance, Judge Connors became
> entangled with Selby's perjury and Wilson's subornation of perjury,
> thereby qualifying Selby and Wilson as state actors

> 151. By his actions in committing a fraud on the court, Wilson, a partner at
> Howard & Howard, was acting as a final policy maker for the law firm, thus
> making Howard & Howard liable for Wilson's actions. . . .

> 153. By their actions as state actors, Selby, Wilson and Howard & Howard
> have violated Evans' procedural due process rights under the Fourteenth
> Amendment and their conduct "shocks the conscience," thereby violating
> her substantive due process rights under the Fourteenth Amendment.

(*Id.*, PageID.4935-36 (internal citations omitted).) What agreement between these

parties took place—especially with Judge Connors? To recap, Plaintiffs allege that

Defendant Selby, through his counsel, committed perjury, and thus participated in a

"conspiracy to subvert the power of the court to their ends." (*Id.*, PageID.4935.) Then,

Judge Connors' *unilateral* failure to intercede somehow "entangled" him with the perjurious statements (*Id.*, PageID.4936), but Plaintiffs make no allegation that Defendants attempted to make an improper agreement with Judge Connors or otherwise coerced him to take part in a corrupt conspiracy. *See Twombly*, 550 U.S. at 556-57 (holding that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *cf. Dennis v. Sparks*, 449 U.S. 24, 28 (1980); *Mikhail v. Kahn*, 991 F. Supp. 2d 596, 645 (E.D. Pa. 2014), *aff'd*, 572 F. App'x 68 (3d Cir. 2014). The court fails to see how a single plan existed with the conspiratorial objective to deprive Plaintiffs of their rights. *See Moldowan*, 578 F.3d at 395 ("Moldowan offers only one substantive factual allegation . . . [but] makes no other allegations of acts taken in furtherance of a conspiracy.").

### B. Counts III & V

Defendant Judges and Defendant Krichbaum argue that, pursuant to the *Rooker-Feldman* doctrine, court lacks subject matter jurisdiction over Plaintiffs' claims against them. (ECF No. 88, PageID.7660; ECF No. 93, PageID.8131.) "The *Rooker-Feldman* doctrine bars lower federal courts from conducting appellate review of final state-court judgments because 28 U.S.C. § 1257 vests sole jurisdiction to review such claims in the Supreme Court." *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012); *see D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). The doctrine does not apply every time there is a prior state court case addressing similar subject matter, and the Sixth Circuit has recently reminded courts

that the doctrine has a limited scope.[10] *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 402 (6th Cir. 2020); *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 389, 394 (6th Cir. 2021) (noting the Supreme Court limited application of the doctrine only to instances where a plaintiff "asserts before a federal district court that a state court judgment itself was unconstitutional or in violation of federal law" or effectively seeks to take a "de facto appeal"). *Rooker-Feldman* does not, for example, bar "a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *VanderKodde* 951 F.3d at 402 (quoting *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005)).

To determine whether a plaintiff seeks review of a state court judgment, in which case a district court would lack jurisdiction, a court must look to the "source of the injury the plaintiff alleges in the federal complaint." *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). "If the source of the plaintiff's injury is the state-court judgment itself, then *Rooker-Feldman* applies." *VanderKodde*, 951 F.3d at 402 (citing *McCormick*, 451 F.3d at 393). "If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Lawrence v. Welch*, 531 F.3d 364, 368-69 (6th Cir. 2008) (quoting *McCormick*, 451 F.3d at 394). Where a plaintiff presents "some independent claim, albeit one that denies a legal conclusion that a state court has

---

[10]    The need to remind lower courts of the doctrine's proper application apparently stems from the overly "broad expansion" of the doctrine, *RLR Invs.*, 4 F.4th at 385, and its "mischief," which has created "needless complications" that distract courts. *VanderKodde*, 951 F.3d at 405 (Sutton, J., concurring). While courts have consistently agreed that *Rooker-Feldman* prevents "a de facto appeal from a state court judgment" in a district court, "[d]etermining what constitutes a forbidden de facto appeal . . . [has] prove[n] difficult." *RLR Invs.*, 4 F.4th at 386 (quoting *Kougasian v. TMSL, Inc.* 359 F.3d 1136, 1139 (9th Cir. 2004)).

reached in a case to which he was a party," a court may still exercise jurisdiction. *McCormick*, 451 F.3d at 393 (quoting *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005)). However, an "important exception" is "that 'if a third party's actions are the product of a state court judgment,' then challenging the acts would be to challenge the judgment itself." *Hancock v. Miller*, 852 F. App'x 914, 921 (6th Cir. 2021) (quoting *McCormick*, 451 F.3d at 394). "A court cannot determine the source of the injury 'without reference to [the plaintiff's] request for relief.'"[11] *VanderKodde*, 951 F.3d at 402 (alteration in original) (quoting *Berry*, 688 F.3d at 299).

In Count III, Plaintiffs bring a federal claim against Defendants Judge Connors and Judge Kuhnke under 42 U.S.C. § 1983. They allege that Judge Connors, as the judge presiding over Plaintiff Evans' trial, violated her First Amendment "right of access to the courts" and her Fourteenth Amendment right to due process when he continued with trial without the presence of Plaintiff or her attorney. (ECF No. 57, PageID.4935.) Plaintiffs seek a declaratory judgment that Judge Connors violated Plaintiff Evans' rights. (*Id.*) They also seek an injunction requiring Judge Kuhnke, as Chief Judge of the

---

[11] Because a court must refer to a plaintiff's requested relief—and since each claim may request a different form of relief—the court must consider whether *an individual claim* is barred by *Rooker-Feldman*, rather than the complaint as a whole. *See In re Isaacs*, 895 F.3d 904, 912 (6th Cir. 2018) ("The *Rooker-Feldman* doctrine is properly applied on a claim-by-claim basis, even though it is jurisdictional in nature."). Other circuits follow this approach as well. *See Behr v. Campbell*, 8 F.4th 1206, 1213 (11th Cir. 2021) ("*Rooker-Feldman*, being a narrow and limited doctrine, requires a more targeted approach. The question isn't whether the whole complaint seems to challenge a previous state court judgment, but whether resolution of each individual claim requires review and rejection of a state court judgment."); *Dorce v. City of New York*, 2 F.4th 82, 94, 101 (2d Cir. 2021) ("With respect to the difficult question of the application of *Rooker-Feldman* to this case, we conclude that some, but not all, of Plaintiffs' claims may proceed.").

Washtenaw County Circuit Court, to "institute procedures to prevent such conduct from happening again against other litigants in the future." (*Id.*)

As a preliminary matter, the claim against Judge Kuhnke must be dismissed because injunctive relief against a judge "shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *Ward v. City of Norwalk*, 640 F. App'x 462, 467 (6th Cir. 2016); *Lawrence v. Pelton*, 413 F. Supp. 3d 701, 711 (E.D. Mich. 2019). Plaintiff's complaint does not address the propriety of declaratory relief as to Judge Kuhnke, but instead seeks only that the court "enjoin . . . [her] to institute" particular procedures. (ECF No. 57, PageID.4835.) Thus, the court will address Count III only as it pertains to Judge Connors, although the analysis is applicable to both.

Judge Connors argues that the court lacks subject matter jurisdiction because the claim is barred by the *Rooker-Feldman* doctrine. But when considering the request for relief of Count III, the source of injury is not the judgment itself. Count III does not allege "that the state court judgments themselves are unconstitutional or in violation of federal law." *McCormick*, 451 F.3d at 392. Rather, Plaintiffs allege Judge Connors violated Plaintiff Evans' constitutional rights by beginning trial without her presence or her attorney's presence. (ECF No. 57, PageID.4934-35.) The decision to do so occurred *before* any "judgment," defined as when "the court 'investigates, declares, and enforces liabilities' based on application of law to fact." *VanderKodde*, 951 F.3d at 402 (quoting *Van Hoven v. Buckles & Buckles, P.L.C.*, 947 F.3d 889, 892 (6th Cir. 2020)).[12] The

---

[12]     For a similar reason, the Meadowlark and Howard & Howard Defendants' assertions that *Rooker-Feldman* applies to all of the allegations against them fail, as

alleged injury under Count III does not allege that "the plaintiff's injury stems from the state-court judgment," but rather stems from alleged wrongful conduct of Judge Connors. *See RLR Invs.*, 4 F.4th at 398. (holding *Rooker-Feldman* divested federal court of jurisdiction where the plaintiff could "only prevail on its § 1983 claims or its constitutional claims if the state court were wrong.") Thus, although Plaintiff Evans is a state court loser, Count III is not "complaining of injuries caused by state-court judgments . . . and inviting district court review and rejection of those judgments." *See id.* (quoting *Exxon*, 544 U.S. at 284)). This is an independent claim that challenges conduct "that had ultimately led to the issuance of a court order," so *Rooker-Feldman* does not apply. *See, e.g.*, *Scharbrough v. S. Cent. Ohio Job & Fam. Servs.*, No. 2:20-CV-4527, 2021 WL 2314848, at *6 (S.D. Ohio June 7, 2021) (citing *VanderKodde*, 951 F.3d at 403).

However, the court is under an ongoing obligation to ensure it does not improperly exercise jurisdiction. *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."); *Williams v. United States*, 927 F.3d 427, 434 (6th Cir. 2019). Although *Rooker-Feldman* does not bar the claims against Judge Connors, a request for declaratory relief under § 1983 may be barred by Article III's case-or-controversy requirement. *See, e.g.*, *Cooper v. Rapp*, 702 F. App'x 328, 333-34 (6th Cir. 2017) (dismissing various constitutional claims against

---

Plaintiffs attack the constitutionality of their actions which ultimately *led up to* a state court judgment.

judicial defendant). In this regard, the Sixth Circuit recently has "question[ed] whether a dissatisfied litigant may *ever* sue an individual state judge in federal court over a decision the state judge rendered after proper adjudication and under their official duties." *Columbia MHC East, LLC v. Stewart*, 815 F. App'x 887, 891 (6th Cir. 2020). While it did not definitively resolve the question, the *Columbia* court at least "doubt[ed]" that plaintiffs can bring particular claims against state court judges in federal court. *Id.*

The Sixth Circuit has favorably cited other circuit court decisions standing for the proposition that "there is usually no case or controversy between judges acting as adjudicators and litigants displeased with litigation outcomes." *McNeil v. Comm. Prob. Servs., LLC*, 945 F.3d 991, 996-97 (6th Cir. 2019) (citing other circuit court cases and noting unpublished Sixth Circuit cases that uphold the same principle). In similar circumstances as those presented to the court, it has affirmed dismissal of claims where judges' alleged unconstitutional actions occurred while acting in their role as adjudicators of a case. *See, e.g.*, *Oliver v. Scorsone*, No. 20-5381, 2020 WL 5959638, at *1-2 (6th Cir. 2020) (citing cases that address the case-or-controversy requirement but ultimately framing dismissal in terms of "judicial immunity"). In *Oliver*, for example, the plaintiff alleged that a state court judge who presided over her case violated her First, Seventh, and Fourteenth Amendment rights by preventing her from recording or broadcasting a hearing in her state court case, failing to comment on or set a date for a jury trial, and allowing certain state court records to go undisclosed or be tampered with. *Id.* at *1. The Sixth Circuit affirmed dismissal of the action, reasoning that the judge "was acting as an adjudicator when he made the decisions [the defendant] now contests." *Id.* at *1-2. And in other cases, where a judge is "not an adversary . . . in the

state-court proceedings," nor "acting as the enforcer or administrator" of a state statute, courts have found that the judge acts only as a "disinterested judicial adjudicator . . . [and] is not amenable to a suit for declaratory relief under § 1983." *See Cooper*, 702 F. App'x at 333-34; *accord Lindke v. Lane*, 523 F. Supp. 3d 940, 960 (E.D. Mich. 2021) ("The Court concludes that there is no Article III case or controversy with respect to Lindke's claims against Judge Lane because Judge Lane's interests here are not adverse to those of Lindke."). The Supreme Court has recently reaffirmed these principles. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532-33 (2021) (holding that while private parties bringing suits under a state statute "may be litigants adverse to the petitioners," the "state-court judges who decide them generally are not").

Here, Plaintiff Evans alleges that Judge Connors' decision to proceed with trial without her lawyer violated her constitutional rights and attacks his decisions as "clearly erroneous." (ECF No. 57, PageID.4893, 4896.) Not only do Plaintiffs' claims quite clearly stem from displeasure with the outcomes of their state court litigation, but Judge Connors' allegedly improper actions were performed as an adjudicator of the state court case. The court sees no Article III case or controversy over which it can properly exercise jurisdiction—including any controversy it would likely need to resolve in the future. To be sure, a judge may be a proper defendant in a suit for declaratory relief where he enforces or administers a statute, such as where he has the authority to initiate proceedings, has been delegated administrative functions, or in some way possesses adverse interests to the litigant. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy,

between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."); *Allen v. DeBello*, 861 F.3d 433, 440-43 (3d Cir. 2017) (finding judges were not proper defendants in a § 1983 suit); *Malhan v. Katz*, 830 F. App'x 369, 370-71 (3d Cir. 2020) (holding a judge's actions in facilitating a trial "were all done in an adjudicative capacity"). But in the present case, as in *Oliver*, Judge Connors "was acting as an adjudicator when he made the decisions [Plaintiff Evans] now contests"—such as continuing on with trial and declining to address Plaintiff Evans' motions. 2020 WL 5959638, at *2. No case or controversy exists, and Plaintiffs' claims against Judge Connors therefore fail. Amplifying this conclusion is the fact, as it pertains to Judge Connors in Count III, that Plaintiff expressly "requested a ruling only on whether the past actions of [Defendant] were right or wrong, which could not affect the present relationship between the parties." *Larry E. Parrish, P.C. v. Bennett*, 989 F.3d 452, 457 (6th Cir. 2021) (affirming dismissal of constitutional claims against state court judges because "the complaint failed to present a justiciable case or controversy"); *cf. Ward*, 640 F. App'x at 467-68 (holding that a suit for declaratory relief against judges in their official capacity "is actionable only to the extent it seeks prospective relief."). Plaintiffs' claims require dismissal because the requested relief essentially amounts to only "an advisory opinion from the district court as to whether [Plaintiffs'] constitutional rights had been violated." *Larry E. Parrish*, 989 F.3d at 457. Count III will be dismissed.

The *Rooker-Feldman* analysis is different as it pertains to Defendant Krichbaum in Count V. Count V alleges that Defendant Krichbaum, as the appointed receiver, violated Plaintiff Evans' rights under the Fifth and Fourteenth Amendment. (ECF No. 57, PageID.4937-38.) Particularly, Plaintiff Evans claims that "[a]ny income which was

obtained from renting Evans' house . . . should be immediately be provided to Evans, and failure to do so will constitute a taking in violation of the 5th Amendment and a deprivation of property without due process in violation of the 14th Amendment." (*Id.*, PageID.4938.) She requests "an injunction dissolving the receivership and canceling all fees which Krichbaum and PMSI claim they are owed" and to further charge Defendant Krichbaum with violating the Fifth and Fourteenth Amendment to the extent he refuses to provide an accounting for the rental income earned at the home. (*Id.*) Plaintiffs' injuries appear to stem from the state court judgment, as illuminated in their response. They contend that, first, Defendant Krichbaum has imposed a lien on her, but "[*i*]*f the Judgment is void*, then that lien and any efforts to collect on the lien constitute an unconstitutional taking of her property in violation of the 5th and 14th Amendments." (ECF No. 111, PageID.11215 (emphasis added).) And, "regarding Evans' request for an accounting of all monies which were generated from the leasing of her Hatcher home," she similarly contends:

> [*I*]*f the Judgment is void* because it was procured by perjury and the subornation of perjury, *then* Krichbaum had no right to lease Evans' property, had no right to use the money generated from the leasing to pay PMSI for its services, and had no right to fail to provide Evans' with an accounting of the rental receipts. *If the Judgment is void*, *then* these actions by Krichbaum constituted an unconstitutional taking of her property as well."

(*Id.*, PageID.11215-16 (emphasis added).)[13]

As it pertains to the claims against Defendant Krichbaum in Count V, Plaintiffs do not actually allege Defendant Krichbaum is the source of their injuries; instead, it is

---

[13] As Plaintiffs make clear, Defendant PMSI is also implicated in Count V. PMSI has not brought a motion to dismiss.

evident that the state court judgment and receivership order are the source of any alleged harm. Indeed, Plaintiffs argue that "[i]t is *from this void judgment*, obtained by the plaintiffs in the underlying lawsuit by committing a fraud on the trial court, *that all of the other claims against the Defendants arise*." (ECF No. 111, PageID.11194 (emphasis added).) While claims against a third party that do not attack the validity of a state court judgment are independent claims, Count V's allegations falls under the "important exception" that where "a third party's actions are the product of a state court judgment," a challenge to the third party's actions is in fact a challenge to the judgment. *Hancock*, 852 F. App'x at 921 (quoting *McCormick*, 451 F.3d at 394). As in *RLR Investments*, Defendant Krichbaum's allegedly problematic actions as a receiver were "a consequence of the [o]rder"; they were not independent, so the court lacks jurisdiction. 4 F.4th at 388-89; *see also McCormick*, 451 F.3d at 395-96 (barring action because the plaintiff alleged the "order of receivership in and of itself [was] illegal and cause[d] [her] harm").

Moreover, regarding Count V, Plaintiffs' briefing expressly clarifies the relief they are requesting, explaining "that the [state court] *judgment was void ab initio*, and *Plaintiffs request that this Court so rule*." (ECF No. 111, PageID.11194 (emphasis added).) This request is unequivocally "complaining of injuries caused by state-court judgments . . . and inviting district court review and rejection of those judgments," particularly where Plaintiffs have already attempted to contest the order appointing a receiver in state court. (*See* ECF No. 58-1, PageID.4950.) *See RLR Invs.*, 4 F.4th at 387 (quoting *Exxon*, 544 U.S. at 284); *Van Hoven*, 947 F.3d at 893. Just as in *Rooker*, Plaintiffs mount a de facto appeal—the court cannot grant their requested relief against

38

Defendant Krichbaum without declaring the state court judgment "null and void," as that is precisely what they request of the court. 263 U.S. at 414; *Welch*, 531 F.3d at 369 (quoting *McCormick*, 451 F.3d at 395) ("[P]laintiff's claim that the probate court's order of receivership violated her constitutional rights because it effected an unlawful seizure was barred [by *Rooker-Feldman*] because 'the count alleges that the state court order itself was illegal and harmed Plaintiff.'"); *Value Manufactured Homes, LLC v. Key Bank, N.A.*, 919 F. Supp. 2d 303, 307 (W.D.N.Y. 2013) ("[T]o the extent that plaintiffs here seek to attack the Michigan State Court's appointment of a receiver, the [*Rooker-Feldman*] doctrine applies and this action is barred.").

   Plaintiffs argue in rebuttal that *Rooker-Feldman* does not apply because the judgment was procured by *other* Defendants' fraud. This argument misses the mark. Relying on *McCormick*, Plaintiffs argue that because "Selby's and Wilson's perjury and subornation of perjury led to the Judgment," his claim against Defendant Krichbaum is not barred by the *Rooker-Feldman* doctrine. (ECF No. 111, PageID.11228.) But the "*Rooker-Feldman* doctrine is properly applied on a claim-by-claim basis." *See In re Isaacs*, 895 F.3d at 912. This requires the court to evaluate the doctrine as applied to Defendant Krichbaum separately. In *McCormick*, for example, *Rooker-Feldman* did not bar the claims against the defendants who allegedly "committed fraud and misrepresentation" during state court proceedings. 451 F.3d at 392. However, the doctrine *did* bar the claims against the receiver who was allegedly "illegally seizing" the plaintiff's assets because the claims complained of injuries caused by the state court judgment. *See id.* In other words, there is no generalized "fraud" exception to the doctrine for which Plaintiffs apparently advocate; the controlling inquiry is the "source of

the injury." *See id.* at 392-94; *accord Iannucci v. State*, No. 16-CV-10255, 2016 WL 4089215, at *4 (E.D. Mich. Aug. 2, 2016) ("[U]nder the most recent on-point holdings of the Supreme Court and Sixth Circuit, a plaintiff may not avoid application of the *Rooker-Feldman* doctrine merely by alleging that the state-court judgment under attack was procured by fraud."), *aff'd*, No. 16-2214, 2017 WL 3951849 (6th Cir. Mar. 22, 2017).

Thus, although the doctrine applies "only to an exceedingly narrow set of cases," *VanderKodde*, 951 F.3d at 400, it is clear from Plaintiff's arguments and Sixth Circuit case law that the source of Plaintiffs' injury is a state court judgment, and their claim constitutes a de facto appeal. Because the court lacks subject matter jurisdiction under *Rooker-Feldman* to consider the claims against Defendant Krichbaum, Defendant Krichbaum will be dismissed.

## C. Defendant PMSI & Pendent State Law Claims

In Count V, Plaintiffs also allege that PMSI "violated Evans' constitutional and statutory rights by" both (1) "destroying its file related to its management of Evans' property located on Hatcher Crescent"—leading to PMSI being unable to account for the losses—and (2) failing to compensate Plaintiff Evans for damage done by tenants to the rental property. (ECF No. 57, PageID.4937-38.) The court discerns several potential problems with this final federal claim. Not only does it bear similarities to those against Defendant Krichbaum, which again implicates *Rooker-Feldman*, the court perceives that dismissal could be warranted due to an absence of state action as required under § 1983 or a failure to state a claim under the Fifth and Fourteenth Amendment. The court will therefore order Plaintiffs to show cause why this claim should not be dismissed on any of these grounds.

Finally, Plaintiffs' remaining claims under Counts VI-XV are based in Michigan state law. As relevant here, district courts may decline to exercise supplemental jurisdiction when the pendent state law claims "substantially predominate[] over the claim or claims over which the district court has original jurisdiction." *See* 28 U.S.C. § 1367(c); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[T]he doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in a manner that most sensibly accommodates a range of concerns and values."). "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 727 (1966).

The "real body" of this case revolves around a failed contractual relationship between Plaintiff Evans and the Meadowlark Defendants and their resulting conflicts. Even if Count V against Defendant PMSI survives, the court finds that the ten state law claims "substantially predominate[] over the . . . claims over which the district court has original jurisdiction," as this constitutional claim is quite distinct from the remaining allegations. Indeed, of the ten remaining state law claims, Defendant PMSI is implicated in only one of them. *See Dietrich v. Simon*, No. 16-2551, 2017 WL 5201919, at *2 (6th Cir. May 17, 2017) (citing 28 U.S.C. § 1367(c)(2)) ("Because Dietrich's complaint alleged only a single federal claim and five state law claims, the state law claims predominated, and the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over them.").

Thus, considering "several factors, including 'values of judicial economy, convenience, fairness, and comity,'" this court will exercise its discretion in declining jurisdiction. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon*, 484 U.S. at 350). The court will give Michigan state courts the opportunity to hear and adjudicate Plaintiffs' claims under their laws, as they are debatable and best suited for courts with specific expertise in state law. Lastly, although potentially inconvenient, dismissal without prejudice would not inflict any fundamental unfairness on either party. *See, e.g.*, *Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439, 448 (Mich. Ct. App. 2018); *see also Roberts v. City of Troy*, 429 N.W.2d 206, 213 (Mich. Ct. App. 1988).

## IV. CONCLUSION

For the foregoing reasons, the court finds that dismissal of all Defendants except for Defendant PMSI is warranted. Accordingly,

IT IS ORDERED that Defendants' motions to dismiss (ECF Nos. 80, 86, 88, 91, 93) are GRANTED. The only surviving federal claim is Count V, specifically as to whether Defendant PMSI violated Plaintiffs' Fifth or Fourteenth Amendment rights through its (1) alleged destruction of Plaintiffs' file of the rental property located on Hatcher Crescent and (2) alleged failure to compensate Plaintiff Evans for damage done by tenants to the rental property.

IT IS FURTHER ORDERED that the "Pendent State Claims" advanced by Plaintiffs under Counts VI-XV are DISMISSED WITHOUT PREJUDICE.

Finally, IT IS ORDERED that Plaintiffs must show cause, in writing, why Count V against Defendant PMSI should not be dismissed by **March 11, 2022.** In its response,

Plaintiffs should address *only* the allegations against Defendant PMSI under Count V.

Defendant PMSI, if it so chooses, may file a reply to Plaintiffs' show cause response by

**March 25, 2022.**


           s/Robert H. Cleland
           ROBERT H. CLELAND
           UNITED STATES DISTRICT JUDGE

Dated:  February 25, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 25, 2022, by electronic and/or ordinary mail.

           s/Lisa G. Wagner
           Case Manager and Deputy Clerk
           (810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\21-10575.EVANS.MotionsToDismiss.MAZ.3.(002)RHC.docx